NUNC PRO TUNC

JUN – 2 2008

FILED

2008 JUN -5 AM 11: 46

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ CNH DEPUTY

1  James-Francis: Murphy
2  In Care of Postal Department 234277
3  Encinitas, California 92023-4277
4  Tel. No. - 760-230-2868
5   In Propria  Persona ( not Pro Se)
6

7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,        )    Case No. – 08 CR 1196 W
12          Plaintiff                )
13              v.                    )
14  JAMES FRANCIS MURPHY,            )    Memorandum of Federal
15          Defendant                )    Jurisdiction Limitations
16  _____     )    Points and Authorities
17  James-Francis: Murphy            )    of Law
18  Real Party in Interest           )    MO. ARG. 6/16/08 @ 2 PM
19  Third Party Intervener           )
20  Authorized Representative        )
21  _____     )
22

23              **FEDERAL JURISDICTION LIMITATIONS**

24  1. In the United States, there are two separate and distinct jurisdictions, one being

25     that of the States within their own territorial boundaries and the other being

26     federal jurisdiction. Broadly speaking, state jurisdiction encompasses the

27     legislative power to regulate, control and govern real and personal property,

28     individuals and enterprises within the territorial limits of any given State.

29

30  2. In contrast, federal jurisdiction is extremely limited, with the same being

31     exercised only in areas external to state legislative power and territory.

Notwithstanding the clarity of this simple principle, the line of demarcation between these two jurisdictions and the extent and reach of each has become somewhat blurred due to popular misconceptions and the efforts expended by the federal government to conceal one of its major weaknesses. Only by resorting to history and case law can this obfuscation be clarified and the two distinct jurisdictions be readily seen.

3. The original thirteen colonies of America were each separately established by charters from the English Crown. Outside of the common bond of each being a dependency and colony of the mother country, England, the colonies were not otherwise united. Each had its own governor, legislative assembly and courts, and each was governed separately and independently by the English Parliament.

4. The political connections of the separate colonies to the English Crown and Parliament descended to a rebellious state of affairs as the direct result of Parliamentary acts adopted in the late 1760's and early 1770's. Due to the real and perceived dangers caused by these various acts, the First Continental Congress was convened by representatives of the several colonies in October, 1774, and its purpose was to submit a petition of grievances to the British Parliament and Crown. By the Declaration and Resolves of the First Continental Congress, dated October 14, 1774, the colonial representatives labeled these Parliamentary acts of which they complained as "impolitic, unjust, and cruel, as well as unconstitutional, and most dangerous and destructive of American rights;" but further, they asserted that these acts manifested designs, schemes and plans "which demonstrate a system formed to enslave America."

5. Matters grew worse and between October 1775, and the middle of 1776, each of the colonies separately severed their ties and relations with England, and several adopted constitutions for the newly formed States. By July 1776, the

exercise of British authority in all of the colonies was not recognized in any degree. The capstone of this actual separation of the colonies from England was the more formal Declaration of Independence.

6. The legal effect of the Declaration of Independence was to make each new State a separate and independent sovereign over, which there was no other government of superior power or jurisdiction. This was clearly shown in M'Ilvaine v. Coxe's Lessee, 8 U.S. (4 Cranch) 209, 212 (1808), where it was held:

"This opinion is predicated upon a principle which is believed to be undeniable, that the several states which composed this Union, so far at least as regarded their municipal regulations, became entitled, from the time when they declared themselves independent, to all the rights and powers of sovereign states, and that they did not derive them from concessions made by the British king. The treaty of peace contains a recognition of their independence, not a grant of it.

7. From hence it results, that the laws of the several state governments were the laws of sovereign states, and as such were obligatory upon the people of such state, from the time they were enacted." The consequences of independence was again explained in Harcourt v. Gaillard, 25 U.S. (12 Wheat.) 523, 526, 527 (1827), where the Supreme Court stated:

"There was no territory within the United States that was claimed in any other right than that of some one of the confederated states; therefore, there could be no acquisition of territory made by the United States distinct from, or independent of some one of the states.

"Each declared itself sovereign and independent, according to the limits of its territory.

8. "[T]he soil and sovereignty within their acknowledged limits were as much theirs at the declaration of independence as at this hour." Thus, unequivocally, in July 1776, the new States possessed all sovereignty, power, and jurisdiction over all the soil and persons in their respective territorial limits. This condition of supreme sovereignty of each State over all property and persons within the borders thereof continued notwithstanding the adoption of the Articles of Confederation. Article II of that document declared:

"Article II. Each state retains its sovereignty, freedom, and independence, and every Power, Jurisdiction and right, which is not by this confederation expressly delegated to the United States, in Congress assembled."

As the history of the confederation government demonstrated, each State was indeed sovereign and independent to such a degree that it made the central government created by the confederation fairly ineffectual. These defects of the confederation government strained the relations between and among the States and the remedy became the calling of a constitutional convention.

9. The representatives which assembled in Philadelphia in May 1787, to attend the Constitutional Convention met for the primary purpose of improving the commercial relations among the States, although the product of the Convention was more than this. But, no intention was demonstrated for the States to surrender in any degree the jurisdiction so possessed by them at that time, and indeed the Constitution as finally drafted continued the same territorial jurisdiction of the States as existed under the Articles of Confederation. The essence of this retention of state jurisdiction was embodied in Art. I, § 8, cl. 17 of the U.S. Constitution, which defined federal jurisdiction as follows:

"To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the

Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings."

