1   James-Francis: Murphy,
2   In Care of Postal Department 234277
3   Encinitas, California 92023-4277
4   Tel: 760-230-2868
5   In Propria Persona
6
7
8

**NUNC PRO TUNC**

AUG 2 5 2008

FILED

08 AUG 27 AM 9: 29

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

9                  UNITED STATES DISTRICT COURT
10               SOUTHERN DISTRICT OF CALIFORNIA
11
12   **UNITED STATES OF AMERICA**    )    CASE NO. - 08 CR 1196 W
13          PLAINTIFF,                )
14                v.                   )    **EXHIBIT 8**
15   JAMES FRANCIS MURPHY             )
16          Defendant,                )    **Afroyim v. Rusk,**
17                                     )    **387 U.S. 253 (1967)**
18   _____ )
19   James-Francis: Murphy            )    Magistrate Judge Nita L. Stormes
20         Third Party Intervener,    )    August 26, 2008 at 9:30am
21         Real Party in Interest,    )
22         Authorized Representative  )    Judge Thomas J. Whelan
23                                     )    September 8, 2008 at 2:00pm and
24                                     )    September 30, 2008 at 9:00am
25
26
27   Total pages of **EXHIBIT 8** attached-  nineteen (19)
28
29   James Francis Murphy, AR, appears and presents this exhibit for the court for
30   submission into evidence now and/or at trial.
31
32
33
34   Respectfully submitted August 25, 2008,
35
36   James-Francis: Murphy,
37   Authorized Representative
38

08/08/21 [Exhibit 8] — Page 1 of 2



## CERTIFICATE OF SERVICE

COPY of the forgoing hand delivered,
This 25 day of August, 2008, to:
U. S. Assistant Attorney Fred Sheppard
880 Front Street Room 6293
San Diego, CA
619-557-5610

_____

Service performed by:

James-Francis: Murphy
In Care of Postal Department 234277
Encinitas, California a 92023-4277
Tel: 760-230-2868

US Supreme Court Center> US Supreme Court Cases & Opinions> Volume 387 > AFROYIM V. RUSK, 387 U. S. 253 (1967)

## AFROYIM V. RUSK, 387 U. S. 253 (1967)

Subscribe to Cases that cite 387 U. S. 253 [RSS]

Google

[ Search Cases ]

**Free Cobranding of the US Supreme Court Center**
Link to Cases & Search with Linkback and Cobranding - Lean More

Link to the Case Preview: http://supreme.justia.com/us/387/253/

Link to the Full Text of Case: http://supreme.justia.com/us/387/253/case.html

# U.S. Supreme Court

## Afroyim v. Rusk, 387 U.S. 253 (1967)

**Afroyim v. Rusk**

**No. 456**

**Argued February 20, 1967**

**Decided May 29, 1967**

**387 U.S. 253**

*CERTIORARI TO THE UNITED STATES COURT OF APPEAL*

*FOR THE SECOND CIRCUIT*

*Syllabus*

Petitioner, of Polish birth, became a naturalized American citizen in 1926. He went to Israel in 1950, and in 1951 voted in an Israeli legislative election. The State Department subsequently refused to renew his passport, maintaining that petitioner had lost his citizenship by virtue of § 401 (e) of the Nationality Act of 1940 which provides that a United States citizen shall "lose" his citizenship if he votes in a foreign political election. Petitioner then brought this declaratory judgment action alleging the unconstitutionality of § 401(e). On the basis of *Perez v. Brownell*, 356 U. S. 44, the District Court and Court of Appeals held that Congress, under its implied power to regulate foreign affairs, can strip an American citizen of his citizenship.

*Held:* Congress has no power under the Constitution to divest a person of his United States citizenship absent his voluntary renunciation thereof. *Perez v. Brownell, supra,* overruled. Pp. 387 U. S. 256-268.

(a) Congress has no express power under the Constitution to strip a person of citizenship, and no such power can be sustained as an implied attribute of sovereignty, as was recognized by Congress before the passage of the Fourteenth Amendment, and a mature and well considered dictum in @ 22 U. S. 827, is to the same effect. Pp. 387 U. S. 257-261.

(b) The Fourteenth Amendment's provision that "All persons born or naturalized in the United States . . . are citizens of the United States . . ." completely controls the status of citizenship, and prevents the cancellation of petitioner's citizenship. Pp. 387 U. S. 262-268.

361 F.2d 102, reversed.

Page 387 U. S. 254

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioner, born in Poland in 1893, immigrated to this country in 1912 and became a naturalized American citizen in 1926. He went to Israel in 1950, and in 1951, he voluntarily voted in an election for the Israeli Knesset, the legislative body of Israel. In 1960, when he applied for renewal of his United States passport, the Department of State refused to grant it on the sole ground that he had lost his American citizenship by virtue of § 401(e) of the Nationality Act of 1940, which provides that a United States citizen shall "lose" his citizenship if he votes "in a political election in a foreign state." [Footnote 1] Petitioner then brought this declaratory judgment action in federal district court alleging that § 401(e) violates both the Due Process Clause of the Fifth Amendment and § 1, cl. 1, of the Fourteenth Amendment, [Footnote 2] which grants American citizenship to persons like petitioner. Because neither the Fourteenth Amendment nor any other provision of the Constitution expressly grants Congress the power to

Page 387 U. S. 255

take away that citizenship once it has been acquired, petitioner contended that the only way he could lose his citizenship was by his own voluntary renunciation of it. Since the Government took the position that § 401(e) empowers it to terminate citizenship without the citizen's voluntary renunciation, petitioner argued that this section is prohibited by the Constitution. The District Court and the Court of Appeals, rejecting this argument, held that Congress has constitutional authority to take away citizenship for voting in a foreign country based on its implied power to regulate foreign affairs. Consequently, petitioner was held to have lost his American citizenship regardless of his intention not to give it up. This is precisely what this Court held in Perez v. Brownell, 356 U. S. 44.

Petitioner, relying on the same contentions about voluntary renunciation of citizenship which this Court rejected in upholding § 401(e) in Perez, urges us to reconsider that case, adopt the view of the minority there, and overrule it. That case, decided by a 5-4 vote almost 10 years ago, has been a source of controversy and confusion ever since, as was emphatically recognized in the opinions of all the judges who participated in this case below. [Footnote 3] Moreover, in the other cases decided with [Footnote 4] and since [Footnote 5] Perez, this Court has consistently invalidated on a case-by-case basis various other statutory sections providing for involuntary expatriation. It has done so on various grounds, and has refused to hold that citizens can be expatriated without their voluntary renunciation of

Page 387 U. S. 256

citizenship. These cases, as well as many commentators, [Footnote 6] have cast great doubt upon the soundness of Perez. Under these circumstances, we granted certiorari to reconsider it, 385 U.S. 917. In view of the many recent opinions and dissents comprehensively discussing all the issues involved, [Footnote 7] we deem it unnecessary to treat this subject at great length.

The fundamental issue before this Court here, as it was in Perez, is whether Congress can, consistently with the Fourteenth Amendment, enact a law stripping an American of his citizenship which he has never voluntarily renounced or given up. The majority in Perez held that Congress could do this because withdrawal of citizenship is "reasonably calculated to effect the end that is within the power of Congress to achieve." 356 U.S. at 356 U. S. 60. That conclusion was reached by this chain of reasoning: Congress has an implied power to deal with foreign affairs as an indispensable attribute of sovereignty; this implied power, plus the Necessary and Proper Clause, empowers Congress to regulate voting by American citizens in foreign elections; involuntary expatriation is within the "ample scope" of "appropriate modes" Congress can adopt to effectuate its general regulatory power. Id. at

Page 387 U. S. 257

356 U. S. 57-60. Then, upon summarily concluding that

"there is nothing in the . . . Fourteenth Amendment to warrant drawing from it a restriction upon the power otherwise possessed by Congress to withdraw citizenship,"

id. at 356 U. S. 58, n. 3, the majority specifically rejected the "notion that the power of Congress to terminate citizenship depends upon the citizen's assent," id. at 356 U. S. 61.

