James-Francis: Murphy,
In Care of Postal Department 234277
Encinitas, California 92023-4277
Tel: 760-230-2868
In Propria Persona

**NUNC PRO TUNC**

AUG 2 5 2008

FILED
08 AUG 27 AM 9:30
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>PLAINTIFF,<br>v.<br>JAMES FRANCIS MURPHY<br>Defendant,<br>______________________<br>James-Francis: Murphy<br>Third Party Intervener,<br>Real Party in Interest,<br>Authorized Representative | CASE NO. - 08 CR 1196 W<br><br>**EXHIBIT 12**<br><br>**Wilson v. Omaha Indian Tribe, 422 U.S. 653. 667 (1979)**<br><br>Magistrate Judge Nita L. Stormes<br>August 26, 2008 at 9:30am<br><br>Judge Thomas J. Whelan<br>September 8, 2008 at 2:00pm and<br>September 30, 2008 at 9:00am |

Total pages of **EXHIBIT 12** attached- fifteen (15)

James Francis Murphy, AR, appears and presents this exhibit for the court for submission into evidence now and/or at trial.

Respectfully submitted August 25, 2008,

James-Francis: Murphy,
Authorized Representative

**CERTIFICATE OF SERVICE**

COPY of the forgoing hand delivered,
This 25 day of August, 2008, to:
U. S. Assistant Attorney Fred Sheppard
880 Front Street Room 6293
San Diego, CA
619-557-5610

Service performed by:

James-Francis: Murphy
In Care of Postal Department 234277
Encinitas, California a 92023-4277
Tel: 760-230-2868

Case 3:08-cr-01196-W Document 37-7 Filed 08/27/2008 Page 3 of 17



and if the commands of the Fourteenth Amendment are to be satisfied, then waiver of those constitutional rights cannot be inferred from mere silence or inaction on the part of the institutionalized child. Cf. *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938). Pennsylvania must assign each institutionalized child a representative obliged to initiate contact with the child and ensure that the child's constitutional rights are fully protected. Otherwise, it is inevitable that the children's due process rights will be lost through inadvertence, inaction, or incapacity. See 459 F. Supp., at 44 n. 47; *Bartley* v. *Kremens*, 402 F. Supp. 1039, 1050–1051 (ED Pa. 1975).



# WILSON ET AL. *v.* OMAHA INDIAN TRIBE ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 78–160. Argued March 21, 1979—Decided June 20, 1979*

Pursuant to an 1854 treaty, the reservation of the Omaha Indian Tribe (Tribe) was established in the Territory of Nebraska on the west bank of the Missouri River, with the eastern boundary being fixed as the center of the river's main channel. In 1867, a General Land Office survey established that certain land was included in the reservation but since then the river has changed course several times, leaving most of the survey area on the Iowa side of the river, separated from the rest of the reservation. Residents of Iowa ultimately settled on and improved this land, and these non-Indian owners and their successors in title occupied the land for many years prior to April 2, 1975, when they were dispossessed by the Tribe, with the assistance of the Bureau of Indian Affairs. Three federal actions, consolidated in District Court, were instituted by respondents, the Tribe and the United States as trustee of the reservation lands, against petitioners, including the State of Iowa and several individuals. Both sides sought to quiet title in their names, respondents arguing that the river's movement had been avulsive and thus did not affect the reservation's boundary, whereas petitioners argued that the disputed land had been formed by gradual accretion and belonged to the Iowa riparian owners. The District Court held that state rather than federal law should be the basis of decision; that 25 U. S. C. § 194—which provides that "[i]n all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership"—was not applicable because the Tribe could not make out a prima facie case that it possessed the disputed land in the past without proving its case on the merits; and that under Nebraska law, the changes in the river had been accretive and thus the petitioners were the owners of the disputed area. The Court of Appeals reversed, ruling that federal rather than state law was applicable; that the Tribe had made a sufficient showing to invoke

*Together with No. 78–161, *Iowa et al.* v. *Omaha Indian Tribe et al.*, also on certiorari to the same court.

Case 3:08-cr-01196-W Document 37-7 Filed 08/27/2008 Page 4 of 17



§ 194; and that applying the federal common law of accretion and avulsion to the evidence, the evidence was in equipoise and thus, under § 194, judgment must be entered for the Tribe.

*Held:*

1. The Court of Appeals was partially correct in ruling that § 194 is applicable here; by its terms, § 194 applies to the private petitioners but not to petitioner State of Iowa. In view of the history of § 194 and its purpose of protecting Indians from claims made by non-Indian squatters on their lands, it applies even when an Indian tribe is the litigant rather than one or more individual Indians. But, while Congress was aware that § 194 would be interpreted to cover artificial entities, such as corporations, as well as individuals, there is nothing to indicate that Congress intended the word "white person" to include any of the States of the Union. Here, there seems to be no question that the disputed land was once riparian land lying on the west bank of the Missouri River and was long occupied by the Tribe as part of the reservation set apart for it in consequence of the 1854 treaty, and this was enough to bring § 194 into play. In view of the purpose of the statute and its use of the term "presumption" which the "white man" must overcome, § 194 contemplates the non-Indian's shouldering the burden of persuasion as well as the burden of producing evidence once the tribe has made out its prima facie case of prior title or possession. Pp. 664–669.

2. The Court of Appeals properly concluded that federal law governs the substantive aspects of the dispute, but it erred in arriving at a federal standard, independent of state law, to determine whether there had been an avulsion or an accretion. Pp. 669–679.

(a) The general rule that, absent an overriding federal interest, the laws of the several States determine the ownership of the banks and shores of waterways, *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363, does not oust federal law in this litigation. Here, the United States has never yielded title or terminated its interest in the property, and, in these circumstances, the Indians' right to the property depends on federal law, "wholly apart from the application of state law principles which normally and separately protect a valid right of possession." *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 677. Pp. 669–671.

(b) However, state law should be borrowed as the federal rule of decision here. There is no imperative need to develop a general body of federal common law to decide cases such as this, where an interstate boundary is not in dispute (the location of the boundary between Iowa and Nebraska having been settled by Compact in 1943). Furthermore, given equitable application of state law, there is little likelihood of injury to federal trust responsibilities or to tribal possessory interests. And this is also an area in which the States have substantial interest in having their own law resolve controversies such as these; there is considerable merit in not having the reasonable expectations, under state real property law, of private landowners upset by the vagaries of being located adjacent to or across from Indian reservations or other property in which the United States has a substantial interest. Cf. *Board of Comm'rs* v. *United States*, 308 U. S. 343; *Arkansas* v. *Tennessee*, 246 U. S. 158. Pp. 671–676.