The reason for the inclusion of this clause in the Constitution is obvious. Under the Articles of Confederation, the States retained full and complete jurisdiction over lands and persons within their borders. The Congress under the Articles of Confederation was merely a body, which represented and acted, as agents of the Separate States for external affairs, and it had no jurisdiction within the States. This defect in the Articles made the Confederation Congress totally dependent upon any given State for protection and this dependency did in fact cause embarrassment for that Congress.

10.     During the Revolutionary War while the Congress met in Philadelphia, a body of mutineers from the Continental Army surrounded the Congress and chastised and insulted its members. The governments of both Philadelphia and Pennsylvania proved themselves powerless to remedy this situation, so Congress was forced to flee first to Princeton, New Jersey, and finally to Annapolis, Maryland.

11.     Thus, this clause was inserted into the Constitution to give jurisdiction to Congress over its capital, and such other places, which Congress might purchase for forts, magazines, arsenals and other needful buildings wherein the State ceded jurisdiction of such lands to the federal government. Other than in these areas, this clause of the Constitution did not operate to cede further jurisdiction to the federal government, and jurisdiction over those areas, which had not been so ceded, remained within the States.

12.    While there had been no real provisions in the Articles, which permitted the Confederation Congress to acquire property and possess exclusive jurisdiction over that property, the above clause filled an essential need by permitting the federal government to acquire land for the seat of government and other purposes from certain of the States. These lands were deemed essential to enable the United States to perform the powers delegated by the Constitution, and a cession of lands by any particular State would grant exclusive jurisdiction of them to Congress. Perhaps the best explanations for this clause in the Constitution were set forth in Essay No. 43 of The Federalist, "The indispensable necessity of complete authority at the seat of government carries its own evidence with it. It is a power exercised by every legislature of the Union, I might say of the world, by virtue of its general supremacy. Without it not only the public authority might be insulted and its proceedings interrupted with impunity, but a dependence of the members of the general government on the State comprehending the seat of the government for protection in the exercise of their duty might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy. This consideration has the more weight as the gradual accumulation of public improvements at the stationary residence of the government would be both too great a public pledge to be left in the hands of a single State, and would create so many obstacles to a removal of the government, as still further to abridge its necessary independence. The extent of this federal district is sufficiently circumscribed to satisfy every jealousy of an opposite nature. And as it is to be appropriated to this use with the consent of the State ceding it; as the State will no doubt provide in the compact for the rights and the consent of the citizens inhabiting it; as the inhabitants will find sufficient inducements of interest to become willing parties to the cession; as they will have had their voice in the election of the government which is to exercise authority over them; as a municipal legislature for local purposes, derived from their own suffrages, will of course be allowed them; and as the

authority of the legislature of the State, and of the inhabitants of the ceded part of it, to concur in the cession will be derived from the whole people of the State in their adoption of the Constitution, every imaginable objection seems to be obviated.

13.    "The necessity of a like authority over forts, magazines, etc., established by the general government, is not less evident.

14.    The public money expended on such places, and the public property deposited in them, require that they should be exempt from the authority of the particular State. Nor would it be proper for the places on which the security of the entire Union may depend to be in any degree dependent on a particular member of it. All objections and scruples are here also obviated by requiring the concurrence of the States concerned in every such establishment." Since the ratification of the present U.S. Constitution, the U.S. Supreme Court and all lower courts have had many opportunities to construe and apply this clause of the Constitution.  The essence of all these decisions manifests a legal principle that the States of this nation have exclusive jurisdiction of property and persons located within their borders, excluding such lands and persons residing thereon which, have been ceded to the United States.

15.    Perhaps one of the earliest decisions on this point was United States v. Bevans, 16 U.S. (3 Wheat.) 336 (1818), which involved a federal prosecution for a murder committed on board the Warship, Independence, anchored in the harbor of Boston, Massachusetts. The defense complained that only the state had jurisdiction to prosecute this crime and argued that the federal circuit courts had no jurisdiction of this crime supposedly committed within the federal government's admiralty jurisdiction. In argument before the Supreme Court, counsel for the United States admitted as much: "The exclusive jurisdiction which the United States have in forts and dock-yards ceded to them, is derived

from the express assent of the states by whom the cessions are made. It could be derived in no other manner; because without it, the authority of the state would be supreme and exclusive therein," Id., at 350-51. In holding that the State of Massachusetts had jurisdiction over this crime, the Court held:

16.    "What, then, is the extent of jurisdiction which a state possesses?

17.    "We answer, without hesitation, the jurisdiction of a state is co-extensive with its territory; co-extensive with its legislative power," Id., at 386-87."The article which describes the judicial power of the United States is not intended for the cession of territory or of general jurisdiction. Congress has power to exercise exclusive jurisdiction over this district, and over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings.

18.    "It is observable that the power of exclusive legislation (which is jurisdiction) is united with cession of territory, which is to be the free act of the states. It is difficult to compare the two sections together, without feeling a conviction, not to be strengthened by any commentary on them, that, in describing the judicial power, the framers of our constitution had not in view any cession of territory; or, which is essentially the same, of general jurisdiction," Id., at 388. The Court in thus established a principle that federal jurisdiction extends only over the areas wherein it possesses the power of exclusive legislation, and this is a principle incorporated into all subsequent decisions regarding the extent of federal jurisdiction. To hold otherwise would destroy the purpose, intent and meaning of the entire U.S. Constitution.

19.    The decision in Bevans was closely followed by decisions made in two state courts and one federal court within the next two years.