First, we reject the idea expressed in Perez that, aside from the Fourteenth Amendment, Congress has any general power, express or implied, to take away an American citizen's citizenship without his assent. This power cannot, as Perez indicated, be sustained as an implied attribute of sovereignty possessed by all nations. Other nations are governed by their own constitutions, if any, and we can draw no support from theirs. In our country the people are sovereign and the Government cannot sever its relationship to the people by taking away their citizenship. Our Constitution governs us and we must never forget that our Constitution limits the Government to those powers specifically granted or those that are necessary and proper to carry out the specifically granted ones. The Constitution, of course, grants Congress no express power to strip people of their citizenship, whether in the exercise of the implied power to regulate foreign affairs or in the exercise of any specifically granted power. And even before the adoption of the Fourteenth Amendment, views were expressed in Congress and by this Court that, under the Constitution the Government was granted no power, even under its express power to pass a uniform rule of naturalization, to determine what conduct should and should not result in the loss of citizenship. On three occasions, in 1794, 1797, and 1818, Congress considered and rejected

proposals to enact laws which would describe certain conduct as resulting in expatriation. [Footnote 8] On each occasion

Page 387 U. S. 258

Congress was considering bills that were concerned with recognizing the right of voluntary expatriation and with providing some means of exercising that right. In 1794 and 1797, many members of Congress still adhered to the English doctrine of perpetual allegiance and doubted whether a citizen could even voluntarily renounce his citizenship. [Footnote 9] By 1818, however, almost no one doubted the existence of the right of voluntary expatriation, but several judicial decisions had indicated that the right could not be exercised by the citizen without the consent of the Federal Government in the form of enabling legislation. [Footnote 10] Therefore, a bill was introduced to provide that a person could voluntarily relinquish his citizenship by declaring such relinquishment in writing before a district court and then departing from the country. [Footnote 11] The opponents of the bill argued that Congress had no constitutional authority, either express or implied, under either the Naturalization Clause or the Necessary and Proper Clause, to provide that a certain act would constitute expatriation. [Footnote 12] They pointed to a proposed Thirteenth

Page 387 U. S. 259

Amendment, subsequently not ratified, which would have provided that a person would lose his citizenship by accepting an office or emolument from a foreign government. [Footnote 13] Congressman Anderson of Kentucky argued:

"The introduction of this article declares the opinion . . . that Congress could not declare the acts which should amount to a renunciation of citizenship; otherwise there would have been no necessity for this last resort. When it was settled that Congress could not declare that the acceptance of a pension or an office from a foreign Emperor amounted to a disfranchisement of the citizen, it must surely be conceded that they could not declare that any other act did. The cases to which their powers before this amendment confessedly did not extend are very strong, and induce a belief that Congress could not in any case declare the acts which should cause 'a person to cease to be a citizen.' The want of power in a case like this, where the individual has given the strongest evidence of attachment to a foreign potentate and an entire renunciation of the feelings and principles of an American citizen, certainly establishes the absence of all power to pass a bill like the present one. Although the intention with which it was introduced, and the title of the bill declare that it is to insure and foster the right of the citizen, the direct and inevitable effect of the bill, is an assumption of power by Congress to declare that certain acts when committed shall amount to a renunciation of citizenship."

31 Annals of Cong. 1038-1039 (1818).

Page 387 U. S. 260

Congressman Pindall of Virginia rejected the notion, later accepted by the majority in *Perez*, that the nature of sovereignty gives Congress a right to expatriate citizens:

"[A]llegiance imports an obligation on the citizen or subject, the correlative right to which resides in the sovereign power: allegiance in this country is not due to Congress, but to the people, with whom the sovereign power is found; it is, therefore, by the people only that any alteration can be made of the existing institutions with respect to allegiance."

*Id.* at 1045. Although he recognized that the bill merely sought to provide a means of voluntary expatriation, Congressman Lowndes of South Carolina argued:

"But, if the Constitution had intended to give to Congress so delicate a power, it would have been expressly granted. That it was a delicate power, and ought not to be loosely inferred, . . . appeared in a strong light, when it was said, and could not be denied, that to determine the manner in which a citizen may relinquish his right of citizenship, is equivalent to determining how he shall be divested of that right. The effect of assuming the exercise of these powers will be, that, by acts of Congress a man may not only be released from all the liabilities, but from all the privileges of a citizen. If you pass this bill, . . . you have only one step further to go, and say that such and such acts shall be considered as presumption of the intention of the citizen to expatriate, and thus take from him the privileges of a citizen. . . . [Q]uestions affecting the right of the citizen were questions to be regulated, not by the laws of the General or State Governments, but by Constitutional provisions. If there was anything

Page 387 U. S. 261

essential to our notion of a Constitution, . . . it was this: that, while the employment of the physical force of the country is in the hands of the Legislature, those rules which determine what constitutes the rights of the citizen, shall be a matter of Constitutional provision."

*Id.* at 1050-1051. The bill was finally defeated. [Footnote 14] It is in this setting that six years later, in @ 22 U. S. 827, this Court, speaking through Chief Justice Marshall, declared in what appears to be a mature and well considered dictum that Congress, once a person becomes a citizen, cannot deprive him of that status:

"[The naturalized citizen] becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the constitution, on the footing of a native. The constitution does not authorize Congress to enlarge or abridge those rights. The simple power of the national Legislature, is to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it, so far as respects the individual."

Although these legislative and judicial statements may be regarded as inconclusive and must be considered in the historical context in which they were made, [Footnote 15] any doubt

Page 387 U. S. 262

as to whether prior to the passage of the Fourteenth Amendment Congress had the power to deprive a person against his will of citizenship, once obtained, should have been removed by the unequivocal terms of the Amendment itself. It provides its own constitutional rule in language calculated completely to control the status of citizenship: "All persons born or naturalized in the United States . . . are citizens of the United States. . . ." There is no indication in these words of a fleeting citizenship, good at the moment it is acquired but subject to destruction by the Government at any time. Rather the Amendment can most reasonably be read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it. Once acquired, this Fourteenth Amendment citizenship was not to be shifted, canceled, or diluted at the will of the Federal Government, the States, or any other governmental unit.

It is true that the chief interest of the people in giving permanence and security to citizenship in the Fourteenth Amendment was the desire to protect Negroes. The _Dred Scott_ decision, 19 How. 393, had shortly before greatly disturbed many people about the status of Negro citizenship. But the Civil Rights Act of 1866, 14 Stat. 27, had already attempted to confer citizenship on all persons born or naturalized in the United States. Nevertheless, when the Fourteenth Amendment passed the House without containing any definition of citizenship, the sponsors of the Amendment in the Senate insisted on inserting a constitutional definition and grant of citizenship. They expressed fears that the citizenship so recently conferred on Negroes by the Civil Rights Act could be just as easily taken away from them by subsequent Congresses, and it was to provide an insuperable obstacle against every governmental effort to strip Negroes of their newly acquired citizenship that the first clause was added to the Fourteenth Amendment. [Footnote 16]

Page 387 U. S. 263

Senator Howard, who sponsored the Amendment in the Senate, thus explained the purpose of the clause:

"It settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States. . . . We desired to put this question of citizenship and the rights of citizens . . . under the civil rights bill beyond the legislative power. . . ."

Cong.Globe, 39th Cong., 1st Sess., 2890, 2896 (1866).

This undeniable purpose of the Fourteenth Amendment to make citizenship of Negroes permanent and secure would be frustrated by holding that the Government can rob a citizen of his citizenship without his consent by simply proceeding to act under an implied general power to regulate foreign affairs or some other power generally granted. Though the framers of the Amendment were not particularly concerned with the problem of expatriation, it seems undeniable from the language they used that they wanted to put citizenship beyond the power of any governmental unit to destroy. In 1868, two years after the Fourteenth Amendment had been proposed, Congress specifically considered the subject of expatriation. Several bills were introduced to impose involuntary expatriation on citizens who committed certain acts. [Footnote 17] With little

Page 387 U. S. 264

discussion, these proposals were defeated. Other bills, like the one proposed but defeated in 1818, provided merely a means by which the citizen could himself voluntarily renounce his citizenship. [Footnote 18] Representative Van Trump of Ohio, who proposed such a bill, vehemently denied in supporting it that his measure would make the Government

"a party to the act dissolving the tie between the citizen and his country . . . where the statute simply prescribes the manner in which the citizen shall proceed to perpetuate the evidence of his intention, or election, to renounce his citizenship by expatriation."

Cong.Globe, 40th Cong., 2d Sess., 1804 (1868). He insisted that "inasmuch as the act of expatriation depends almost entirely upon a question of intention on the part of the citizen," _id._ at 1801,

"the true question is, that not only the right of expatriation, but the whole power of its exercise, rests solely and exclusively in the will of the individual,"

_id._ at 1804. [Footnote 19] In strongest of terms, not contradicted by any during the debates, he concluded:

"To enforce expatriation or exile against a citizen without his consent is not a power anywhere belonging to this Government. No conservative-minded

Page 387 U. S. 265

statesman, no intelligent legislator, no sound lawyer has ever maintained any such power in any branch of the Government. The lawless precedents created in the delirium of war . . . of sending men by force into exile, as a punishment for political opinion, were violations of this great law . . . of the Constitution. . . . The men who debated the question in 1818 failed to see the true distinction. . . . They failed to comprehend that it is not the Government, but that it is the individual, who has the right and the only power of expatriation. . . . [I]t belongs and appertains to the

citizen, and not to the Government, and it is the evidence of his election to exercise his right, and not the power to control either the election or the right itself, which is the legitimate subject matter of legislation. There has been, and there can be, no legislation under our Constitution to control in any manner the right itself."