(c) Under the construction of the 1943 Compact in *Nebraska* v. *Iowa*, 406 U. S. 117, Nebraska law should be applied in determining whether the changes in the river that moved the disputed land from Nebraska to Iowa were avulsive or accretive. Pp. 676–678.

575 F. 2d 620, vacated and remanded.



White, J., delivered the opinion of the Court, in which all other Members joined, except Powell, J., who took no part in the consideration or decision of the cases. Blackmun, J., filed a concurring opinon, in which Burger, C. J., joined, *post*, p. 679.

*Edson Smith* argued the cause for petitioners in No. 78–160. With him on the briefs were *Robert H. Berkshire*, *Thomas R. Burke*, *Lyman L. Larsen*, *Francis M. Gregory, Jr.*, and *Maurice B. Nieland*. *Bennett Cullison, Jr.*, argued the cause for petitioners in No. 78–161. With him on the brief were *Richard C. Turner*, Attorney General of Iowa, and *James C. Davis*, Assistant Attorney General.

*William H. Veeder* argued the cause and filed a brief for respondent Omaha Indian Tribe in both cases. *Sara Sun Beale* argued the cause for the United States in both cases. With her on the brief were *Solicitor General McCree*, *Assistant Attorney General Moorman*, *Deputy Solicitor General Barnett*, *Robert L. Klarquist*, and *Edward J. Shawaker*.†

---

†*Edgar B. Washburn* filed a brief for Title Insurance and Trust Co. et al. as *amici curiae* urging reversal in both cases.

A brief of *amici curiae* urging reversal in No. 78–161 was filed for their respective States by *Theodore L. Sendak*, Attorney General of Indiana,

MR. JUSTICE WHITE delivered the opinion of the Court.

At issue here is the ownership of a tract of land on the east bank of the Missouri River in Iowa. Respondent Omaha

*Jane Gootee*, Deputy Attorney General, and *Donald Bogard*; *William J. Baxley*, Attorney General of Alabama; *Avrum Gross*, Attorney General of Alaska; *John A. LaSota, Jr.*, Acting Attorney General of Arizona; *William J. Clinton*, Attorney General of Arkansas; *Carl R. Ajello*, Attorney General of Connecticut; *Richard R. Wier, Jr.*, Attorney General of Delaware; *Robert L. Shevin*, Attorney General of Florida; *Ronald Y. Amemiya*, Attorney General of Hawaii; *Wayne L. Kidwell*, Attorney General of Idaho; *William J. Scott*, Attorney General of Illinois; *Curt T. Schneider*, Attorney General of Kansas; *Robert F. Stephens*, Attorney General of Kentucky; *William J. Guste, Jr.*, Attorney General of Louisiana; *Joseph E. Brennan*, Attorney General of Maine; *Francis B. Burch*, Attorney General of Maryland; *Francis X. Bellotti*, Attorney General of Massachusetts; *Frank J. Kelley*, Attorney General of Michigan; *A. F. Summer*, Attorney General of Mississippi; *John D. Ashcroft*, Attorney General of Missouri; *Paul L. Douglas*, Attorney General of Nebraska; *Robert List*, Attorney General of Nevada; *Thomas D. Rath*, Attorney General of New Hampshire; *Toney Anaya*, Attorney General of New Mexico; *Louis J. Lefkowitz*, Attorney General of New York; *Rufus L. Edmisten*, Attorney General of North Carolina; *Allen I. Olson*, Attorney General of North Dakota; *William J. Brown*, Attorney General of Ohio; *James A. Redden*, Attorney General of Oregon; *Daniel R. McLeod*, Attorney General of South Carolina; *William Janklow*, Attorney General of South Dakota; *William M. Leech, Jr.*, Attorney General of Tennessee; *Robert B. Hansen*, Attorney General of Utah; *M. Jerome Diamond*, Attorney General of Vermont; *J. Marshall Coleman*, Attorney General of Virginia; *Slade Gorton*, Attorney General of Washington; *Chauncey H. Browning, Jr.*, Attorney General of West Virginia; *Bronson C. La Follette*, Attorney General of Wisconsin; *John J. Rooney*, Acting Attorney General of Wyoming, and *Jack D. Palma II*, Senior Assistant Attorney General.

*Robert S. Pelcyger*, *Richard B. Collins*, and *Arthur Lazarus, Jr.*, filed a brief for the Native American Rights Fund et al. as *amici curiae* urging affirmance in both cases.

*John C. Christie, Jr.*, *Charles T. Martin*, and *Stephen J. Landes* filed a brief for the American Land Title Assn. as *amicus curiae* in both cases.

A brief of *amici curiae* was filed in No. 78–161 for their respective States by *Evelle J. Younger*, Attorney General of California, *N. Gregory*



Indian Tribe, supported by the United States as trustee of the Tribe's reservation lands,[1] claims the tract as part of reservation lands created for it under an 1854 treaty. Petitioners, including the State of Iowa and several individuals, argue that past movements of the Missouri River washed away part of the reservation and the soil accreted to the Iowa side of the river, vesting title in them as riparian landowners.[2]

Two principal issues are presented. First, we are faced with novel questions regarding the interpretation and scope

*Taylor*, Assistant Attorney General, and *John Briscoe* and *Bruce S. Flushman*, Deputy Attorneys General; *John L. Hill*, Attorney General of Texas; *Mike Greely*, Attorney General of Montana; *Warren Spannaus*, Attorney General of Minnesota; *Gerald Gornish*, Attorney General of Pennsylvania; and *J. D. MacFarlane*, Attorney General of Colorado, and *David W. Robbins*, Deputy Attorney General.

[1] In *Heckman* v. *United States*, 224 U. S. 413 (1912), the Court explained the source and nature of this trust relationship. In the exercise of its plenary authority over Indian affairs, Congress has the power to place restrictions on the alienation of Indian lands. Where it does so, it continues guardianship over Indian lands and "[d]uring the continuance of this guardianship, the right and duty of the Nation to enforce by all appropriate means the restrictions designed for the security of the Indians cannot be gainsaid. . . . A transfer of the [Indian land] is not simply a violation of the proprietary rights of the Indian. It violates the governmental rights of the United States." *Id.*, at 437–438. Accordingly, the United States is entitled to go into court as trustee to enforce Indian land rights. "It [is] not essential that it should have a pecuniary interest in the controversy." *Id.*, at 439. See also *Morrison* v. *Work*, 266 U. S. 481, 485 (1925); *Choate* v. *Trapp*, 224 U. S. 665, 678 (1912); F. Cohen, Handbook of Federal Indian Law 94–96 (1942).