20.    In Commonwealth v. Young, Brightly, N.P. 302, 309 (Pa. 1818), the Supreme
Court of Pennsylvania was presented with the issue of whether lands owned by
the United States for which Pennsylvania had never ceded jurisdiction had to be
sold pursuant to state law. In deciding that the law of Pennsylvania exclusively
controlled this sale of federal land, the Court held:

21.    "The legislation and authority of congress is confined to cessions by
particular states for the seat of government, and purchases made by consent of
the legislature of the state, for the purpose of erecting forts. The legislative
power and exclusive jurisdiction remained in the several states, of all territory
within their limits, not ceded to, or purchased by, congress, with the assent of
the state legislature, to prevent the collision of legislation and authority
between the United States and the several states." A year later, the Supreme
Court of New York was presented with the issue of whether the State of New
York had jurisdiction over a murder committed at Fort Niagara, a federal fort. In
People v. Godfrey, 17 Johns. 225, 233 (N.Y. 1819),that court held that the fort
was subject to the jurisdiction of the State since the lands therefore had not
been ceded to the United States:

"To oust this state of its jurisdiction to support and maintain its laws, and to punish
crimes, it must be shown that an offense committed within the acknowledged
limits of the state, is clearly and exclusively cognizable by the laws and courts of
the United States. In the case already cited, Chief Justice Marshall observed, that to
bring the offense within the jurisdiction of the courts of the union, it must have
been committed out of the jurisdiction of any state; it is not (he says,) the offence
committed, but the place in which it is committed, which must be out of the
jurisdiction of the state."

24. The decisional authority upon which this court relied was United States v.
Bevans, supra. At about the same time that the New York Supreme Court rendered

its opinion in Godfrey, a similar fact situation was before a federal court, the only difference being that the murder was committed on land which had been ceded to the United States. In United States v. Cornell, 25 Fed.Cas. 646, 648, No. 14,867 (C.C.D.R.I. 1819), the court held that the case fell within federal jurisdiction:

"But although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction or sovereignty of such State over the lands so purchased. It remains until the State has relinquished its authority over the land either expressly or by necessary implication.

"When therefore a purchase of land for any of these purposes is made by the national government, and the State Legislature has given its consent to the purchase, the land so purchased by the very terms of the constitution ipso facto falls within the exclusive legislation of Congress, and the State jurisdiction is completely ousted."

22.    Nearly 18 years later, the U.S. Supreme Court was again presented with a case involving the distinction between state and federal jurisdiction. In New Orleans v. United States, 35 U.S. (10 Pet.) 662, 737 (1836), the United States claimed title to property in New Orleans likewise claimed by the city. After holding that title to the subject lands was owned by the city, the Court addressed the question of federal jurisdiction:

"Special provision is made in the Constitution for the cession of jurisdiction from the States over places where the federal government shall establish forts or other military works.

23.    And it is only in these places, or in the territories of the United States, where it can exercise a general jurisdiction." In New York v. Miln, 36 U.S. (11 Pet.) 102

(1837), the question before the Court involved an attempt by the City of New York to assess penalties against the master of a ship for his failure to make a report regarding the persons his ship brought to New York. As against the master's contention that the act was unconstitutional and that New York had no jurisdiction in the matter, the Court held:

"If we look at the place of its operation, we find it to be within the territory, and, therefore, within the jurisdiction of New York. If we look at the person on whom it operates, he is found within the same territory and jurisdiction," Id., at 133.

24.    "They are these: that a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits, as any foreign nation, where that jurisdiction is not surrendered or restrained by the Constitution of the United States. That, by virtue of this, it is not only the right, but the bounden and solemn duty of a State, to advance the safety, happiness and prosperity of its people, and to provide for its general welfare, by any and every act of legislation which it may deem to be conducive to these ends; where the power over the particular subject, or the manner of its exercise is not surrendered or restrained, in the manner just stated. That all those powers which relate to merely municipal legislation, or what may, perhaps, more properly be called internal police, are not thus surrendered or restrained; and that, consequently, in relation to these, the authority of a State is complete, unqualified and exclusive," Id., at 139.

25.    Some eight years later in Pollard v. Hagan, 44 U.S. (3 How.) 212 (1845), the question of federal jurisdiction was once again before the Court. This case involved a real property title dispute with one of the parties claiming a right to the contested property via a U.S. patent; the lands in question were situated in Mobile, Alabama, adjacent to Mobile Bay. In discussing the subject of federal jurisdiction, the Court held:

"We think a proper examination of this subject will show that the United States never held any municipal sovereignty, jurisdiction, or right of soil in and to the territory, of which Alabama or any of the new States were formed," Id., at 221.

"[B]ecause, the United States have no constitutional capacity to exercise municipal jurisdiction, sovereignty, or eminent domain, within the limits of a State or elsewhere, except in the cases in which it is expressly granted," Id., at 223.

26.    "Alabama is therefore entitled to the sovereignty and jurisdiction over all the territory within her limits, subject to the common law," Id., at 228-29. The single most important case regarding the subject of federal jurisdiction appears to be Fort Leavenworth R. Co. v. Lowe, 114 U.S. 525, 531, 5 S.Ct. 995 (1885), which sets forth the law on this point fully. Here, the railroad company property which passed through the Fort Leavenworth federal enclave was being subjected to taxation by Kansas, and the company claimed an exemption from state taxation because its property was within federal jurisdiction and outside that of the state. In holding that the railroad company's property could be taxed, the Court carefully explained federal jurisdiction within the States:

27.    "The consent of the states to the purchase of lands within them for the special purposes named, is, however, essential, under the constitution, to the transfer to the general government, with the title, of political jurisdiction and dominion.