*Ibid.* But even Van Trump's proposal, which went no further than to provide a means of evidencing a citizen's intent to renounce his citizenship, was defeated. [Footnote 20] The Act,

Page 387 U. S. 266

as finally passed, merely recognized the "right of expatriation" as an inherent right of all people. [Footnote 21]

The entire legislative history of the 1868 Act makes it abundantly clear that there was a strong feeling in the Congress that the only way the citizenship it conferred could be lost was by the voluntary renunciation or abandonment by the citizen himself. And this was the unequivocal statement of the Court in the case of *United States v. Wong Kim Ark,* 169 U. S. 649. The issues in that case were whether a person born in the United States to Chinese aliens was a citizen of the United States and whether, nevertheless, he could be excluded under the Chinese Exclusion Act, 22 Stat. 58. The Court first held that, within the terms of the Fourteenth Amendment, *Wong Kim Ark* was a citizen of the United States, and then pointed out that, though he might "renounce this citizenship, and become a citizen of . . . any other country," he had never done so. *Id.* at 169 U. S. 704-705. The Court then held [Footnote 22] that Congress could not do anything to abridge or affect his citizenship conferred by the Fourteenth Amendment. Quoting Chief Justice Marshall's well considered and oft-repeated dictum in *Osborn* to the effect that Congress, under the power of naturalization, has "a power to confer citizenship, not a power to take it away," the Court said:

"Congress having no power to abridge the rights conferred by the Constitution upon those who have become naturalized citizens by virtue of acts of Congress, *a fortiori* no act . . . of Congress . . .

Page 387 U. S. 267

can affect citizenship acquired as a birthright, by virtue of the Constitution itself. . . . The Fourteenth Amendment, while it leaves the power where it was before, in Congress, to regulate naturalization, has conferred no authority upon Congress to restrict the effect of birth, declared by the Constitution to constitute a sufficient and complete right to citizenship."

*Id.* at 169 U. S. 703.

To uphold Congress' power to take away a man's citizenship because he voted in a foreign election in violation of § 401(e) would be equivalent to holding that Congress has the power to "abridge," "affect," "restrict the effect of," and "take . . . away" citizenship. Because the Fourteenth Amendment prevents Congress from doing any of these things, we agree with THE CHIEF JUSTICE's dissent in the *Perez* case that the Government is without power to rob a citizen of his citizenship under § 401(e). [Footnote 23]

Because the legislative history of the Fourteenth Amendment, and of the expatriation proposals which preceded and followed it, like most other legislative history, contains many statements from which conflicting inferences can be drawn, our holding might be unwarranted if it rested entirely or principally upon that legislative history. But it does not. Our holding, we think, is the only one that can stand in view of the language and the purpose of the Fourteenth Amendment, and our construction of that Amendment, we believe, comports more nearly than *Perez* with the principles of liberty and equal justice to all that the entire Fourteenth Amendment was adopted to guarantee. Citizenship is no light trifle

Page 387 U. S. 268

to be jeopardized any moment Congress decides to do so under the name of one of its general or implied grants of power. In some instances, loss of citizenship can mean that a man is left without the protection of citizenship in any country in the world -- as a man without a country. Citizenship in this Nation is a part of a cooperative affair. Its citizenry is the country, and the country is its citizenry. The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship. We hold that the Fourteenth Amendment was designed to, and does, protect every citizen of this Nation against a congressional forcible destruction of his citizenship, whatever his creed, color, or race. Our holding does no more than to give to this citizen that which is his own, a constitutional right to remain a citizen in a free country unless he voluntarily relinquishes that citizenship.

*Perez v. Brownell* is overruled. The judgment is

*Reversed.*

[Footnote 1]

54 Stat. 1168, as amended, 58 Stat. 746, 8 U.S.C. § 801 (1946 ed.):

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by: "

"* * * *"

"(e) Voting in a political election in a foreign state or participating in an election or plebiscite to determine the sovereignty over foreign territory."

This provision was reenacted as § 349(a)(5) of the Immigration and Nationality Act of 1952, 66 Stat. 267, 8 U.S.C. § 1481(a)(5).

[Footnote 2]

"All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States. . . ."

[Footnote 3]

250 F.Supp. 686; 361 F.2d 102, 105.

[Footnote 4]

*Trop v. Dulles,* 356 U. S. 86; *Nishikawa v. Dulles,* 356 U. S. 129.

[Footnote 5]

*Kennedy v. Mendoza-Martinez,* 372 U. S. 144; *Schneider v. Rusk,* 377 U. S. 163. In his concurring opinion in *Mendoza-Martinez,* MR. JUSTICE BRENNAN expressed "felt doubts of the correctness of *Perez.* . . ." 372 U.S. at 372 U. S. 187

[Footnote 6]

*See, e.g.,* Agata, Involuntary Expatriation and *Schneider v. Rusk,* 27 U.Pitt.L.Rev. 1 (1965); Hurst, Can Congress Take Away Citizenship?, 29 Rocky Mt.L.Rev. 62 (1956); Kurland, Foreword: "Equal in Origin and Equal in Title to the Legislative and Executive Branches of the Government," 78 Harv.L.Rev. 143, 169-175 (1964); Comment, 56 Mich.L.Rev. 1142 (1958); Note, Forfeiture of Citizenship Through Congressional Enactments, 21 U.Cin.L.Rev. 59 (1952); 40 Cornell L.Q. 365 (1955); 25 S.Cal.L.Rev.196 (1952). *But see, e.g.,* Comment, The Expatriation Act of 1954, 64 Yale L.J. 1164 (1955).

[Footnote 7]

*See Perez v. Brownell, supra,* at 356 U. S. 62 (dissenting opinion of THE CHIEF JUSTICE), 356 U. S. 79 (dissenting opinion of MR. JUSTICE DOUGLAS); *Trop v. Dulles, supra,* at 356 U. S. 91-93 (part I of opinion of Court); *Nishikawa v. Dulles, supra,* at 356 U. S. 138 (concurring opinion of MR. JUSTICE BLACK).

[Footnote 8]

For a history of the early American view of the right of expatriation, including these congressional proposals, *see generally* Roche, The Early Development of United States Citizenship (1949); Tsiang, The Question of Expatriation in America Prior to 1907 (1942); Dutcher, The Right of Expatriation, 11 Am.L.Rev. 447 (1877); Roche, The Loss of American Nationality -- The Development of Statutory Expatriation, 99 U.Pa.L.Rev. 25 (1950); Slaymaker, The Right of the American Citizen to Expatriate, 37 Am.L.Rev.191 (1903).

[Footnote 9]

4 Annals of Cong. 1005, 102-1030 (1794); 7 Annals of Cong. 349 *et seq.* (1797).

[Footnote 10]

*See, e.g.,* 3 U. S. Janson, 3 Dall. 133.

[Footnote 11]

31 Annals of Cong. 495 (1817).

[Footnote 12]

*Id.* at 1036-1037, 1058 (1818). Although some of the opponents, believing that citizenship was derived from the States, argued that any power to prescribe the mode for its relinquishment rested in the States, they were careful to point out that "the absence of all power from the State Legislatures would not vest it in us." *Id.* at 1039.

[Footnote 13]

The amendment had been proposed by the 11th Cong., 2d Sess. *See* The Constitution of the United States of America, S.Doc. No. 39, 88th Cong., 1st Sess., 77-78 (1964).

[Footnote 14]

Id. at 1071. It is interesting to note that the proponents of the bill, such as Congressman Cobb of Georgia, considered it to be "the simple declaration of the manner in which a voluntary act, in the exercise of a natural right, may be performed" and denied that it created or could lead to the creation of "a presumption of relinquishment of the right of citizenship." Id. at 1068.

[Footnote 15]

The dissenting opinion here points to the fact that a Civil War Congress passed two Acts designed to deprive military deserters to the Southern side of the rights of citizenship. Measures of this kind passed in those days of emotional stress and hostility are by no means the most reliable criteria for determining what the Constitution means.

[Footnote 16]

Cong.Globe, 39th Cong., 1st Sess., 2768-2769, 2869, 2890 et seq. (1866). See generally, Flack, Adoption of the Fourteenth Amendment 88-94 (1908).

[Footnote 17]

Representative Jenckes of Rhode Island introduced an amendment that would expatriate those citizens who became naturalized by a foreign government, performed public duties for a foreign government, or took up domicile in a foreign country without intent to return. Cong.Globe, 40th Cong., 2d Sess., 968, 1129, 2311 (1868). Although he characterized his proposal as covering "cases where citizens may voluntarily renounce their allegiance to this country," id. at 1159, it was opposed by Representative Chanler of New York, who said,

"So long as a citizen does not expressly dissolve his allegiance and does not swear allegiance to another country his citizenship remains in statu quo, unaltered and unimpaired."

Id. at 1016.

[Footnote 18]

Proposals of Representatives Pruyn of New York (id. at 1130) and Van Trump of Ohio (id. at 1801, 2311).

[Footnote 19]

While Van Trump disagreed with the 1818 opponents as to whether Congress had power to prescribe a means of voluntary renunciation of citizenship, he wholeheartedly agreed with their premise that the right of expatriation belongs to the citizen, not to the Government, and that the Constitution forbids the Government from being party to the act of expatriation. Van Trump simply thought that the opponents of the 1818 proposal failed to recognize that their mutual premise would not be violated by an Act which merely prescribed "how . . . [the rights of citizenship] might be relinquished at the option of the person in whom they were vested." Cong.Globe, 40th Cong., 2d Sess., 1804 (1868).