[2] The State of Iowa claims title to certain lands deeded to it by quitclaim and to the bed of the Missouri between the thalweg (see n. 3, *infra*) and the ordinary high-water mark, any islands formed in that portion of the river, and any abandoned channels. The latter claims are based upon the equal-footing doctrine, see *Pollard's Lessee* v. *Hagan*, 3 How. 212 (1845), and the 1943 Boundary Compact between Iowa and Nebraska, see n. 6, *infra*.

of Rev. Stat. § 2126, as set forth in 25 U. S. C. § 194, a 145-year-old, but seldom used, statute that provides:

> "In all trials about the right of property in which an Indian may be a party on one side, and a white person on the other, the burden of proof shall rest upon the white person, whenever the Indian shall make out a presumption of title in himself from the fact of previous possession or ownership."

Second, we must decide whether federal or state law determines whether the critical changes in the course of the Missouri River in this case were accretive or avulsive.

## I

In 1854, the Omaha Indian Tribe ceded most of its aboriginal lands by treaty to the United States in exchange for money and assistance to enable the Tribe to cultivate its retained lands. Treaty of Mar. 16, 1854, 10 Stat. 1043; see *United States* v. *Omaha Indians*, 253 U. S. 275, 277–278 (1920). The retained lands proved unsatisfactory to the Tribe, and it exercised its option under the treaty to exchange those lands for a tract of 300,000 acres to be designated by the President and acceptable to the Tribe. The Blackbird Hills area, on the west bank of the Missouri, all of which was then part of the Territory of Nebraska, was selected. The eastern boundary of the reservation was fixed as the center of the main channel of the Missouri River, the thalweg.[3] That land,

[3] The term is commonplace in boundary disputes between riparian States. See, *e. g., Minnesota* v. *Wisconsin*, 252 U. S. 273, 282 (1920):

"The doctrine of *Thalweg*, a modification of the more ancient principle which required equal division of territory, was adopted in order to preserve to each State equality of right in the beneficial use of the stream as a means of communication. Accordingly, the middle of the principal channel of navigation is commonly accepted as the boundary. Equality in the beneficial use often would be defeated, rather than promoted, by fixing the boundary on a given line merely because it connects points of greatest depth. Deepest water and the principal navigable channel are not necessarily the same. The rule has direct reference to actual or probable use in the ordinary course, and common experience shows that vessels do not follow a narrow crooked channel close to shore, however deep, when they can proceed on a safer and more direct one with sufficient water."



as modified by a subsequent treaty and statutes,[4] has remained the home of the Omaha Indian Tribe.

In 1867, a survey by T. H. Barrett of the General Land Office established that the reservation included a large peninsula jutting east toward the opposite, Iowa, side of the river, around which the river flowed in an oxbow curve known as Blackbird Bend.[5] Over the next few decades, the river changed course several times, sometimes moving east, sometimes west.[6] Since 1927, the river has been west of its 1867 position, leaving most of the Barrett survey area on the Iowa side of the river, separated from the rest of the reservation.

As the area, now on the Iowa side, dried out, Iowa residents settled on, improved, and farmed it. These non-Indian owners and their successors in title occupied the land for many

[4] Treaty of Mar. 6, 1865, 14 Stat. 667; Act of June 22, 1874, 18 Stat. 146, 170; Act of Aug. 7, 1882, 22 Stat. 341; see also Act of Mar. 3, 1885, 23 Stat. 362, 370, as amended by Act of Jan. 7, 1925, ch. 34, 43 Stat. 726.

[5] There is some dispute over whether the Barrett survey actually marked the reservation boundary because several years had passed since the Tribe began occupying the reservation and the Missouri may have changed its course during that period. See *United States* v. *Wilson*, 433 F. Supp. 67, 69, 74 (ND Iowa 1977). This does not appear to be of significance in this litigation. *Id.*, at 75.

[6] In *Nebraska* v. *Iowa*, 143 U. S. 359 (1892), the Court decided a boundary dispute between the States of Nebraska and Iowa caused by the wanderings of the Missouri. "[T]he fickle Missouri River," however, "refused to be bound by the . . . decree," Eriksson, The Boundaries of Iowa, 25 Iowa J. of Hist. and Pol. 163, 234 (1927); and in 1943 Nebraska and Iowa entered into a Compact fixing the boundary between the States independent of the river's location. Congress ratified the Compact in the Act of July 12, 1943, ch. 220, 57 Stat. 494. Since the time of the Compact, the Army Corps of Engineers has been largely successful in taming the river. See *Nebraska* v. *Iowa*, 406 U. S. 117, 119 (1972).

years prior to April 2, 1975, when they were dispossessed by the Tribe, with the assistance of the Bureau of Indian Affairs.

Four lawsuits followed the seizure, three in federal court and one in state court. The Federal District Court for the Northern District of Iowa consolidated the three federal actions, severed claims to damages and lands outside the Barrett survey area, and issued a temporary injunction that permitted the Tribe to continue possession. The court then tried the case without a jury. At trial, the Government and the Tribe argued that the river's movement had been avulsive, and therefore the change in location of the river had not affected the boundary of the reservation. Petitioners argued that the river had gradually eroded the reservation lands on the west bank of the river, and that the disputed land on the east bank, in Iowa, had been formed by gradual accretion and belonged to the east-bank riparian owners.[7] Both sides sought to quiet title in their names.

The District Court concluded that state rather than federal law should be the basis of decision. *United States* v. *Wilson,* 433 F. Supp. 57 (1977). The court interpreted the Rules of Decision Act, 28 U. S. C. § 1652, as not requiring the application of federal law in land disputes, even though the United States and an Indian tribe were claimants,[8] unless the Constitution, a treaty, or an Act of Congress specifically supplanted state law. The court found no indication in those sources that federal law was to govern. It then went on to conclude that 25 U. S. C. § 194 was not applicable to the case because it was impossible for the Tribe to make out a prima facie case that it possessed the disputed lands in the past without proving its case on the merits. Thus, § 194 had no significance because it was "inextricably entwined with the merits." 433 F. Supp., at 66.[9]

Applying Nebraska law,[10] which places the burden of proof on the party seeking to quiet title, the court concluded that the key changes in the river had been accretive, and that the east-bank riparians, the petitioners, were thus the owners of the disputed area. 433 F. Supp. 67 (1977).[11]

---

[7] The District Court stated the common-law rule, 433 F. Supp. 57, 62 (1977):

"Simply stated, when a river which forms a boundary between two parcels of land moves by processes of erosion and accretion, the boundary follows the movements of the river. *Independent Stock Farm v. Stevens,* 128 Neb. 619, 259 N. W. 647 (1935). On the other hand, when a river which forms a boundary between two parcels of land abruptly moves from its old channel to a new channel through an event known as avulsion, the boundary remains defined by the old river channel. *Iowa Railroad Land Co. v. Coulthard,* 96 Neb. 607, 148 N. W. 328 (1914). The jurisdiction of Nebraska applies these principles to the movements of the Missouri River. *DeLong v. Olsen,* 63 Neb. 327, 88 N. W. 512 (1901)."