28.    Where lands are acquired without such consent, the possession of the United States, unless political jurisdiction be ceded to them in some other way, is simply that of an ordinary proprietor. The property in that case, unless used as a means to carry out the purposes of the government, is subject to the legislative authority and control of the states equally with the property of private

individuals." Thus the cases decided within the 19th century clearly disclosed the extent and scope of both State and federal jurisdiction. In essence, these cases, among many others, hold that the jurisdiction of any particular State is co-extensive with its borders or territory, and all persons and property located or found therein are subject to that jurisdiction; this jurisdiction is superior. Federal jurisdiction results from a conveyance of state jurisdiction to the federal government for lands owned or otherwise possessed by the federal government, and thus federal jurisdiction is extremely limited in nature. There is no federal jurisdiction if there be no grant or cession of jurisdiction by the State to the federal government. Therefore, federal territorial jurisdiction exists only in Washington, D.C., the federal enclaves within the States, and the territories and insular possessions of the United States.

29.    The above principles of jurisdiction established in the last century continue their vitality today with only one minor exception. In the last century, the cessions of jurisdiction by States to the federal government were by legislative acts which typically ceded full jurisdiction to the federal government, thus placing in the hands of the federal government the troublesome problem of dealing with and governing scattered, localized federal enclaves which had been totally surrendered by the States. With the advent in this century of large federal works projects and national parks, the problems regarding management of these areas by the federal government were magnified.

30.    During the last century, it was thought that if a State ceded jurisdiction to the federal government, the cession granted full and complete jurisdiction. But with the ever increasing number of separate tracts of land falling within the jurisdiction of the federal government in this century, it was obviously determined by both federal and state public officials that the States should retain greater control over these ceded lands, and the courts have

1  acknowledged the constitutionality of varying degrees of state jurisdiction and

2  control over lands so ceded.

3

4  31.    One of the first cases to acknowledge the proposition that a State could

5        retain some jurisdiction over property ceded to the federal government was

6        Surplus Trading Co. v. Cook, 281 U.S. 647, 50 S.Ct. 455 (1930). Here, a state

7        attempt to assess an ad valorem tax on Army blankets located within a federal

8        army camp was found invalid and beyond the state's jurisdiction. But in regards

9        to the proposition that a State could make a qualified cession of jurisdiction to

10       the federal government, the Court held:

11

12 32.    "[T]he state undoubtedly may cede her jurisdiction to the United States and

13       may make the cession either absolute or qualified as to her may appear

14       desirable, provided the qualification is consistent with the purposes for which

15       the reservation is maintained and is accepted by the United States. And, where

16       such a cession is made and accepted, it will be determinative of the jurisdiction

17       of both the United States and the state within the reservation," Id., at 651-52.

18       Two cases decided in 1937 by the U.S. Supreme Court further clarify the

19       constitutionality of a reservation of partial state jurisdiction over lands ceded to

20       the jurisdiction of the United States.

21

22 33.    In James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208 (1937),

23       the State of West Virginia sought to impose a tax upon the gross receipts of the

24       company arising from a contract which it had made with the United States to

25       build some dams.

26

27 34.    One of the issues involved in this case was the validity of the state tax

28       imposed on the receipts derived by the company from work performed on lands

29       to which the State had ceded "concurrent" jurisdiction to the United States. The

30       Court held that a State could reserve and qualify any cession of jurisdiction for

lands owned by the United States; since the State had done so here, the Court upheld this part of the challenged tax notwithstanding a partial cession of jurisdiction to the U.S. A similar result occurred in Silas Mason Co. v. Tax Commission of State of Washington, 302 U.S. 186, 58 S.Ct. 233 (1937).

35.    Here, the United States was undertaking the construction of several dams on the Columbia River in Washington, and had purchased the lands necessary for the project. Silas Mason obtained a contract to build a part of the Grand Coulee Dam, but filed suit challenging the Washington income tax when that State sought to impose that tax on the contract proceeds. Mason's argument that the federal government had exclusive jurisdiction over both the lands and its contract was not upheld by either the Supreme Court of Washington or the U.S. Supreme Court. The latter Court held that none of the lands owned by the U.S. were within its jurisdiction and thus Washington clearly had jurisdiction to impose the challenged tax; see also Wilson v. Cook, 327 U.S. 474, 66 S.Ct. 663 (1946).

36.    Some few years later in 1943, the Supreme Court was again presented with similar taxation and jurisdiction issues; the facts in these two cases were identical with the exception that one clearly involved lands ceded to the jurisdiction of the United States. This single difference caused directly opposite results in both cases. In Pacific Coast Dairy v. Department of Agriculture of California, 318 U.S. 285, 63 S.Ct. 628 (1943), the question involved the applicability of state law to a contract entered into and performed on a federal enclave to which jurisdiction had been ceded to the United States. During World War II, California passed a law setting a minimum price for the sale of milk, and this law imposed penalties for sales made below the regulated price. Here, Pacific Coast Dairy consummated a contract on Moffett Field, a federal enclave within the exclusive jurisdiction of the United States, to sell milk to such federal facility at below the regulated price. When this occurred, California sought to

1  impose a penalty for what it perceived as a violation of state law. But, the U.S.