[Footnote 20]

Id. at 2317. Representative Banks of Massachusetts, the Chairman of the House Committee on Foreign Affairs which drafted the bill eventually enacted into law, explained why Congress refrained from providing a means of expatriation:

"It is a subject which, in our opinion, ought not to be legislated upon. . . . [T]his comes within the scope and character of natural rights which no Government has the right to control and which no Government can confer. And wherever this subject is alluded to in the Constitution -- . . . it is in the declaration that Congress shall have no power whatever to legislate upon these matters."

Id. at 2316.

[Footnote 21]

15 Stat. 223, R.S. § 1999.

[Footnote 22]

Some have referred to this part of the decision as a holding, see, e.g., Hurst, supra, 29 Rocky Mt.L.Rev. at 779; Comment, 56 Mich.L.Rev. at 1153-1154; while others have referred to it as obiter dictum, see, e.g., Roche, supra, 99 U.Pa.L.Rev. at 26-27. Whichever it was, the statement was evidently the result of serious consideration, and is entitled to great weight.

[Footnote 23]

Of course, as THE CHIEF JUSTICE said in his dissent, 356 U.S. at 356 U.S. 66, naturalization unlawfully procured can be set aside. *See, e.g.*, *Knauer v. United States*, 328 U.S. 654; *Baumgartner v. United States*, 322 U.S. 665; *Schneiderman v. United States*, 320 U.S. 118.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK, MR. JUSTICE STEWART, and MR. JUSTICE WHITE join, dissenting.

Almost 10 years ago, in *Perez v. Brownell*, 356 U.S. 44, the Court upheld the constitutionality of § 401(e) of the Nationality Act of 1940, 54 Stat. 1169. The section deprives of his nationality any citizen who has voted in a foreign political election. The Court reasoned that Congress derived from its power to regulate foreign affairs authority to expatriate any citizen who intentionally commits acts which may be prejudicial to the foreign relations of the United States, and which reasonably may be deemed to indicate a dilution of his allegiance to this country. Congress, it was held, could appropriately consider

Page 387 U.S. 269

purposeful voting in a foreign political election to be such an act.

The Court today overrules *Perez*, and declares § 401(e) unconstitutional, by a remarkable process of circumlocution. First, the Court fails almost entirely to dispute the reasoning in *Perez*; it is essentially content with the conclusory and quite unsubstantiated assertion that Congress is without "any general power, express or implied," to expatriate a citizen "without his assent." [Footnote 2/1] Next, the Court embarks upon a lengthy, albeit incomplete, survey of the historical background of the congressional power at stake here, and yet, at the end, concedes that the history is susceptible of "conflicting inferences." The Court acknowledges that its conclusions might not be warranted by that history alone, and disclaims that the decision today relies, even "principally," upon it. Finally, the Court declares that its result is bottomed upon the "language

Page 387 U.S. 270

and the purpose" of the Citizenship Clause of the Fourteenth Amendment; in explanation, the Court offers only the terms of the clause itself, the contention that any other result would be "completely incongruous," and the essentially arcane observation that the "citizenry is the country and the country is its citizenry."

I can find nothing in this extraordinary series of circumventions which permits, still less compels, the imposition of this constitutional constraint upon the authority of Congress. I must respectfully dissent.

There is no need here to rehearse Mr. Justice Frankfurter's opinion for the Court in *Perez*; it then proved and still proves to my satisfaction that § 401(e) is within the power of Congress. [Footnote 2/2] It suffices simply to supplement *Perez* with an examination of the historical evidence which the Court in part recites, and which provides the only apparent basis for many of the Court's conclusions. As will be seen, the available historical evidence is not only inadequate to support the Court's abandonment of *Perez*, but, with due regard for the

Page 387 U.S. 271

restraints that should surround the judicial invalidation of an Act of Congress, even seems to confirm *Perez'* soundness.

I

Not much evidence is available from the period prior to the adoption of the Fourteenth Amendment through which the then-prevailing attitudes on these constitutional questions can now be determined. The questions pertinent here were only tangentially debated; controversy centered instead upon the wider issues of whether a citizen might under any circumstances *renounce* his citizenship, and, if he might, whether that right should be conditioned upon any formal prerequisites. [Footnote 2/3] Even the discussion of these issues was seriously clouded by the widely accepted view that authority to regulate the incidents of citizenship had been retained, at least in part, by the several States. [Footnote 2/4] It should therefore be remembered that the evidence which is now available may not necessarily represent any carefully considered, still less prevailing, viewpoint upon the present issues.

Measured even within these limitations, the Court's evidence for this period is remarkably inconclusive; the Court relies simply upon the rejection by Congress of

Page 387 U.S. 272

legislation proposed in 1794, 1797, and 1818, and upon an isolated dictum from the opinion of Chief Justice Marshall in *Osborn v. Bank of the United States*, 9 Wheat. 738. This, as will appear, is entirely inadequate to support the Court's conclusion, particularly in light of other and more pertinent evidence which the Court does not notice.

The expatriation of unwilling citizens was apparently first discussed in the lengthy congressional debates of 1794 and 1795, which culminated eventually in the Uniform Naturalization Act of 1795. [Footnote 2/5] 1 Stat. 414. Little contained in those debates is pertinent here. The present question was considered only in connection with an amendment, offered by Congressman Hillhouse of Connecticut, which provided that any American who acquired a foreign citizenship should not subsequently be permitted to repatriate in the United States. Although this obscure proposal scarcely seems relevant to the present issues, it was apparently understood, at least by some members, to require the automatic expatriation of an American who acquired a second citizenship. Its discussion in the House consumed substantially less than one day, and, of

this debate, only the views of two Congressmen, other than Hillhouse, were recorded by the Annals. [Footnote 2/6] Murray of Maryland, for reasons immaterial here, supported the proposal. In response, Baldwin of Georgia urged that foreign citizenship was often conferred only as a mark of esteem, and that it would be unfair to deprive of his domestic citizenship an American honored in this fashion. There is no indication that any member believed the proposal to be forbidden by the Constitution. The measure was rejected by the House without a reported

Page 387 U. S. 273

vote, and no analogous proposal was offered in the Senate. Insofar as this brief exchange is pertinent here, it establishes, at most, that two or more members believed the proposal both constitutional and desirable, and that some larger number determined, for reasons that are utterly obscure, that it should not be adopted.

The Court next relies upon the rejection of proposed legislation in 1797. The bill there at issue would have forbidden the entry of American citizens into the service of any foreign state in time of war; its sixth section included machinery by which a citizen might voluntarily expatriate himself. [Footnote 2/7] The bill contained nothing which would have expatriated unwilling citizens, and the debates do not include any pronouncements relevant to that issue. It is difficult to see how the failure of that bill might be probative here.

The debates in 1817 and 1818, upon which the Court so heavily relies, are scarcely more revealing. Debate centered upon a brief bill [Footnote 2/8] which provided merely that any citizen who wished to renounce his citizenship must first declare his intention in open court, and thereafter depart the United States. His citizenship would have terminated at the moment of his renunciation. The bill was debated only in the House; no proposal permitting the involuntary expatriation of any citizen was made or considered there or in the Senate. Nonetheless, the Court selects portions of statements made by three individual Congressmen, who apparently denied that Congress had authority to enact legislation to deprive unwilling citizens of their citizenship. These brief dicta are, by the most generous standard, inadequate to warrant the Court's broad constitutional conclusion. Moreover, it must be observed that they were in great part deductions from

Page 387 U. S. 274

constitutional premises which have subsequently been entirely abandoned. They stemmed principally from the Jeffersonian contention that allegiance is owed by a citizen first to his State, and only through the State to the Federal Government. The spokesmen upon whom the Court now relies supposed that Congress was without authority to dissolve citizenship, since "we have no control" over "allegiance to the State. . . ." [Footnote 2/9] The bill's opponents urged that

"The relation to the State government was the basis of the relation to the General Government, and therefore, as long as a man continues a citizen of a State, he must be considered a citizen of the United States. [Footnote 2/10]"

Any statute, it was thought, which dissolved federal citizenship while a man remained a citizen of a State "would be inoperative." [Footnote 2/11] Surely the Court does not revive this entirely discredited doctrine, and yet, so long as it does not, it is difficult to see that any significant support for the ruling made today may be derived from the statements on which the Court relies. To sever the statements from their constitutional premises, as the Court has apparently done, is to transform the meaning these expressions were intended to convey. Finally, it must be remembered that these were merely the views of three Congressmen; nothing in the debates indicates that their constitutional doubts were shared by any substantial number of the other 67 members who eventually opposed the bill. They were plainly not accepted by the 58 members who voted in the bill's favor. The bill's opponents repeatedly urged that, whatever its constitutional validity, the bill was imprudent

Page 387 U. S. 275

and undesirable. Pindall of Virginia, for example, asserted that a citizen who employed its provisions would have "motives of idleness or criminality," [Footnote 2/12] and that the bill would thus cause "much evil." [Footnote 2/13] McLane of Delaware feared that citizens would use the bill to escape service in the armed forces in time of war; he warned that the bill would, moreover, weaken "the love of country so necessary to individual happiness and national prosperity." [Footnote 2/14] He even urged that "The commission of treason, and the objects of plunder and spoil, are equally legalized by this bill." [Footnote 2/15] Lowndes of South Carolina cautioned the House that difficulties might again arise with foreign governments over the rights of seamen if the bill were passed. [Footnote 2/16] Given these vigorous and repeated arguments, it is quite impossible to assume, as the Court apparently has, that any substantial portion of the House was motivated wholly, or even in part, by any particular set of constitutional assumptions. These three statements must, instead, be taken as representative only of the beliefs of three members, premised chiefly upon constitutional doctrines which have subsequently been rejected, and expressed in a debate in which the present issues were not directly involved.