This Court has followed the same principles resolving boundary disputes between States bordering on navigable streams. *Arkansas* v. *Tennessee,* 246 U. S. 158, 173 (1918); *Missouri* v. *Nebraska,* 196 U. S. 23, 34–36 (1904); *Nebraska* v. *Iowa,* 143 U. S., at 360–361, 370.



[8] The District Court relied on *Mason* v. *United States,* 260 U. S. 545 (1923); *Francis* v. *Francis,* 203 U. S. 233 (1906); and *Fontenelle* v. *Omaha Tribe of Nebraska,* 298 F. Supp. 855 (Neb. 1969), aff'd, 430 F. 2d 143 (CA8 1970).

[9] The District Court also suggested that the possessory interest of the Tribe was not of sufficient quality to trigger the burden shifting contemplated by 25 U. S. C. § 194.

[10] The District Court construed the Court's decision in *Nebraska* v. *Iowa,* 406 U. S. 117 (1972), as requiring the application of Nebraska law with respect to changes in the river that occurred before 1943, the date of the Iowa-Nebraska Compact that permanently fixed the boundary between the States, because the land at issue here was indisputably part of Nebraska before the river changed its course. 433 F. Supp., at 60, and n. 2.

[11] Although the District Court hewed closely to Nebraska case law, it also observed that insofar as the relevant definitions of avulsion and accretion were concerned, there was no significant difference between Iowa and Nebraska law, except that under Iowa law accretion was presumed, which was not the case under Nebraska law. Because Nebraska law would not aid the defendants by a presumption of accretion, the Tribe was favored by the application of Nebraska law. The District Court was also of the view that the federal accretion-avulsion law was not substantially different. As

The Court of Appeals reversed. 575 F. 2d 620 (CA8 1978). It began by ruling that the District Court should have applied federal rather than state law for two distinct reasons. First, the boundary of the reservation was coincidental with an interstate boundary at the time the river moved. Therefore, under *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363, 375 (1977), and other cases of this Court, the governing law is federal because

> "[t]he rendering of a decision in a private dispute which would 'press back' an interstate boundary sufficiently implicates the interests of the states to require the application of federal common law." 575 F. 2d, at 628.

Second, the Court of Appeals construed our decision in *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661, 677 (1974), as requiring the application of federal law because the Tribe asserted a right to reservation land based directly on the 1854 treaty and therefore arising under and protected by federal law.

The Court of Appeals also ruled that the District Court had erred by refusing to apply 25 U. S. C. § 194. Because the Tribe had proved that the 1854 treaty included the land area within the Barrett survey, it had made a sufficient showing of "previous possession or ownership" to invoke the statute and place the burden of proof on petitioners. Adopting the District Court's construction "would negate the application of the § 194 statutory burden upon a pleading that simply recites Indian land had been destroyed by the erosive action of a river." 575 F. 2d, at 631.

Reviewing what it perceived to be the federal common law of accretion and avulsion and with no more than passing reference to Nebraska law on the issue, the Court of Appeals concluded that the District Court had based its ruling on a

we shall see, the Court of Appeals differed with the District Court in this respect.



too narrow definition of avulsion.[12] The court then applied the law to the evidence and found that the evidence was in equipoise. Because § 194 placed the burden of proof on the non-Indians, however, the court ruled that judgment must be entered for the Tribe.

We granted separate petitions for certiorari filed by the State of Iowa and its Conservation Commission in No. 78–161 and by the individual petitioners in No. 78–160, but limited to the questions whether 25 U. S. C. § 194 is applicable in the circumstances of this litigation, in particular with respect to the State of Iowa, and whether federal or state law governs the substantive aspects of these cases. 439 U. S. 963 (1978).[13]

[12] The Court of Appeals relied on two cases, *Veatch* v. *White*, 23 F. 2d 69 (CA9 1927), and *Uhlhorn* v. *United States Gypsum Co.*, 366 F. 2d 211 (CA8 1966), cert. denied, 385 U. S. 1026 (1967), in concluding that, under federal law, "the sudden, perceptible change of the channel, whether within or without the river's original bed, is a critical factor in defining an avulsion." 575 F. 2d 620, 637 (CA8 1978). This definition was broader than the Nebraska rule as understood and applied by the District Court, which the Court of Appeals described as follows: "an avulsion occurs only where a sudden shift in a channel cuts off land 'so that after the shift it remains identifiable as land which existed before the change of the channel and which never became a part of the river bed.'" *Id.*, at 634, quoting 433 F. Supp., at 73. As is evident, the definition employed by the Court of Appeals permits a finding of avulsion even where the river is still largely within its original bed.

[13] In No. 78–161, filed by the State of Iowa and its Conservation Commission, the questions on which certiorari was granted were stated as follows:

"Whether the State of Iowa is 'a white person', and the Omaha Indian Tribe is 'an Indian' within the meaning of 25 U. S. C. § 194.

. . . . .

"Whether federal law requires divestiture of Iowa's apparent good title to real property located within its boundaries."

In No. 78–160, we granted certiorari on the following questions:

"Whether the Eighth Circuit erroneously construed Title 25 U. S. Code § 194 to make it applicable in this case.

"Whether the Eighth Circuit erred in holding that Federal and not state

We are in partial, but serious, disagreement with the Court of Appeals, and vacate its judgment.

II

Petitioners challenge on several grounds the Court of Appeals' construction and application of § 194 to these cases.[14] First, they argue that by its plain language the section does not apply when an Indian tribe, rather than one or more individual Indians, is the litigant. We think the argument is untenable. The provision first appeared in slightly different form in 1822, Act of May 6, 1822, 3 Stat. 683, as part of an Act amending the 1802 Indian Trade and Intercourse Act, Act of Mar. 30, 1802, 2 Stat. 139, which was one of a series of Acts originating in 1790 and designed to regulate trade and other forms of intercourse between the North American Indian tribes and non-Indians.[15] Because of recurring trespass upon and illegal occupancy of Indian territory, a major purpose of these Acts as they developed was to protect the rights of Indians to their properties. Among other things, non-Indians were prohibited from settling on tribal properties, and the use of force was authorized to remove persons who violated these restrictions. The 1822 provision was part of this design; and with only slight change in wording, it was incorporated in the 1834 consolidation of the various statutes dealing with Indian affairs. Act of June 30, 1834, 4 Stat. 729. Section 22 of that Act is now 25 U. S. C. § 194, already set out in this opinion. Although the word "Indian" in the second line of § 22 of the 1834 Act replaced the word "Indians" in the 1822 provision, there is no indication that any change in meaning was intended; and none should be implied at this late date, particularly in light of 1 U. S. C. § 1, which provides that unless the context indicates otherwise, "words importing the singular include and apply to several persons, parties, or things."