2  Supreme Court refused to permit the enforcement of the California law, holding

3  that the contract was made and performed in a territory outside the jurisdiction

4  of California and within the jurisdiction of the United States, a place where this

5  law didn't apply. Thus in this case, the existence of federal jurisdiction was the

6  foundation for the decision. However, in Penn Dairies v. Milk Control

7  Commission of Pennsylvania, 318 U.S. 261, 63 S.Ct.617 (1943), an opposite

8  result was reached on almost identical facts. Here, Pennsylvania likewise had a

9  law which regulated the price of milk and penalized milk sales below the

10  regulated price. During World War II, the United States leased some land from

11  Pennsylvania for the construction of a military camp; since the land was leased,

12  Pennsylvania did not cede jurisdiction to the United States.

13

14  37.    When Penn Dairies sold milk to the military facility for a price below the

15  regulated price, the Commission sought to impose the penalty. In this case,

16  since there was no federal jurisdiction, the Supreme Court found that the state

17  law applied and permitted the imposition of the penalty. These two cases clearly

18  show the different results, which can occur with the presence or absence of

19  federal jurisdiction.

20

21  38.    A final point regarding federal jurisdiction concerns the question of when

22  such jurisdiction ends or ceases. This issue was considered S.R.A. v. Minnesota,

23  327 U.S. 558, 563-64, 66 S.Ct. 749 (1946), which involved the power of a State

24  to tax the real property interest of a purchaser of land sold by the United States.

25  Here, a federal post office building was sold to S.R.A. pursuant to a real estates

26  sale contract, which provided that title would pass only after the purchase price

27  had been paid. In refuting the argument of S.R.A. that the ad valorem tax on its

28  equitable interest in the property was really an unlawful tax on U.S. property,

29  the Court held: "In the absence of some such provisions, a transfer of property

30  held by the United States under state cessions pursuant to Article I, Section 8,

Clause 17, of the Constitution would leave numerous isolated islands of federal jurisdiction, unless the unrestricted transfer of the property to private hands is thought without more to revest sovereignty in the states. As the purpose of Clause 17 was to give control over the sites of governmental operations to the United States, when such control was deemed essential for federal activities, it would seem that the sovereignty of the United States would end with the reason for its existence and the disposition of the property. We shall treat this case as though the Government's unrestricted transfer of property to non-federal hands is a relinquishment of the exclusive legislative power." Thus when any property within the exclusive jurisdiction of the United States is no longer utilized by that government for governmental purposes, and the title or any interest therein is conveyed to private interests, the jurisdiction of the federal government ceases and jurisdiction once again reverts to the State.

39.    The above principles regarding the distinction between State and federal jurisdiction continue today; see Paul v. United States, 371 U.S. 245, 83 S.Ct. 426 (1963), and United States v. State Tax Commission of Mississippi, 412 U.S. 363, 93 S.Ct. 2183 (1973).

40.    What was definitely decided in the beginning days of this Republic regarding the extent, scope, and reach of each of these two distinct jurisdictions remains unchanged and forms the foundation and basis for the smooth workings of state governmental systems in conjunction with the federal government. Without such jurisdictional principles which form a clear boundary between the jurisdiction of the States and the United States, our federal governmental system would have surely met its demise long before now.

41.    In summary, the jurisdiction of the States is essentially the same as they possessed when they were leagued together under the Articles of Confederation. The confederated States possessed absolute, complete and full

jurisdiction over property and persons located within their borders. It is hypocritical to assume or argue that these States, which had banished the centralized power and jurisdiction of the English Parliament and Crown over them by the Declaration of Independence, would shortly thereafter cede comparable power and jurisdiction to the Confederation Congress.

42.    They did not and they closely and jealously guarded their own rights, powers and jurisdiction. When the Articles were replaced by the Constitution, the intent and purpose of the States was to retain their same powers and jurisdiction, with a small concession of jurisdiction to the United States of lands found essential for the operation of that government. However, even this provision did not operate to instantly change any aspect of state jurisdiction, it only permitted its future operation wherein any State, by its own volition, should choose to cede jurisdiction to the United States.

43.    By the adoption of the Constitution, the States jointly surrendered some 17 specific and well defined powers to the federal Congress, which related almost entirely to external affairs of the States. Any single delegated power, or even several powers combined, do not operate in a fashion so as to invade or divest a State of its jurisdiction. As against a single State, the remainder of the States under the Constitution have no right to jurisdiction within the single State absent its consent. The only provision in the Constitution which permits territorial jurisdiction to be vested in the United States is found in Art. I, § 8, cl. 17, which provides the mechanism for a voluntary cession of jurisdiction from any State to the United States. When the Constitution was adopted, the United States had jurisdiction over no lands within the States, and it possessed jurisdiction only in the lands encompassed in the Northwest Territories. Shortly after formation of the Union, Maryland and Virginia ceded jurisdiction to the United States for Washington, D.C. Over time, the States have ceded jurisdiction to federal enclaves within the States. Today, the territorial jurisdiction of the

United States is found only in such ceded areas, which encompass Washington, D.C., the federal enclaves within the States, and such territories and possessions, which may now be owned by the United States.

44.    The above conclusion is buttressed by the opinion of the federal government itself. In June 1957, the United States government published a work entitled Jurisdiction Over Federal Areas Within The States: Report of the Interdepartmental Committee for the Study of Jurisdiction Over Federal Areas Within the States, Part II, and this report is the definitive study on this issue. Therein, the Committee stated: "The Constitution gives express recognition to but one means of Federal acquisition of legislative jurisdiction -- by State consent under Article I, section 8, clause 17... Justice McLean suggested that the Constitution provided the sole mode for transfer of jurisdiction, and that if this mode is not pursued, no transfer of jurisdiction can take place," Id., at 41.

45.    "It scarcely needs to be said that unless there has been a transfer of jurisdiction (1) pursuant to clause 17 by a Federal acquisition of land with State consent, or (2) by cession from the State to the Federal Government, or unless the Federal Government has reserved jurisdiction upon the admission of the State, the Federal Government possesses no legislative jurisdiction over any area within a State, such jurisdiction being for exercise by the State, subject to non- interference by the State with Federal functions," Id., at 45. The U.S. Supreme Court in New York v. United States, 505 U.S. 144(1992) stated in part "That Congress may not simply commandeer legislative and regulatory process of the states . . ."