The last piece of evidence upon which the Court relies for this period is a brief *obiter dictum* from the lengthy opinion for the Court in 22 U. S. 827, written by Mr. Chief Justice Marshall. This use of the dictum is entirely unpersuasive, for its terms and context make quite plain that it cannot have been intended to reach the questions presented

Page 387 U. S. 276

here. The central issue before the Court in *Osborn* was the right of the bank to bring its suit for equitable relief in the courts of the United States. In argument, counsel for Osborn had asserted that, although the bank had been created by the laws of the United States, it did not necessarily follow that any cause involving the bank had arisen under those laws. Counsel urged by analogy that the naturalization of an alien might as readily be said to confer upon the new citizen a right to bring all his actions in the federal courts. Id. at 813-814 [argument of counsel omitted from electronic version]. Not surprisingly, the Court rejected the analogy, and remarked that an act of naturalization "does not proceed to give, to

*regulate, or to prescribe his capacities," since the Constitution demands that a naturalized citizen must in all respects stand "on the footing of a native."* Id. at 22 U. S. 827. *The Court plainly meant no more than that counsel's analogy is broken by Congress' inability to offer a naturalized citizen rights or capacities which differ in any particular from those given to a native-born citizen by birth. Mr. Justice Johnson's discussion of the analogy in dissent confirms the Court's purpose.* Id.@ at 22 U. S. 875-876.

Any wider meaning, so as to reach the questions here, wrenches the dictum from its context and attributes to the Court an observation extraneous even to the analogy before it. Moreover, the construction given to the dictum by the Court today requires the assumption that the Court in *Osborn* meant to decide an issue which had to that moment scarcely been debated, to which counsel in *Osborn* had never referred, and upon which no case had ever reached the Court. All this, it must be recalled, is in an area of the law in which the Court had steadfastly avoided unnecessary comment. *See, e.g.,* 8 U. S. 212-213; 20 U. S. 347-348. By any

Page 387 U. S. 277

standard, the dictum cannot provide material assistance to the Court's position in the present case. [Footnote 2/17]

Before turning to the evidence from this period which has been overlooked by the Court, attention must be given an incident to which the Court refers, but upon which it apparently places relatively little reliance. In 1810, a proposed thirteenth amendment to the Constitution

Page 387 U. S. 278

was introduced into the Senate by Senator Reed of Maryland; the amendment, as subsequently modified, provided that any citizen who accepted a title of nobility, pension, or emolument from a foreign state, or who married a person of royal blood, should "cease to be a citizen of the United States." [Footnote 2/18] The proposed amendment was, in a modified form, accepted by both Houses; [Footnote 2/19] I have found nothing which indicates with any certainty why such a provision should then have been thought necessary, [Footnote 2/20] but two reasons suggest themselves for the use of a constitutional amendment. First, the provisions may have been intended in part as a sanction for Art. I, § 9, cl. 8; [Footnote 2/21] it may therefore have been thought more appropriate that it be placed within the Constitution itself. Second, a student of expatriation issues in this period has dismissed the preference for an amendment with the explanation that

"the dominant Jeffersonian view held that citizenship was within the jurisdiction of the states; a statute would thus have been a federal usurpation of state power. [Footnote 2/22]"

This second explanation is fully substantiated by the debate in

Page 387 U. S. 279

1818; the statements from that debate set out in the opinion for the Court were, as I have noted, bottomed on the reasoning that, since allegiance given by an individual to a State could not be dissolved by Congress, a federal statute could not regulate expatriation. It surely follows that this "obscure enterprise" [Footnote 2/23] in 1810, motivated by now discredited constitutional premises, cannot offer any significant guidance for solution of the important issues now before us.

The most pertinent evidence from this period upon these questions has been virtually overlooked by the Court. Twice in the two years immediately prior to its passage of the Fourteenth Amendment, Congress exercised the very authority which the Court now suggests that it should have recognized was entirely lacking. In each case, a bill was debated and adopted by both Houses which included provisions to expatriate unwilling citizens.

In the spring and summer of 1864, both Houses debated intensively the Wade-Davis bill to provide reconstruction governments for the States which had seceded to form the Confederacy. Among the bill's provisions was § 14, by which

"every person who shall hereafter hold or exercise any office . . . in the rebel service . . . is hereby declared not to be a citizen of .the United States. [Footnote 2/24]"

Much of the debate upon the bill did not, of course, center on the expatriation provision, although it certainly did not escape critical attention. [Footnote 2/25] Nonetheless, I have not found any indication in the debates in either House that it was supposed that Congress was without authority to deprive an unwilling citizen of his citizenship. The bill was not signed by President Lincoln before the adjournment

Page 387 U. S. 280

of Congress, and thus failed to become law, but a subsequent statement issued by Lincoln makes quite plain that he was not troubled by any doubts of the constitutionality of § 14. [Footnote 2/26] Passage of the Wade-Davis bill of itself "suffices to destroy the notion that the men who drafted the Fourteenth Amendment felt that citizenship was an *absolute.'"* [Footnote 2/27]

Twelve months later, and less than a year before its passage of the Fourteenth Amendment, Congress adopted a second measure which included provisions that permitted the expatriation of unwilling citizens. Section 21 of the Enrollment Act of 1865 provided that deserters from the military service of the United States "shall be deemed and taken to have voluntarily relinquished and forfeited their rights of citizenship and their

rights to become citizens. . . ." [Footnote 2/28] The same section extended these disabilities to persons who departed the United States with intent to avoid "draft into the military or naval service. . . ." [Footnote 2/29] The bitterness of war did not cause Congress here to neglect the requirements of the Constitution, for it was urged in both Houses that § 21 as written was *ex post facto,* and thus was constitutionally

Page 387 U. S. 281

impermissible. [Footnote 2/30] Significantly, however, it was never suggested in either debate that expatriation without a citizen's consent lay beyond Congress' authority. Members of both Houses had apparently examined intensively the section's constitutional validity, and yet had been undisturbed by the matters upon which the Court now relies.

Some doubt, based on the phrase "rights of citizenship," has since been expressed [Footnote 2/31] that § 21 was intended to require any more than disfranchisement, but this is, for several reasons, unconvincing. First, § 21 also explicitly provided that persons subject to its provisions should not thereafter exercise various "rights of citizens"; [Footnote 2/32] if the section had not been intended to cause expatriation, it is difficult to see why these additional provisions would have been thought necessary. Second, the executive authorities of the United States afterwards consistently construed the section as causing expatriation. [Footnote 2/33] Third, the section was apparently understood by various courts to result in expatriation; in particular, Mr. Justice Strong, while a member of the Supreme Court of Pennsylvania, construed the section to cause a "forfeiture of citizenship," *Huber v. Reily,* 53 Pa. 112, 118, and although this point was not expressly reached, his general understanding of the statute was approved by this Court in *Kurtz v. Moffitt,* 115 U. S. 487, 115 U. S. 501. Finally, Congress in 1867 approved an exemption from the section's provisions for those who had deserted after the termination of general hostilities, and the statute as adopted specifically described the disability from which exemption was given as a "loss of his citizenship."

Page 387 U. S. 282

15 Stat. 14. The same choice of phrase occurs in the pertinent debates. [Footnote 2/34]

It thus appears that Congress had twice, immediately before its passage of the Fourteenth Amendment, unequivocally affirmed its belief that it had authority to expatriate an unwilling citizen.

The pertinent evidence for the period prior to the adoption of the Fourteenth Amendment can therefore be summarized as follows. The Court's conclusion today is supported only by the statements, associated at least in part with a now abandoned view of citizenship, of three individual Congressmen, and by the ambiguous and inapposite dictum from *Osborn.* Inconsistent with the Court's position are statements from individual Congressmen in 1794, and Congress' passage in 1864 and 1865 of legislation which expressly authorized the expatriation of unwilling citizens. It may be that legislation adopted in the heat of war should be discounted in part by its origins, but, even if this is done, it is surely plain that the Court's conclusion is entirely unwarranted by the available historical evidence for the period prior to the passage of the Fourteenth Amendment. The evidence suggests, to the contrary, that Congress in 1865 understood that it had authority, at least in some circumstances, to deprive a citizen of his nationality.

II

The evidence with which the Court supports its thesis that the Citizenship Clause of the Fourteenth Amendment was intended to lay at rest any doubts of Congress' inability to expatriate without the citizen's consent is no more persuasive. The evidence consists almost exclusively of two brief and general quotations from Howard

Page 387 U. S. 283

of Michigan, the sponsor of the Citizenship Clause in the Senate, and of a statement made in a debate in the House of Representatives in 1868 by Van Trump of Ohio. Measured most generously, this evidence would be inadequate to support the important constitutional conclusion presumably drawn in large part from it by the Court; but, as will be shown, other relevant evidence indicates that the Court plainly has mistaken the purposes of the clause's draftsmen.