Even construed as including the plural, however, it is urged that the word "Indians" does not literally include an Indian tribe, and that it is plain from other provisions of the Act that Congress intended to distinguish between Indian tribes and individual Indians. But as we see it, this proves too much. At the time of the enactment of the predecessors of § 194, Indian land ownership was primarily tribal ownership; aboriginal title, a possessory right, was recognized and was extinguishable only by agreement with the tribes with the consent of the United States. *Oneida Indian Nation* v. *County of Oneida*, 414 U. S., at 669–670. Typically, this was accomplished by treaty between the United States and the tribe, and typically the land reserved or otherwise set aside was held in trust by the United States for the tribe itself. " 'Whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members.' " *United States* v. *Jim*, 409 U. S. 80, 82 (1972), quoting *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307 (1902). It is clear enough that, when enacted, Congress intended the 1822 and 1834 provisions to protect Indians from claims made by non-Indian squatters on their lands. To limit the force of these provisions to lands held by individual Indians would be to drain them of all significance, given the historical fact that at the time of the enactment virtually all Indian land was

---

common law with regard to accretion and avulsion is applicable in this case."

[14] Of these various arguments, only the single ground relied on by the District Court in refusing to apply § 194 was discussed and rejected by the Court of Appeals. The other grounds for holding § 194 inapplicable to this case were presented by petitioners either in their briefs on the merits before the Court of Appeals or their petition for rehearing before that court after it reversed the District Court.

[15] The background, history, and development of these laws and Acts are explored exhaustively in F. Prucha, American Indian Policy in the Formative Years: The Indian Trade and Intercourse Acts 1790–1834 (1962). See also Cohen, *supra* n. 1, at 68–75.

tribally held. Legislation dealing with Indian affairs "cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted [it]." *Oliphant* v. *Suquamish Indian Tribe*, 435 U. S. 191, 206 (1978). Furthermore, "'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'" *Bryan* v. *Itasca County*, 426 U. S. 373, 392 (1976), quoting *Alaska Pacific Fisheries* v. *United States*, 248 U. S. 78, 89 (1918).

The second argument, presented in its most acute form by the State of Iowa, is that § 194 applies only where the Indians' antagonist is an individual white person and has no force at all where the adverse claimant is an artificial entity.[16] We cannot accept this broad submission. The word "person" for purposes of statutory construction, unless the context indicates to the contrary, is normally construed to include "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U. S. C. § 1. And in terms of the protective purposes of the Acts of which § 194 and its predecessors were a part, it would make little sense to construe the provision so that individuals, otherwise subject to its burdens, could escape its reach merely by incorporating and carrying on business as usual. As we said in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 687 (1978), "by 1871, it was well understood that corporations should be treated as natural persons for virtually all purposes of constitutional and statutory analysis."[17] It stands to reason that in re-enacting this provision in the Revised Statutes, now codified in the United States Code, Congress was fully aware that it would be interpreted to cover artificial entities as well as individuals.

It nevertheless does not follow that the "white persons" to whom will be shifted the burden of proof in title litigation with Indians also include the sovereign States of the Union. "[I]n common usage, the term 'person' does not include the sovereign, [and] statutes employing the phrase are ordinarily construed to exclude it." *United States* v. *Cooper Corp.*, 312 U. S. 600, 604 (1941); accord, *United States* v. *Mine Workers*, 330 U. S. 258, 275 (1947). Particularly is this true where the statute imposes a burden or limitation, as distinguished from conferring a benefit or advantage. *United States* v. *Knight*, 14 Pet. 301, 315 (1840). There is nevertheless "no hard and fast rule of exclusion," *United States* v. *Cooper Corp.*, *supra*, at 604–605; and much depends on the context, the subject matter, legislative history, and executive interpretation. The legislative history here is uninformative, and executive interpretation is unhelpful with respect to this dormant statute. But in terms of the purpose of the provision—that of preventing and providing remedies against non-Indian squatters on Indian lands—it is doubtful that Congress anticipated such threats from the States themselves or intended to handicap the States so as to offset the likelihood of unfair advantage. Indeed, the 1834 Act, which included § 22, the provision identical to the present § 194, was "intended to apply to the whole Indian country, as defined in the first section." H. R. Rep. No. 474, 23d Cong., 1st Sess., 10 (1834). Section 1 defined Indian country as being "all that part of the United States west of

[16] Petitioners cite *United States* v. *Perryman*, 100 U. S. 235 (1880), as support for their position that § 194 must be construed literally to apply only to a "white person," or individual Caucasian. But that case dealt with another provision of the 1834 Nonintercourse Act, § 16, and there were distinct grounds in the legislative history indicating that the term "white person" as used in § 16 did not include a Negro. Whether *Perryman* would be followed today is a question we need not decide.

[17] There were two corporate defendants among the parties in the District Court. They filed a separate petition for certiorari, No. 78–162, *RGP, Inc.* v. *Omaha Indian Tribe*, but no action has yet been taken on it. Under our Rules, however, the two corporations are party-respondents in the cases in which we have granted certiorari. Rule 21 (4).

the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and, also, that part of the United States east of the Mississippi River, and not within any state to which the Indian title has not been extinguished . . . ." 4 Stat. 729. Although this definition was discarded in the Revised Statutes, see Rev. Stat. § 5596, it is apparent that in adopting § 22 Congress had in mind only disputes arising in Indian country, disputes that would not arise in or involve any of the States.

Nor have we discovered anything since its passage or in connection with the definition of Indian country now contained in the Criminal Code, 18 U. S. C. § 1151, indicating that Congress intended the words "white person" in § 194 to include any of the original or any of the newly admitted States of the Union. We hesitate, therefore, to hold that the State of Iowa must necessarily be disadvantaged by § 194 when litigating title to the property to which it claims ownership, particularly where its opposition is an organized Indian tribe litigating with the help of the United States of America. It may well be that a State, like other litigants and like the State of Iowa did in this case, will often bear the burden of proof on various issues in litigating the title to real estate. But § 194 operates regardless of the circumstances once the Tribe or its champion, the United States, has demonstrated that the Tribe was once in possession of or had title to the area under dispute.