46.    "The Federal Government cannot, by unilateral action on its part, acquire legislative jurisdiction over any area within the exterior boundaries of a State," Id., at 46.

47.    "On the other hand, while the Federal Government has power under various provisions of the Constitution to define, and prohibit as criminal, certain acts or omissions occurring anywhere in the United States, it has no power to punish for various other crimes, jurisdiction over which is retained by the States under our Federal-State system of government, unless such crime occurs on areas as to which legislative jurisdiction has been vested in the Federal Government," Id., at 107.

48.    Thus from a wealth of case law, in addition to this lengthy and definitive government treatise, the "jurisdiction of the United States" is identified as a very precise and carefully defined portion of America. The United States is one of the 50 jurisdictions existing on this continent, excluding Canada and its provinces.

**FEDERAL CRIMINAL JURISDICTION**

49.    It is a well established principle of law that all federal "legislation applies only within the territorial jurisdiction of the United States unless a contrary intent appears;" see Caha v. United States, 152 U.S. 211, 215, 14 S.Ct. 513 (1894); American Banana Company v. United Fruit Company, 213 U.S. 347, 357, 29 S.Ct. 511 (1909); United States v. Bowman, 260 U.S. 94, 97, 98, 43 S.Ct. 39 (1922); Blackmer v. United States, 284 U.S. 421, 437, 52 S.Ct. 252 (1932); Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575 (1949);United States v. Spelar, 338 U.S. 217, 222, 70 S.Ct. 10 (1949); and United States v. First National City Bank, 321 F.2d 14, 23 (2nd Cir.1963). This particular principle of law is expressed in a number of cases from the federal appellate courts; see McKeel v. Islamic Republic of Iran, 722 F.2d 582, 589 (9th Cir. 1983) (holding the Foreign Sovereign Immunities Act as territorial); Meredith v. United States, 330 F.2d 9, 11 (9thCir. 1964) (holding the Federal Torts Claims Act as territorial); United States v. Cotroni, 527 F.2d 708, 711 (2nd Cir. 1975) (holding federal wiretap laws as territorial); Stowe v Devoy, 588 F.2d 336, 341 (2nd Cir.

1978); Cleary v. United States Lines, Inc., 728 F.2d 607, 609 (3rd Cir. 1984) (holding federal age discrimination laws as territorial); Thomas v. Brown &amp; Root, Inc., 745 F.2d 279, 281 (4th Cir. 1984) (holding same as Cleary, supra); United States v. Mitchell, 553 F.2d 996, (5th Cir. 1977) (holding marine mammals protection act as territorial); Pfeiffer v. William Wrigley, Jr., Co., 755 F.2d 554, 557 (7th Cir.1985) (holding age discrimination laws as territorial); Airline Stewards &amp; Stewardesses Assn. v. Northwest Airlines, Inc., 267 F.2d 170, 175(8th Cir. 1959) (holding Railway Labor Act as territorial); Zahourek v. Arthur Young and Co., 750 F.2d 827, 829 (10th Cir. 1984) (holding age discrimination laws as territorial); Commodities Futures Trading Comm. v. Nahas, 738 F.2d 487, 493 (D.C.Cir. 1984) (holding commission's subpoena power under federal law as territorial); Reyes v. Secretary of H.E.W., 476 F.2d 910, 915 (D.C.Cir. 1973) (holding administration of Social Security Act as territorial); and  Schoenbaum v. Firstbrook, 268 F.Supp. 385, 392 (S.D.N.Y. 1967) (holding securities act as territorial). This principle was  perhaps best expressed in Caha v. United States, 152 U.S., at 215, where the Court declared:

"The laws of Congress in respect to those matters do not extend into the territorial limits of the states, but have force only in the District of Columbia, and other places that are within the exclusive jurisdiction of the national government."

50.    But, because of treaties as well as express statutory language, the federal drug laws operate extra-territorially; see United States v. King, 552 F.2d 833, 851 (9th Cir. 1976). The United States has territorial jurisdiction only in Washington, D.C., the federal enclaves within the States, and in the territories and insular possessions of the United States. However, it has no territorial jurisdiction over non-federally owned areas inside the territorial jurisdiction of the States within the American Union, and this proposition of law is supported by literally hundreds of cases.

51.    As a general rule, the power of the United States to criminally prosecute is, for the most part, confined to offenses committed within "its jurisdiction" in the absence of treaties. This is born out simply by examination of 18 U.S.C. §5, which defines the term "United States" in clear jurisdictional terms. [2] Further, §7 of that federal criminal code contains the fullest statutory definition of the "jurisdiction of the United States."