The Amendment as initially approved by the House contained nothing which described or defined citizenship. [Footnote 2/35] The issue did not as such even arise in the House debates; it was apparently assumed that Negroes were citizens, and that it was necessary only to guarantee to them the rights which sprang from citizenship. It is quite impossible to derive from these debates any indication that the House wished to deny itself the authority it had exercised in 1864 and 1865; so far as the House is concerned, it seems that no issues of citizenship were "at all involved." [Footnote 2/36]

In the Senate, however, it was evidently feared that, unless citizenship were defined, or some more general classification substituted, freedmen might, on the premise that they were not citizens, be excluded from the Amendment's protection. Senator Stewart thus offered an amendment which would have inserted into § 1 a definition of citizenship, [Footnote 2/37] and Senator Wade urged as an alternative the elimination of the term "citizen" from the Amendment's first section. [Footnote 2/38] After a caucus of the

Page 387 U. S. 284

chief supporters of the Amendment, Senator Howard announced on their behalf that they favored the addition of the present Citizenship Clause. [Footnote 2/39]

The debate upon the clause was essentially cursory in both Houses, but there are several clear indications of its intended effect. Its sponsors evidently shared the fears of Senators Stewart and Wade that, unless citizenship were defined, freedmen might, under the reasoning of the *Dred Scott* decision, [Footnote 2/40] be excluded by the courts from the scope of the Amendment. It was agreed that, since the "courts have stumbled on the subject," it would be prudent to remove the "doubt thrown over" it. [Footnote 2/41] The clause would essentially overrule *Dred Scott* and place beyond question the freedmen's right of citizenship because of birth. It was suggested, moreover, that it would, by creating a basis for federal citizenship which was indisputably independent of state citizenship, preclude any effort by state legislatures to circumvent the Amendment by denying freedmen state citizenship. [Footnote 2/42] Nothing in the debates, however, supports the Court's assertion that the clause was intended to deny Congress its authority to expatriate unwilling citizens. The evidence indicates that its draftsmen instead expected the clause only to declare unreservedly to

Page 387 U. S. 285

whom citizenship initially adhered, thus overturning the restrictions both of *Dred Scott* and of the doctrine of primary state citizenship, while preserving Congress' authority to prescribe the methods and terms of expatriation.

The narrow, essentially definitional purpose of the Citizenship Clause is reflected in the clear declarations in the debates that the clause would not revise the prevailing incidents of citizenship. Senator Henderson of Missouri thus stated specifically his understanding that the "section will leave citizenship where it now is." [Footnote 2/43] Senator Howard, in the first of the statements relied upon, in part, by the Court, said quite unreservedly that

"This amendment [the Citizenship Clause] which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is . . . a citizen of the United States. [Footnote 2/44]"

Henderson had been present at the Senate's consideration both of the Wade-Davis bill and of the Enrollment Act, and had voted at least for the Wade-Davis bill. [Footnote 2/45]

Page 387 U. S. 286

Howard was a member of the Senate when both bills were passed, and had actively participated in the debates upon the Enrollment Act. [Footnote 2/46] Although his views of the two expatriation measures were not specifically recorded, Howard certainly never expressed to the Senate any doubt either of their wisdom or of their constitutionality. It would be extraordinary if these prominent supporters of the Citizenship Clause could have imagined, as the Court's construction of the clause now demands, that the clause was only "declaratory" of the law "where it now is." and yet that it would entirely withdraw a power twice recently exercised by Congress in their presence.

There is, however, even more positive evidence that the Court's construction of the clause is not that intended by its draftsmen. Between the two brief statements from Senator Howard relied upon by the Court, Howard, in response to a question, said the following:

"I take it for granted that, after a man becomes a citizen of the United States under the Constitution, he cannot cease to be citizen *except by expatriation or the commission of some crime by which his citizenship shall be forfeited.* [Footnote 2/47]"

(Emphasis added.) It would be difficult to imagine a more unqualified rejection of the Court's position; Senator Howard, the clause's sponsor, very plainly believed that it would leave unimpaired Congress' power to deprive unwilling citizens of their citizenship. [Footnote 2/48]

Page 387 U. S. 287

Additional confirmation of the expectations of the clause's draftsmen may be found in the legislative history, wholly overlooked by the Court, of the Act for the Relief of certain Soldiers and Sailors, adopted in 1867. 15 Stat. 14. The Act, debated by Congress within 12 months of its passage of the Fourteenth Amendment, provided an exception from the provisions of 21 of the Enrollment Act of 1865 for those who had deserted from the Union forces after the termination of general hostilities. Had the Citizenship Clause been understood to have the effect now given it by the Court, surely this would have been clearly reflected in the debates; members would at least have noted that, upon final approval of the Amendment, which had preceded the approval of 21 States, § 21 would necessarily be invalid. Nothing of the sort occurred; it was argued by some members that § 21 was imprudent, and even unfair, [Footnote 2/49] but Congress evidently did not suppose that it was, or would be, unconstitutional. Congress simply failed to attribute to the Citizenship

Page 387 U. S. 288

Clause the constitutional consequences now discovered by the Court. [Footnote 2/50]

Nonetheless, the Court urges that the debates which culminated in the Expatriation Act of 1868 materially support its understanding of the purposes of the Citizenship Clause. This is, for several reasons, wholly unconvincing. Initially, it should be remembered that discussion of the Act began in committee some six months after the passage of the Relief Act of 1867, by the Second Session of the Congress which had approved the Relief Act; the Court's interpretation of the history of the Expatriation Act thus demands, at the outset, the supposition that a view of the Citizenship Clause entirely absent in July had appeared vividly by the following January. Further, the purposes and background of the Act should not be forgotten. The debates were stimulated by repeated requests both from President Andrew Johnson and from the public that Congress assert the rights of naturalized Americans against the demands of their former countries. [Footnote 2/51] The Act as finally adopted was thus

intended

"primarily to assail the conduct of the British Government [chiefly for its acts toward naturalized Americans resident in Ireland] and to declare the right of naturalized Americans to renounce their native allegiance; [Footnote 2/52]"

accordingly, very little of the lengthy debate was in the least pertinent to the present issues. Several members did make plain, through their proposed amendments to the bill or their

Page 387 U. S. 289

interstitial comments, that they understood Congress to have authority to expatriate unwilling citizens, [Footnote 2/53] but ,in general, both the issues now before the Court and questions of the implications of the Citizenship Clause were virtually untouched in the debates.

Nevertheless, the Court, in order to establish that Congress understood that the Citizenship Clause denied it such authority, fastens principally upon the speeches of Congressman Van Trump of Ohio. Van Trump sponsored, as one of many similar amendments offered to the bill by various members, a proposal to create formal machinery by which a citizen might voluntarily renounce his citizenship. [Footnote 2/54] Van Trump himself spoke at length in support of his proposal; his principal speech consisted chiefly of a detailed examination of the debates and judicial decisions pertinent to the issues of voluntary renunciation of citizenship. [Footnote 2/55] Never in his catalog of relevant materials did Van Trump even mention the Citizenship Clause of the Fourteenth Amendment; [Footnote 2/56] so far as may be seen from his comments on the House floor, Van Trump evidently supposed the clause to be entirely immaterial to the issues of expatriation. This is completely characteristic of the debate in both Houses; even its draftsmen and principal supporters, such as Senator Howard, permitted the Citizenship Clause to

Page 387 U. S. 290

pass unnoticed. The conclusion seems inescapable that the discussions surrounding the Act of 1868 cast only the most minimal light, if indeed any, upon the purposes of the clause, and that the Court's evidence from the debates is, by any standard, exceedingly slight. [Footnote 2/57]

There is, moreover, still further evidence, overlooked by the Court, which confirms yet again that the Court's view of the intended purposes of the Citizenship Clause is mistaken. While the debate on the Act of 1868 was still in progress, negotiations were completed on the first of a series of bilateral expatriation treaties, which "initiated this country's policy of automatic divestment of citizenship for specified conduct affecting our foreign relations." Perez v. Brownell, supra, at 356 U. S. 48. Seven such treaties were negotiated in 1868 and 1869 alone; [Footnote 2/58] each was ratified by the Senate. If, as the Court now suggests, it was "abundantly clear" to Congress in 1868 that the Citizenship Clause had taken from its hands the power of expatriation, it is quite difficult to understand why these conventions were negotiated, or why, once negotiated,

Page 387 U. S. 291

they were not immediately repudiated by the Senate. [Footnote 2/59]

Further, the executive authorities of the United States repeatedly acted, in the 40 years following 1868, upon the premise that a citizen might automatically be deemed to have expatriated himself by conduct short of a voluntary renunciation of citizenship; individual citizens were, as the Court indicated in Perez, regularly held on this basis to have lost their citizenship. Interested Members of Congress, and others, could scarcely have been unaware of the practice; as early as 1874, President Grant urged Congress in his Sixth Annual Message to supplement the Act of 1868 with a statutory declaration of the acts by which a citizen might "be deemed to have renounced or to have lost his citizenship." [Footnote 2/60] It was the necessity to provide a more satisfactory basis for this practice that led first to the appointment of the Citizenship Board of 1906, and subsequently to the Nationality Acts of 1907 and 1940. The administrative practice in this period was described by the Court in Perez; it suffices here merely to emphasize that the Court today has not ventured to explain why the Citizenship Clause should, so shortly after its adoption, have been, under the Court's construction, so seriously misunderstood.