Petitioners also defend the refusal of the District Court to apply § 194 on the grounds that a precondition to applying it is proof of prior possession or title in the Indians and that this involves the merits of the issue on which this case turns—whether the changes in the river were avulsive or accretive. We think the Court of Appeals had the better view of the statute in this regard. Section 194 is triggered once the Tribe makes out a prima facie case of prior possession or title to the particular *area* under dispute. The usual way of describing



real property is by identifying an area on the surface of the earth through the use of natural or artificial monuments. There seems to be no question here that the area within the Barrett survey was once riparian land lying on the *west* bank of the Missouri River and was long occupied by the Tribe as part of the reservation set apart for it in consequence of the treaty of 1854. This was enough, it seems to us, to bring § 194 into play. Of course, that would not foreclose the State of Iowa from offering sufficient evidence to prove its own title or from prevailing on any affirmative defenses it may have.

Petitioners also assert that even if § 194 is operative and even if the Tribe has made out its prima facie case, only the burden of going forward with the evidence, and not the burden of persuasion, is shifted to the State. Therefore they, the petitioners, should prevail if the evidence is in equipoise. The term "burden of proof" may well be an ambiguous term connoting either the burden of going forward with the evidence, the burden of persuasion, or both. But in view of the evident purpose of the statute and its use of the term "presumption" which the "white man" must overcome, we are in agreement with the two courts below that § 194 contemplates the non-Indian's shouldering the burden of persuasion as well as the burden of producing evidence once the tribe has made out its prima facie case of prior title or possession.

## III

### A

In *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363 (1977), this Court held that, absent an overriding federal interest, the laws of the several States determine the ownership of the banks and shores of waterways. This was expressive of the general rule with respect to the incidents of federal land grants:

> " 'We hold the true principle to be this, that whenever the question in any Court, state or federal, is, *whether* a

> title to land which had once been the property of the United States has passed, that question must be resolved by the laws of the United States; but that *whenever*, according to those laws, *the title shall have passed*, then that property, like all other property in the state, is *subject to state legislation*; so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States.'" *Id.*, at 377, quoting *Wilcox* v. *Jackson*, 13 Pet. 498, 517 (1839) (emphasis added by the *Corvallis* Court).

The Court's conclusion in the particular dispute before it in *Corvallis* was that state law governed the rights of the riparian owner because there was no claim of an applicable federal right other than the equal-footing origin of the State's title.

As the Court of Appeals held, however, the general rule recognized by *Corvallis* does not oust federal law in this case. Here, we are not dealing with land titles merely derived from a federal grant, but with land with respect to which the United States has never yielded title or terminated its interest. The area within the survey was part of land to which the Omahas had held aboriginal title and which was reserved by the Tribe and designated by the United States as a reservation and the Tribe's permanent home. The United States continues to hold the reservation lands in trust for the Tribe and to recognize the Tribe pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U. S. C. § 461 *et seq.*

In these circumstances, where the Government has never parted with title and its interest in the property continues, the Indians' right to the property depends on federal law, "wholly apart from the application of state law principles which normally and separately protect a valid right of possession." *Oneida Indian Nation* v. *County of Oneida*, 414 U. S., at 677. It is rudimentary that "Indian title is a matter of federal law and can be extinguished only with federal consent" and that the termination of the protection



that federal law, treaties, and statutes extend to Indian occupancy is "exclusively the province of federal law." *Id.*, at 670. Insofar as the applicable law is concerned, therefore, the claims of the Omahas are "clearly distinguishable from the claims of land grantees for whom the Federal Government has taken no such responsibility." *Id.*, at 684 (REHNQUIST, J., concurring). This is not a case where the United States has patented or otherwise granted lands to private owners in a manner that terminates its interest and subjects the grantees' incidents of ownership to determination by the applicable state law. The issue here is whether the Tribe is no longer entitled to possession of an area that in the past was concededly part of the reservation as originally established. That question, under *Oneida*, is a matter for the federal law to decide.[18]

### B

Although we have determined that federal law ultimately controls the issue in this case, it is still true that "[c]ontro-

---

[18] Petitioners claim that *Oklahoma* v. *Texas*, 258 U. S. 574 (1922), mandates the applicability of state rather than federal law in this case. But there the United States issued patents granting former reservation lands. The Court merely held that, absent contrary evidence, when the United States conveyed and completely parted with its territory, even though Indian land, it intended the incidents of the resulting ownership to be determined by state law. This is no more than the general rule that *Oneida* recognized. In the present case, of course, the area at issue was never conveyed away by the United States or by the Tribe and is claimed by the United States and the Tribe to remain as part of the reservation established as the result of the treaty of 1854. Neither do we find that *United States* v. *Oklahoma Gas & Electric Co.*, 318 U. S. 206 (1943), presents a contrary holding. There, the Court refused to construe a federal statute permitting the Secretary of the Interior to grant permission for the opening of highways over Indian land "in accordance with the laws of the state" as prohibiting the establishment of a power line in the highway right-of-way without further federal consent. *Id.*, at 208. As we understand that case, the Court held only that the consent authorized by the federal statute included the uses which such consent would authorize under state law.

versies . . . governed by federal law, do not inevitably require resort to uniform federal rules. . . . Whether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy 'dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law.'" *United States* v. *Kimbell Foods, Inc.*, 440 U. S. 715, 727–728 (1979), quoting *United States* v. *Standard Oil Co.*, 332 U. S. 301, 310 (1947).[19] The Court of Appeals, noting the existence of a body of federal law necessarily developed by this Court in the course of adjudicating boundary disputes between States having their common border on a navigable stream, purported to find in those doctrines the legal standards to apply in deciding whether the changes in the course of the Missouri River involved in this case had been avulsive or accretive in nature.

The federal law applied in boundary cases, however, does not necessarily furnish the appropriate rules to govern this case. No dispute between Iowa and Nebraska as to their common border on or near the Missouri River is involved here. The location of that border on the ground was settled by Compact in 1943 and by further litigation in this Court, *Nebraska* v. *Iowa*, 406 U. S. 117 (1972). The federal interest in this respect has thus been satisfied, except to the extent that the Compact itself may bear upon a dispute such as this. *United States* v. *Kimbell Foods, Inc., supra*, advises that at this juncture we should consider whether there is need for

[19] Compare P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 768 (2d ed. 1973):

"The federal 'command' to incorporate state law may be a judicial rather than a legislative command; that is, it may be determined as a matter of choice of law, even in the absence of statutory command or implication, that, although federal law should 'govern' a given question, state law furnishes an appropriate and convenient measure of the content of this federal law."



a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state law. An application of these factors suggests to us that state law should be borrowed as the federal rule of decision here.