52.    The District Courts of the U.S. have jurisdiction of offenses occurring within the "United States" pursuant to 18 U.S.C. §3231. Examples of this proposition are numerous. In Pothier v. Rodman, 291 F. 311 (1st Cir. 1923), the question involved whether a murder committed at Camp Lewis Military Reservation in the State of Washington was a federal crime. Here, the murder was committed more than a year before the U.S. acquired a deed for the property, which was the scene of the crime. Pothier was arrested and incarcerated in Rhode Island and filed a habeas corpus petition seeking his release on the grounds that the federal courts had no jurisdiction over this offense not committed in U.S. jurisdiction. The First Circuit agreed that there was no federal jurisdiction and ordered his release. But, on appeal to the U.S. Supreme Court, in Rodman v. Pothier, 264 U.S. 399, 44 S.Ct. 360 (1924), that Court reversed; although agreeing with the jurisdictional principles enunciated by the First Circuit, it held that only the federal court in Washington State could decide that issue. In United States v. Unzeuta, 35 F.2d 750 (8th Cir. 1929), the Eighth Circuit held that the U.S. had no jurisdiction over a murder committed in a railroad car at Fort Robinson, the state cession statute being construed as not including railroad rights-of-way. This decision was reversed in United States v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284 (1930), the Court holding that the U.S. did have jurisdiction over the railroad rights-of-way in Fort Robinson. In Bowen v. Johnson, 97 F.2d 860 (9th Cir. 1938), the question presented was whether the lack of jurisdiction over an offense prosecuted in federal court could be raised in a habeas corpus petition. The denial of Bowen's petition was reversed in

1    Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442 (1939), the Court concluding that

2    such a jurisdictional challenge could be raised via such a petition. But, the

3    Court then addressed the issue, found that the U.S. both owned the property in

4    question and had a state legislative grant ceding jurisdiction to the United

5    States, thus there was jurisdiction in the United States to prosecute Bowen. But,

6    if jurisdiction is not vested in the United States pursuant to statute, there is no

7    jurisdiction; see Adams v. United States, 319 U.S. 312, 63 S.Ct. 1122 (1943).

8

9    53.    The lower federal courts also require the presence of federal jurisdiction in

10    criminal prosecutions. In Kelly v. United States, 27 F. 616 (D.Me. 1885), federal

11    jurisdiction of a manslaughter committed at Fort Popham was upheld when it

12    was shown that the U.S. owned the property where the offense occurred and the

13    state had ceded jurisdiction.

14

15    54.    In United States v. Andem, 158 F. 996 (D.N.J. 1908), federal jurisdiction for a

16    forgery offense was upheld on a showing that the United States owned the

17    property where the offense was committed and the state had ceded jurisdiction

18    of the property to the U.S. In United States v. Penn, 48 F. 669 (E.D.Va. 1880),

19    since the U.S. did not have jurisdiction over Arlington National Cemetery, a

20    federal larceny prosecution was dismissed. In United States v. Lovely, 319 F.2d

21    673 (4th Cir. 1963), federal jurisdiction was found to exist by U.S. ownership of

22    the property and a state cession of jurisdiction. In United States v. Watson, 80

23    F.Supp. 649, 651 (E.D.Va. 1948), federal criminal charges were dismissed, the

24    court stating:

25

26    "Without proof of the requisite ownership or possession of the United States, the

27    crime has not been made out."

28

29    55.    In Brown v. United States, 257 F. 46 (5th Cir. 1919), federal jurisdiction was

30    upheld on the basis that the U.S. owned the post office site where a murder was

committed and the state had ceded jurisdiction; see also England v. United States, 174 F.2d 466 (5th Cir. 1949); Hudspeth v. United States, 223 F.2d 848 (5th Cir. 1955); Krull v. United States, 240 F.2d 122 (5th Cir. 1957); and Gainey v. United States, 324 F.2d 731 (5th Cir. 1963). In <I>United States v. Townsend, 474 F.2d 209 (5th Cir. 1973), a conviction for receiving stolen property was reversed when the court reviewed the record and learned that there was absolutely no evidence disclosing that the defendant had committed this offense within the jurisdiction of the United States. In United States v. Benson, 495 F.2d 475, 481 (5th Cir. 1974), in finding federal jurisdiction for a robbery committed at Fort Rucker, the court held:

56.    "It is axiomatic that the prosecution must always prove territorial jurisdiction over a crime in order to sustain a conviction therefor." In two Sixth Circuit cases, United States v. Tucker, 122 F. 518 (W.D.Ky. 1903), a case involving an assault committed at a federal dam, and United States v. Blunt, 558 F.2d 1245 (6th Cir. 1977), a case involving an assault within a federal penitentiary, jurisdiction was sustained by finding that the U.S. owned the property in question and the state involved had ceded jurisdiction. In In re Kelly, 71 F. 545 (E.D.Wis. 1895), a federal assault charge was dismissed when the court held that the state cession statute in question was not adequate to convey jurisdiction of the property in question to the United States. In United States v. Johnson, 426 F.2d 1112 (7th Cir. 1970), a case involving a federal burglary prosecution, federal jurisdiction was sustained upon the showing of U.S. ownership and a state cession. And cases from the Eighth and Tenth Circuits likewise require the same elements to be shown to demonstrate the presence of federal jurisdiction; see United States v. Heard, 270 F.Supp. 198 (W.D.Mo. 1967); United States v. Redstone, 488 F.2d 300 (8th Cir. 1973); United States v. Goings, 504 F.2d 809 (8th Cir. 1974) (demonstrating loss of jurisdiction); Hayes v. United States, 367 F.2d 216 (10th Cir. 1966); Hall v. United States, 404 F.2d 1367 (10th Cir. 1969); United States

1    v. Carter, 430 F.2d 1278 (10th Cir. 1970); and United States v. Cassidy, 571

2    F.2d 534 (10th Cir.978).

3

4    57.    Of all the circuits, the Ninth Circuit has addressed jurisdictional issues more

5    than any of the rest. In United States v. Bateman, 34 F. 86 (N.D.Cal. 1888), it

6    was determined that the United States did not have jurisdiction to prosecute for

7    a murder committed at the Presidio because California had never ceded

8    jurisdiction; see also United States v. Tully, 140 F. 899 (D.Mon. 1905). But later,

9    California ceded jurisdiction for the Presidio to the United States, and it was

10   held in United States v. Watkins, 22 F.2d 437 (N.D.Cal. 1927), that this enabled

11   the U.S. to maintain a murder prosecution. See also United States v. Holt, 168

12   F. 141 (W.D. Wash. 1909), United States v. Lewis, 253 F. 469 (S.D.Cal. 1918),

13   and United States v. Wurtzbarger, 276 F. 753 (D.Or. 1921). Because the U.S.