It seems to me apparent that the historical evidence which the Court in part recites is wholly inconclusive,

Page 387 U. S. 292

as indeed the Court recognizes; the evidence, to the contrary, irresistibly suggests that the draftsmen of the Fourteenth Amendment did not intend, and could not have expected, that the Citizenship Clause would deprive Congress of authority which it had, to their knowledge, only recently twice exercised. The construction demanded by the pertinent historical evidence, and entirely consistent with the clause's terms and purposes, is instead that it declares to whom citizenship, as a consequence either of birth or of naturalization, initially attaches. The clause thus served at the time of its passage both to overturn Dred Scott and to provide a foundation for federal citizenship entirely independent of state citizenship; in this fashion it effectively guaranteed that the Amendment's protection would not subsequently be withheld from those for whom it was principally intended. But nothing in the history, purposes, or language of the clause suggests that it forbids Congress in all circumstances to withdraw the citizenship of an unwilling citizen. To the contrary, it was expected, and should now be understood, to leave Congress at liberty to expatriate a citizen if the expatriation is an appropriate exercise of a power otherwise given to Congress by the Constitution, and if the methods and terms of expatriation adopted by Congress are consistent with the Constitution's other relevant commands.

The Citizenship Clause thus neither denies nor provides to Congress any power of expatriation; its consequences are, for present purposes, exhausted by its declaration of the classes of individuals to whom citizenship initially attaches. Once obtained, citizenship is, of course, protected

from arbitrary withdrawal by the constraints placed around Congress' powers by the Constitution; it is not proper to create from the Citizenship Clause an additional, and entirely unwarranted, restriction

Page 387 U. S. 293

upon legislative authority. The construction now placed on the Citizenship Clause rests, in the last analysis, simply on the Court's *ipse dixit*, evincing little more, it is quite apparent, than the present majority's own distaste for the expatriation power.

I believe that *Perez* was rightly decided, and on its authority would affirm the judgment of the Court of Appeals.

[Footnote 2/1]

It is appropriate to note at the outset what appears to be a fundamental ambiguity in the opinion for the Court. The Court at one point intimates, but does not expressly declare, that it adopts the reasoning of the dissent of THE CHIEF JUSTICE in *Perez*. THE CHIEF JUSTICE there acknowledged that "actions in derogation of undivided allegiance to this country" had "long been recognized" to result in expatriation, *id.* at 356 U. S. 68; he argued, however, that the connection between voting in a foreign political election and abandonment of citizenship was logically insufficient to support a presumption that a citizen had renounced his nationality. *Id.* at 356 U. S. 76. It is difficult to find any semblance of this reasoning, beyond the momentary reference to the opinion of THE CHIEF JUSTICE, in the approach taken by the Court today; it seems instead to adopt a substantially wider view of the restrictions upon Congress' authority in this area. Whatever the Court's position, it has assumed that voluntariness is here a term of fixed meaning; in fact, of course, it has been employed to describe both a specific intent to renounce citizenship and the uncoerced commission of an act conclusively deemed by law to be a relinquishment of citizenship. Until the Court indicates with greater precision what it means by "assent," today's opinion will surely cause still greater confusion in this area of the law.

[Footnote 2/2]

It is useful, however, to reiterate the essential facts of this case, for the Court's very summary statement might unfortunately cause confusion about the situation to which § 401(e) was here applied. Petitioner emigrated from the United States to Israel in 1950, and, although the issue was not argued at any stage of these proceedings, it was assumed by the District Court that he "has acquired Israeli citizenship." 250 F.Supp. 686, 687. He voted in the election for the Israeli Knesset in 1951, and, as his Israeli Identification Booklet indicates, in various political elections which followed. Transcript of Record 1-2. In 1960, after 10 years in Israel, petitioner determined to return to the United States, and applied to the United States Consulate in Haifa for a passport. The application was rejected, and a Certificate of Loss of Nationality, based entirely on his participation in the 1951 election, was issued. Petitioner's action for declaratory judgment followed. There is, as the District Court noted, "no claim by the [petitioner] that the deprivation of his American citizenship will render him a stateless person." *Ibid.*

[Footnote 2/3]

*See generally* Tsiang, The Question of Expatriation in America Prior to 1907, 25-70; Roche, The Expatriation Cases, 1963 Sup.Ct.Rev. 325, 327-330; Roche, Loss of American Nationality, 4 West.Pol.Q. 268.

[Footnote 2/4]

Roche, The Expatriation Cases, 1963 Sup.Ct.Rev. 325, 329. Although the evidence, which consists principally of a letter to Albert Gallatin, is rather ambiguous, Jefferson apparently believed even that a state expatriation statute could deprive a citizen of his federal citizenship. 1 Writings of Albert Gallatin 301-302 (Adams ed. 1879). His premise was presumably that state citizenship was primary, and that federal citizenship attached only through it. *See* Tsiang, *supra,* at 25. Gallatin's own views have been described as essentially "states' rights"; *see* Roche, Loss of American Nationality, 4 West.Pol.Q. 268, 271.

[Footnote 2/5]

*See* 4 Annals of Cong. 1004 *et seq.*

[Footnote 2/6]

The discussion and rejection of the amendment are cursorily reported at 4 Annals of Cong. 1028-1030.

[Footnote 2/7]

The sixth section is set out at 7 Annals of Cong. 349.

[Footnote 2/8]

The bill is summarized at 31 Annals of Cong. 495.

[Footnote 2/9]

31 Annals of Cong. 1046.

[Footnote 2/10]

31 Annals of Cong. 1057.

[Footnote 2/11]

*Ibid.* Roche describes the Congressmen upon whom the Court chiefly relies as "the states' rights opposition." Loss of American Nationality, 4 West.Pol.Q. 268, 276.

[Footnote 2/12]

31 Annals of Cong. 1047.

[Footnote 2/13]

31 Annals of Cong. 1050.

[Footnote 2/14]

31 Annals of Cong. 1059.

[Footnote 2/15]

*Ibid.*

[Footnote 2/16]

31 Annals of Cong. 1051.

[Footnote 2/17]

Similarly, the Court can obtain little support from its invocation of the dictum from the opinion for the Court in *United States v. Wong Kim Ark*, 169 U. S. 649, 169 U. S. 703. The central issue there was whether a child born of Chinese nationals domiciled in the United States is an American citizen if its birth occurs in this country. The dictum upon which the Court relies, which consists essentially of a reiteration of the dictum from *Osborn*, can therefore scarcely be considered a reasoned consideration of the issues now before the Court. Moreover, the dictum could conceivably be read to hold only that no power to expatriate an unwilling citizen was conferred either by the Naturalization Clause or by the Fourteenth Amendment; if the dictum means no more, it would, of course, not even reach the holding in *Perez*. Finally, the dictum must be read in light of the subsequent opinion for the Court, written by Mr. Justice McKenna, in *Mackenzie v. Hare*, 239 U. S. 299. Despite counsel's invocation of *Wong Kim Ark, id.* at 302 and 303 [argument of counsel -- omitted], the Court held in *Mackenzie* that marriage between an American citizen and an alien, unaccompanied by any intention of the citizen to renounce her citizenship, nonetheless permitted Congress to withdraw her nationality. It is immaterial for these purposes that Mrs. Mackenzie's citizenship might, under the statute there, have been restored upon termination of the marital relationship; she did not consent to the loss, even temporarily, of her citizenship, and, under the proposition apparently urged by the Court today, it can therefore scarcely matter that her expatriation was subject to some condition subsequent. It seems that neither Mr. Justice McKenna, who became a member of the Court after the argument but before the decision of *Wong Kim Ark, supra,* at 169 U. S. 732, nor Mr. Chief Justice White, who joined the Court's opinions in both *Wong Kim Ark* and *Mackenzie,* thought that *Wong Kim Ark* required the result reached by the Court today. Nor, it must be supposed, did the other six members of the Court who joined *Mackenzie,* despite *Wong Kim Ark.*

[Footnote 2/18]

The various revisions of the proposed amendment may be traced through 20 Annals of Cong. 530, 549, 572-573, 635, 671.

[Footnote 2/19]

Ames, The Proposed Amendments to the Constitution of the United States during the First Century of Its History, 2 Ann.Rep.Am.Hist.Assn. for the Year 1896, 188.

[Footnote 2/20]

Ames, *supra,* at 187, speculates that the presence of Jerome Bonaparte in this country some few years earlier might have caused apprehension, and concludes that the amendment was merely an expression of "animosity against foreigners." *Id.*. at 188.

[Footnote 2/21]

The clause provides that

"No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."

[Footnote 2/22]

Roche, The Expatriation Cases, 1963 Sup.Ct.Rev. 325, 335.