First, we perceive no need for a uniform national rule to determine whether changes in the course of a river affecting riparian land owned or possessed by the United States or by an Indian tribe have been avulsive or accretive. For this purpose, we see little reason why federal interests should not be treated under the same rules of property that apply to private persons holding property in the same area by virtue of state, rather than federal, law. It is true that States may differ among themselves with respect to the rules that will identify and distinguish between avulsions and accretions, but as long as the applicable standard is applied evenhandedly to particular disputes, we discern no imperative need to develop a general body of federal common law to decide cases such as this, where an interstate boundary is not in dispute. We should not accept "generalized pleas for uniformity as substitutes for concrete evidence that adopting state law would adversely affect [federal interests]." *United States* v. *Kimbell Foods, Inc., supra*, at 730.

Furthermore, given equitable application of state law, there is little likelihood of injury to federal trust responsibilities or to tribal possessory interests. On some occasions, Indian tribes may lose some land because of the application of a particular state rule of accretion and avulsion, but it is as likely on other occasions that the tribe will stand to gain. The same would be the case under a federal rule, including the rule that the Court of Appeals announced in this case. The United States fears a hostile and unfavorable treatment at the hands of state law, but, as we have said, the legal issues are federal and the federal courts will have jurisdiction to

hear them. *Oneida Indian Nation* v. *County of Oneida*, 414 U. S. 661 (1974). Adequate means are thus available to insure fair treatment of tribal and federal interests.

This is also an area in which the States have substantial interest in having their own law resolve controversies such as these. Private landowners rely on state real property law when purchasing real property, whether riparian land or not. There is considerable merit in not having the reasonable expectations of these private landowners upset by the vagaries of being located adjacent to or across from Indian reservations or other property in which the United States has a substantial interest. Borrowing state law will also avoid arriving at one answer to the avulsive-accretion riddle in disputes involving Indians on one side and possibly quite different answers with respect to neighboring land where non-Indians are the disputants. Indeed, in this case several hundred acres of land within the Barrett survey are held in fee, and concededly are not Indian property. These tracts would not be governed by the federal rule announced by the Court of Appeals.

We have borrowed state law in Indian cases before. In *Board of Comm'rs* v. *United States*, 308 U. S. 343 (1939), the question was what law, federal or state, would apply in a claim to recover taxes improperly levied by a political subdivision of a State upon Indians' trust lands. The Court observed that "[s]ince the origin of the right to be enforced is the Treaty, plainly whatever rule we fashion is ultimately attributable to the Constitution, treaties or statutes of the United States, and does not owe its authority to the law-making agencies of Kansas." *Id.*, at 349–350. The Court, nevertheless, elected to adopt state law as the federal rule of decision. There was no reason in the circumstances of the case for the beneficiaries of federal rights to have a privileged position over other aggrieved taxpayers, and "[t]o respect the law of interest prevailing in Kansas in no wise impinges upon the exemption



which the Treaty of 1861 has commanded Kansas to respect and the federal courts to vindicate." [20]

The importance of attending to state law, once an interstate boundary has been determined, is underlined by *Arkansas* v. *Tennessee*, 246 U. S. 158 (1918). In that case, because the disputed boundary between Arkansas and Tennessee had been determined, the question of title to riparian land and to the river bottom was a matter to be determined by local law:

> "How the land that emerges on either side of an interstate boundary stream shall be disposed of as between public and private ownership is a matter to be determined according to the law of each State, under the familiar doctrine that it is for the States to establish for themselves such rules of property as they deem expedient with respect to the navigable waters within their borders and

[20] See *Board of Comm'rs* v. *United States*, 308 U. S., at 351–352:

"Having left the matter at large for judicial determination within the framework of familiar remedies equitable in their nature, see *Stone* v. *White*, 301 U. S. 532, 534, Congress has left us free to take into account appropriate considerations of 'public convenience.' Cf. *Virginian Ry. Co.* v. *Federation*, 300 U. S. 515, 552. Nothing seems to us more appropriate than due regard for local institutions and local interests. We are concerned with the interplay between the rights of Indians under federal guardianship and the local repercussion of those rights. Congress has not been heedless of the interests of the states in which Indian lands were situated, as reflected by their local laws. See, e. g., § 5 of the General Allotment Act of 1887, 24 Stat. 388, 389. With reference to other federal rights, the state law has been absorbed, as it were, as the governing federal rule not because state law was the source of the right but because recognition of state interests was not deemed inconsistent with federal policy. See *Brown* v. *United States*, 263 U. S. 78; *Seaboard Air Line R. Co.* v. *United States*, 261 U. S. 299. In the absence of explicit legislative policy cutting across state interests, we draw upon a general principle that the beneficiaries of federal rights are not to have a privileged position over other aggrieved tax-payers in their relation with the states or their political subdivisions. To respect the law of interest prevailing in Kansas in no wise impinges upon the exemption which the Treaty of 1861 has commanded Kansas to respect and the federal courts to vindicate."

> the riparian lands adajacent to them. . . . But these dispositions are in each case limited by the interstate boundary, and cannot be permitted to press back the boundary line from where otherwise it should be located." *Id.*, at 175–176.

Likewise, in the present case, the Compact of 1943 settled the location of the interstate boundary, within and without the river; and the question of land ownership within or adjacent to the river is best settled by reference to local law even where Indian trust land, a creature of the federal law, is involved.

C

The passage quoted above from *Arkansas* v. *Tennessee* was quoted with approval in *Nebraska* v. *Iowa,* 406 U. S., at 126–127, where the central question was the interpretation of the Interstate Compact determining the location of the entire border between Nebraska and Iowa.[21] Our opinion in *Nebraska* v. *Iowa* is also instructive with respect to which state law, Iowa or Nebraska, the federal court should refer to in determining the federal standard applicable to this case.

Under § 2 of the Compact, each State ceded to the other and relinquished jurisdiction over all lands within the Compact boundary of the other State. Under § 3, "Titles, mortgages, and other liens" affecting such lands that are "good in" the ceding State "shall be good in" the other State.[22]

[21] The Special Master in that case observed that, although it would be difficult, the location of the agreed-upon boundary in the Compact could be determined with reasonable accuracy. Report of Special Master in *Nebraska* v. *Iowa,* O. T. 1964, No. 17 Orig., p. 50.

[22] See 1943 Iowa Acts, ch. 306, as ratified by Act of July 12, 1943, ch. 220, 57 Stat. 494:

"Sec. 2. The State of Iowa hereby cedes to the State of Nebraska and relinquishes jurisdiction over all lands now in Iowa but lying westerly of said boundary line and contiguous to lands in Nebraska.