14   owned and had a state cession of jurisdiction for Fort Douglas in Utah, it was

15   held that the U.S. had jurisdiction for a rape prosecution in Rogers v. Squier,

16   157 F.2d 948 (9th Cir. 1946). But, without a cession, the U.S. has no

17   jurisdiction; see Arizona v. Manypenny, 445 F.Supp. 1123 (D.Ariz. 1977).

18

19   58.    The above cases from the U.S. Supreme Court and federal appellate courts

20   set forth the rule that in criminal prosecutions, the government, as the party

21   seeking to establish the existence of federal jurisdiction, must prove U.S.

22   ownership of the property in question and a state cession of jurisdiction. This

23   same rule manifests itself in state cases.

24

25   59.    State courts are courts of general jurisdiction and in a state criminal

26   prosecution, the state must only prove that the offense was committed within

27   the state and a county thereof. If a defendant contends that only the federal

28   government has jurisdiction over the offense, he, as proponent for the

29   existence of federal jurisdiction, must likewise prove U.S. ownership of the

30   property where the crime was committed and state cession of jurisdiction.

60.     Examples of the operation of this principle are numerous. In Arizona, the State has jurisdiction over federal lands in the public domain, the state not having ceded jurisdiction of that property to the U.S.; see State v. Dykes, 114 Ariz. 592, 562 P.2d 1090 (1977). In California, if it is not proved by a defendant in a state prosecution that the state has ceded jurisdiction, it is presumed the state does have jurisdiction over a criminal offense; see People v. Brown, 69 Cal. App.2d 602, 159 P.2d 686 (1945). If the cession exists, the state has no jurisdiction; see People v. Mouse, 203 Cal. 782, 265 P. 944 (1928). In Montana, the state has jurisdiction over property if it is not proved there is a state cession of jurisdiction to the U.S.; see State ex rel Parker v. District Court, 147 Mon. 151, 410 P.2d 459 (1966); the existence of a state cession of jurisdiction to the U.S. ousts the state of jurisdiction; see State v. Tully, 31 Mont. 365, 78 P. 760 (1904). The same applies in Nevada; see State v. Mack, 23 Nev. 359, 47 P. 763 (1897), and Pendleton v. State, 734 P.2d 693 (Nev. 1987); it applies in Oregon (see State v. Chin Ping, 91 Or. 593, 176 P. 188 (1918), and State v. Aguilar, 85 Or.App. 410, 736 P.2d 620 (1987)); and in Washington (see State v. Williams, 23 Wash.App. 694, 598 P.2d 731 (1979)).

61.     In People v. Hammond, 1 Ill.2d 65, 115 N.E.2d 331 (1953), a burglary of an IRS office was held to be within state jurisdiction, the court holding that the defendant was required to prove existence of federal jurisdiction by U.S. ownership of the property and state cession of jurisdiction. In two cases from Michigan, larcenies committed at U.S. post offices which were rented were held to be within state jurisdiction; see People v. Burke, 161 Mich. 397, 126 N.W. 446 (1910), and People v. Van Dyke, 276 Mich. 32, 267 N.W. 778 (1936). See also In re Kelly, 311 Mich. 596, 19 N.W.2d 218 (1945).

62.     In Kansas City v. Garner, 430 S.W.2d 630 (Mo.App. 1968), state jurisdiction over a theft offense occurring in a federal building was upheld, and the court

place where the crime was committed and state cession of jurisdiction. If the government contends for the power to criminally prosecute for an offense committed outside "its jurisdiction," it must prove an extra-territorial application of the statute in question as well as a constitutional foundation supporting the same. Absent this showing, no federal prosecution can be commenced for offenses committed outside "its jurisdiction."

END NOTES:

63.    [1] See Fort Leavenworth R.Co.v. Lowe, 114 U.S. 525, 529, 5 S.Ct. 995 (1885).

64.    [2] The statutory definition of "United States" as expressed in this § 5 is identical to the constitutional definition of this term; see Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504 (1923), which, deals with the definition of "United States" as used in the 18th Amendment.

65.    The first FULL and complete definition of the word "state" in a federal statute appears in an act to tax booze and tobacco, 15 Stat. 125, ch. 186  (July 20, 1868). Section 104 of this act, 15 Stat. at 166, contained definitions to certain words appearing in the act and here may be found the following: "... and the word 'State' to mean and include a Territory and District of Columbia..."

**<u>VERIFICATION</u>**

Under penalty of perjury, I, James-Francis: Murphy, do hereby affirm that I have fully read and understand the foregoing instrument in its entirety and further affirm that all averments contained in this document are true and correct to the best of my knowledge.

Respectfully submitted this 2nd day of June, 2008,

James-Francis: Murphy

Authorized Representative

## **CERTIFICATE OF SERVICE**

COPY of the forgoing hand delivered,

This 2nd day of June, 2008, to:

U. S. Assistant Attorney Fred Sheppard

880 Front Street Room 6293

San Diego, CA

619-557-5610

_____

Service performed by

James-Francis: Murphy

In Care of Postal Department 234277

Encinitas,  California  92023-4277

Tel. No. - 760-230-2868

In Propria Persona ( not Pro Se)