[Footnote 2/23]

*Ibid.*

[Footnote 2/24]

6 Richardson, Messages and Papers of the Presidents 226.

[Footnote 2/25]

*See, e.g.,* the comments of Senator Brown of Missouri, Cong.Globe, 38th Cong., 1st Sess., 3460.

[Footnote 2/26]

Lincoln indicated that, although he was "unprepared" to be "inflexibly committed" to "any single plan of restoration," he was "fully satisfied" with the bill's provisions. 6 Richardson, Messages and Papers of the Presidents 222-223.

[Footnote 2/27]

Roche, The Expatriation Cases, 1963 Sup.Ct.Rev. 325, 343.

[Footnote 2/28]

13 Stat. 490. It was this provision that, after various recodifications, was held unconstitutional by this Court in *Trop v. Dulles,* 356 U.S. 86. A majority of the Court did not there hold that the provision was invalid because Congress lacked all power to expatriate an unwilling citizen. In any event, a judgment by this Court 90 years after the Act's passage can scarcely reduce the Act's evidentiary value for determining whether Congress understood in 1865, as the Court now intimates that it did, that it lacked such power.

[Footnote 2/29]

13 Stat. 491

[Footnote 2/30]

Cong.Globe, 38th Cong., 2d Sess., 642-643, 1155-1156.

[Footnote 2/31]

Roche, The Expatriation Cases, 1963 Sup.Ct.Rev. 325, 336.

[Footnote 2/32]

13 Stat. 490

[Footnote 2/33]

Hearings before House Committee on Immigration and Naturalization on H.R. 6127, 76th Cong., 1st Sess., 38.

[Footnote 2/34]

*See, e.g.,* the remarks of Senator Hendricks, Cong.Globe, 40th Cong., 1st Sess., 661.

[Footnote 2/35]

The pertinent events are described in Flack, Adoption of the Fourteenth Amendment 83-94.

[Footnote 2/36]

*Id.* at 84

[Footnote 2/37]

Cong.Globe, 39th cong., 1st Sess., 2560.

[Footnote 2/38]

Wade would have employed the formula "persons born in the United States or naturalized under the laws thereof" to measure the sections protection. Cong.Globe, 39th Cong., 1st Sess., 2768-2769.

[Footnote 2/39]

81 Cong.Globe, 39th Cong., 1st Sess., 2869. The precise terms of the discussion in the caucus were, and have remained, unknown. For contemporary comment, *see* Cong.Globe, 39th Cong., 1st Sess., 2939.

[Footnote 2/40]

*Scott v. Sandford,* 19 How. 393.

[Footnote 2/41]

Cong.Globe, 39th Cong., 1st Sess., 2768.

[Footnote 2/42]

*See, e.g.,* the comments of Senator Johnson of Maryland, Cong.Globe, 39th Cong., 1st Sess., 2893. It was subsequently acknowledged by several members of this Court that a central purpose of the Citizenship Clause was to create an independent basis of federal citizenship, and thus to overturn the doctrine of primary state citizenship. @ 83 U. S. 74, 83 U. S. 95, 83 U. S. 112. The background of this issue is traced in tenBroek, The Anti-slavery Origins of the Fourteenth Amendment 71-93.

[Footnote 2/43]

Cong.Globe, 39th Cong., 1st Sess., 3031. *See also* Flack, The Adoption of the Fourteenth Amendment 93. In the same fashion, tenBroek, *supra,* at 215-217, concludes that the whole of § 1 was "declaratory and confirmatory." *Id.* at 217.

[Footnote 2/44]

Cong.Globe, 39th Cong., 1st Sess., 2890. *See also* the statement of Congressman Baker, Cong.Globe, 39th Cong., 1st Sess., App. 255, 256. Similarly, two months after the Amendment's passage through Congress, Senator Lane of Indiana remarked that the clause was "simply a re-affirmation" of the declaratory citizenship section of the Civil Rights Bill. Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? 2 Stan.L.Rev. 5, 74.

[Footnote 2/45]

Senator Henderson participated in the debates upon the Enrollment Act and expressed no doubts about the constitutionality of § 21, Cong.Globe, 38th Cong., 2d Sess., 641, but the final vote upon the measure in the Senate was not recorded. Cong.Globe, 38th Cong., 2d Sess., 643.

[Footnote 2/46]

*See, e.g.,* Cong.Globe, 38th Cong., 2d Sess., 632.

[Footnote 2/47]

Cong.Globe, 39th Cong., 1st Sess., 2895.

[Footnote 2/48]

The issues pertinent here were not, of course, matters of great consequence in the ratification debates in the several state legislatures, but some additional evidence is nonetheless available from them. The Committee on Federal Relations of the Texas House of Representatives thus

reported to the House that the Amendment's first section "proposes to deprive the States of the right . . . to determine what shall constitute citizenship of a State, and to transfer that right to the Federal Government." Its "object" was, they thought, "to declare negroes to be citizens of the United States." Tex. House J. 578 (1866). The Governor of Georgia reported to the legislature that the

"prominent feature of the first [section] is, that it settles definitely the right of citizenship in the several States, . . . thereby depriving them in the future of all discretionary power over the subject within their respective limits, and with reference to their State Governments proper."

Ga.Sen. J. 6 (1866). See also the message of Governor Cox to the Ohio Legislature, Fairman, supra, 2 Stan.L.Rev. at 96, and the message of Governor Fletcher to the Missouri Legislature, Mo.Sen.J. 14 (1867). In combination, this evidence again suggests that the Citizenship Clause was expected merely to declare to whom citizenship initially attaches, and to overturn the doctrine of primary state citizenship.

[Footnote 2/49]

Senator Hendricks, for example, lamented its unfairness, declared that its presence was an "embarrassment" to the country, and asserted that it "is not required any longer." Cong.Globe, 40th Cong., 1st Sess., 660-661.

[Footnote 2/50]

Similarly, in 1885, this Court construed § 21 without any apparent indication that the section was, or had ever been thought to be, beyond Congress' authority. Kurtz v. Moffitt, 115 U. S. 487, 115 U. S. 501-502.

[Footnote 2/51]

Tsiang, supra, 387 U. S. 3, at 95. President Johnson emphasized in his Third Annual Message the difficulties which were then prevalent. 6 Richardson, Messages and Papers of the Presidents 558, 580-581.

[Footnote 2/52]

Tsiang, supra, at 95. See also 3 Moore, Digest of International Law 579-580.

[Footnote 2/53]

See, e.g., Cong.Globe, 40th Cong., 2d Sess., 968, 1129-1131.

[Footnote 2/54]

Van Trump's proposal contained nothing which would have expatriated any unwilling citizen, see Cong.Globe, 40th Cong., 2d Sess., 1801; its ultimate failure therefore cannot, despite the Court's apparent suggestion, help to establish that the House supposed that legislation similar to that at issue here was impermissible under the Constitution.

[Footnote 2/55]

Cong.Globe, 40th Cong., 2d Sess., 1800-1805.

[Footnote 2/56]

It should be noted that Van Trump, far from a "framer" of the Amendment, had not even been a member of the Congress which adopted it. Biographical Directory of the American Congress 1774-1961, H.R.Doc. No. 442, 85th Cong., 2d Sess., 1750.

[Footnote 2/57]

As General Banks, the Chairman of the House Committee on Foreign Affairs, carefully emphasized, the debates were intended simply to produce a declaration of the obligation of the United States to compel other countries "to consider the rights of our citizens and to bring the matter to negotiation and settlement"; the bill's proponents stood "for that and nothing more." Cong.Globe, 40th Cong., 2d Sess., 2315.

[Footnote 2/58]

The first such treaty was that with the North German Union, concluded February 22, 1868, and ratified by the Senate on March 26, 1868. 2 Malloy, Treaties, Conventions, International Acts, Protocols and Agreements between the United States and other Powers 1298. Similar treaties were reached in 1868 with Bavaria, Baden, Belgium, Hesse, and Württemberg; a treaty was reached in 1869 with Norway and Sweden. An analogous treaty was made with Mexico in 1868, but, significantly, it permitted rebuttal of the presumption of renunciation of citizenship. See generally Tsiang, supra, at 88.

[Footnote 2/59]

The relevance of these treaties was certainly not overlooked in the debates in the Senate upon the Act of 1868. *See, e.g.,* Cong.Globe, 40th Cong., 2d Sess., 4205, 4211, 4329, 4331. Senator Howard attacked the treaties, but employed none of the reasons which might be suggested by the opinion for the Court today. *Id.* at 4211.

[Footnote 2/60]

7 Richardson, Messages and Papers of the Presidents 284, 291. *See further* Borchard, Diplomatic Protection of Citizens Abroad §§ 319, 324, 325.

Google

**Search Cases**

US Supreme Court Cases | by Volume | by Year    Oyez Supreme Court Multimedia | Dog Law | US Laws | US Federal Court Appeals Opinions
Blawgs.FM Constitutional Law PodCasts | BlawgSearch.com Constitutional Law Blogs | Lawyer and Legal Aid & Services Directory

Copyright © Justia & Oyez & Forms WorkFlow :: Terms of Service :: Privacy Policy :: Have a Happy Day!