"Sec. 3. Titles, mortgages, and other liens good in Nebraska shall be good in Iowa as to any lands Nebraska may cede to Iowa and any pending suits or actions concerning said lands may be prosecuted to final judgment in Nebraska and such judgments shall be accorded full force and effect in Iowa."



Thus, ceded lands east of the Compact line came under Iowa jurisdiction; but Iowa was obligated to respect title to any ceded land east of the new boundary if that title was "good in" Nebraska. Accepting the Special Master's recommendations in this respect, the Court ruled that one claiming a Nebraska title to land east of the Compact line need show only "good title" under Nebraska law and need not also prove either the location of the original boundary between the two States or that the land at issue was on the Nebraska side of that original boundary. The Court further ruled, in agreement with the Special Master, that in litigating with private claimants seeking to prove good Nebraska title to land east of the Compact line, the State of Iowa was disentitled to rely on certain doctrines of Iowa common law bearing on riparian land ownership.[23]

In this case, the District Court ruled that even though the United States and an Indian tribe rather than private parties were plaintiffs, title to the Barrett survey land, which was once in Nebraska but is now unquestionably in Iowa, should be governed by Nebraska law in accordance with the terms of the Compact. Proceeding to adjudicate the case in accordance with Nebraska law, the District Judge found that the Tribe and the Government, respondents here, had failed to prove that the Blackbird Bend area had been separated from the rest of the reservation by avulsive changes in the Missouri River and that the defendants, petitioners here, without the aid of any presumption of accretion available under Iowa law

[23] Under this ruling, Iowa was disentitled, either as plaintiff or defendant, from invoking its presumption that changes in the Missouri had been accretive rather than avulsive, and could not rely on its rule that no person can claim adversely against the sovereign State of Iowa. Thus, a title based on adverse possession good under Nebraska law would be good in Iowa. Report of Special Master, *supra,* at 174–175.

Case 3:08-cr-01196-W Document 37-7 Filed 08/27/2008 Page 16 of 17



if applicable, had instead proved that the river changes had been by accretion. In the course of arriving at this conclusion, the District Court, relying on Nebraska cases, rejected the Government's definition of avulsion, later embraced by the Court of Appeals, as contrary to the common law of Nebraska. The defendants, petitioners here, having carried the burden of proving their good title to the land at issue, were entitled to a decree quieting title in them.

Although we have already held that the District Court erred in concluding that determination of titles to reservations lands is not a matter for the federal law, we have also indicated that the federal law should incorporate the applicable state property law to resolve the dispute. Therefore, it seems to us that the District Court reached the correct result in ruling that under the construction of the Compact in *Nebraska* v. *Iowa*, Nebraska law should be applied in determining whether the changes in the river that moved the Blackbird Bend area from Nebraska to Iowa had been avulsive or accretive. It should also be noted that the District Court, although wrong in wholly rejecting the applicability of § 194, concluded as a matter of fact and law that the defendants, petitioners here, had carried the burden of persuasion normally incumbent upon a plaintiff in a quiet-title action, and had proved by a preponderance of the evidence that the reservation lands had eroded and had accreted to the Iowa shoreline. Apparently for this reason, the trial judge observed at the end of his memorandum opinion that were he wrong in refusing to apply § 194, his findings and conclusions "would not be altered by any different allocation of the burden of persuasion." 433 F. Supp., at 67.

IV

In sum, the Court of Appeals was partially correct in ruling that § 194 was applicable in this case. By its terms, § 194 applies to the private petitioners but not to petitioner State of Iowa. We also agree with the Court of Appeals' conclu-



sion that federal law governed the substantive aspects of the dispute, but find it in error for arriving at a federal standard, independent of state law, to determine whether there had been an avulsion or an accretion. Instead, the court should have incorporated the law of the State that otherwise would have been applicable which, as we have said, is the law of Nebraska. Of course, because of its view of the controlling law, the Court of Appeals did not consider whether the District Court had correctly interpreted Nebraska law and had properly applied it to the facts of this case. These tasks are still to be performed, and we vacate the Court of Appeals' judgment and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring.

I join the Court's opinion, but I write briefly to add a comment about my views as to the scope of 25 U. S. C. § 194.

Section 194 applies to a property dispute between an Indian and a "white person."* The property dispute here is between Indians, on the one hand, and, on the other, nine individuals, two corporations, and the State of Iowa. See 575 F. 2d 620, 622 (CA8 1978). The Court holds that "white person" includes an artificial entity and thus that § 194 applies in the dispute between the Omahas and the two corporate petitioners. *Ante*, at 666–667. Contrariwise, the Court holds that "white person" does not include a sovereign State, and thus that § 194 does not apply in the dispute between the Omahas and petitioner State of Iowa. *Ante*, at 667–668, 678. The Court, however, does not expressly discuss § 194's applicability to the nine individual claimants.

Since the Court nevertheless holds that "§ 194 applies to the private petitioners" without exception, *ante*, at 678, it must be proceeding on one of two assumptions. The Court could assume, first, that all nine individual petitioners are Caucasians, and hence each literally is a "white person" under § 194. There is no evidence in the record, however, as to the race of these individuals. See Brief for Petitioners in No. 78–160, p. 30; Brief for United States 32 n. 25; Tr. of Oral Arg. 13. Since the burden of proving the factual predicate for § 194's applicability presumably rests on the Indians who seek to invoke it, the Court, in holding § 194 applicable to the individual petitioners here, could not properly rely on this first possible assumption.

The Court could assume, second, that "white person" in § 194 refers, not to a Caucasian, but to a "non-Indian" individual. On this assumption, the race of the individual petitioners (so long as they are not Indians) would be irrelevant in determining § 194's applicability. That this is in fact the assumption the Court makes is suggested by its decision to ignore the adjective "white" in holding each of the corporate petitioners to be a "white person," and by its refusal to follow *United States* v. *Perryman*, 100 U. S. 235 (1880), where it was held that "white person," as used in another section of the Non-Intercourse Act, did not include a Negro. *Ante*, at 666 n. 16.

The Court seems to hold implicitly, therefore, that "white person" in § 194 includes any "non-Indian" individual. I would prefer to make this holding explicit. In my view, any other construction of § 194 would raise serious constitutional questions. To construe § 194 as applicable to disputes between Indians and Caucasians, but not to disputes between Indians and black or oriental individuals, would create an irrational racial classification highly questionable under the Fifth Amendment's equal protection guarantee. To



avoid this result, § 194's reference to a "white person" must be read to mean any "non-Indian" individual or entity, and I so interpret the Court's holding today. To the extent that *Perryman* is inconsistent with this reading, I must regard that case as overruled *sub silentio*.