James-Francis: Murphy,
In Care of Postal Department 234277
Encinitas, California 92023-4277
Tel: 760-230-2868
In Propria Persona

NUNC PRO TUNC
AUG 25 2008

FILED
08 AUG 27 AM 9:30
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** PLAINTIFF, v. JAMES FRANCIS MURPHY Defendant, | CASE NO. - 08 CR 1196 W |
| | **EXHIBIT 22** |
| | **CALLAHAN v. WOODS, 658 F.2d 679 (1981)** |
| James-Francis: Murphy Third Party Intervener, Real Party in Interest, Authorized Representative | Magistrate Judge Nita L. Stormes August 26, 2008 at 9:30am |
| | Judge Thomas J. Whelan September 8, 2008 at 2:00pm and September 30, 2008 at 9:00am |

Total pages of **EXHIBIT 22** attached- nine (9)

James Francis Murphy, AR, appears and presents this exhibit for the court for submission into evidence now and/or at trial.

Respectfully submitted August 25, 2008,

James-Francis: Murphy,
Authorized Representative

**CERTIFICATE OF SERVICE**

COPY of the forgoing hand delivered,
This 25 day of August, 2008, to:
U. S. Assistant Attorney Fred Sheppard
880 Front Street Room 6293
San Diego, CA
619-557-5610

Service performed by:

James-Francis: Murphy
In Care of Postal Department 234277
Encinitas, California a 92023-4277
Tel: 760-230-2868

Case 3:08-cr-01196-W Document 37-16 Filed 08/27/2008 Page 3 of 11



issue before us. Both appeals involved the right to peremptory challenges secured by Fed.R.Crim.P. 24; neither raised constitutional questions. Indeed, in *Turner*, Judge Hufstedler, although acknowledging the importance of peremptory challenges, cited *Stilson* for the proposition that "[n]either the number of peremptories nor the manner of their exercise is constitutionally secured." *Id.* at 538.

The majority states that it does not "hold that the Constitution requires the states to afford criminal defendants a particular number of peremptory challenges . . . ." It would agree, presumably, that a state could provide 10 peremptory challenges by statute without violating the defendant's "right to assure the empaneling of an impartial jury." I admit to being puzzled, therefore, as to how that right is denied here, where Hines received 13 peremptory challenges. Obviously Hines had more assurance that an impartial jury would be empaneled than would a defendant in a state which provides 10 peremptory challenges. Defendants in non-capital criminal prosecutions in California are entitled by statute to 13 peremptory challenges, the same number that Hines received. I presume that the majority would not suggest that California defendants in non-capital cases are thereby denied the constitutional right to be tried by an impartial jury.

Nor, finally, do I think that habeas relief can be justified on a theory that peremptory challenges, although not constitutionally required, cannot constitutionally be denied at trial once they are granted by state statute. There is no suggestion here that the trial judge's denial of the additional peremptories was other than inadvertent, and there was no objection made by defendant's trial counsel. The majority, by finding a due process violation in these circumstances, sets the stage for the wholesale constitutionalization of the myriad state rules of criminal procedure. For under the majority's approach, the denial of any state procedural right which—although not constitutionally required—can be deemed important might be held to violate the Due Process Clause. That course, I fear, is likely to impair rather than strengthen the federal courts' role in protecting the constitutional right of state defendants to a fair trial.




**Robert Dale CALLAHAN, Plaintiff-Appellant,**

**v.**

**Marion WOODS, Director California Dept. of Benefit Payments and Joseph Califano, Secretary of Health, Education and Welfare of the United States, Defendants-Appellees.**

No. 79-4612.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 1981.

Decided Oct. 5, 1981.

Rehearing Denied Jan. 19, 1982.

Father who refused to obtain social security number for his daughter so that she could obtain aid to families with dependent children benefits sought writ of mandamus in state court. Action was removed to federal court. The United States District Court for the Northern District of California, William H. Orrick, Jr., J., 479 F.Supp. 621, rendered summary judgment for the government, and plaintiff appealed. The Court of Appeals, Adams, Circuit Judge for the Third Circuit, sitting by designation, held that father's views regarding social security numbers as the "mark of the beast" were theological in nature and plainly religious within meaning of First Amendment and since father sincerely held those views it was incumbent on the government to show a compelling interest in making social security numbers a prerequisite for AFDC benefits and trial court was to determine if that interest could be satisfied by some less restrictive means.

Reversed and remanded.

**1. Constitutional Law ⇐42.2(1)**

Parents may exercise constitutional rights on behalf of their children; hence, father, on behalf of minor daughter, could properly assert that requirement that obtaining a social security number to obtain Aid to Families with Dependent Children on behalf of daughter contravened his sincere religious beliefs. U.S.C.A.Const. Amend. 1; Social Security Act, § 402(a)(25), 42 U.S.C.A. § 602(a)(25).

**2. Constitutional Law ⇐84**

To merit protection under the free exercise clause, a religious claim must satisfy two basic criteria: first, claimant's proffered belief must be sincerely held, and, second, claim must be rooted in religious beliefs and not in purely secular philosophical concerns. U.S.C.A.Const. Amend. 1.

**3. Constitutional Law ⇐84**

A First Amendment inquiry into sincerity with which a proffered belief is held addresses the sincerity with which claimant holds the religious belief itself. U.S.C.A. Const. Amend. 1.

**4. Constitutional Law ⇐84**

If father's current objection to social security numbers and his refusal to obtain one for daughter, on whose behalf he sought aid to families with dependent children benefits, had nothing to do with the reason proffered and if his claims about the "mark of the beast" were fictitious trappings for long-standing secular concerns, trial court would be obliged to find him insincere and his claims entitled to no special privilege under First Amendment. U.S.C.A.Const. Amend. 1; Social Security Act, § 402(a)(25), 42 U.S.C.A. § 602(a)(25).

**5. Constitutional Law ⇐84**

Where it is found that allegedly religious belief is sincerely held, presence of long-standing secular objections does not refute the finding of sincerity, for free exercise purposes. U.S.C.A.Const. Amend. 1.

**6. Constitutional Law ⇐84**

For free exercise purposes, coincidence of religious and secular claims does not extinguish the weight appropriately accorded the religious one. U.S.C.A.Const. Amend. 1.

**7. Constitutional Law ⇐84**

Religious duties need not contradict personal values or preferences in order to be protected under the free exercise clause. U.S.C.A.Const. Amend. 1.

**8. Constitutional Law ⇐84**

In applying the free exercise clause, courts may not inquire into the truth, validity or reasonableness of a claimant's religious beliefs. U.S.C.A.Const. Amend. 1.

**9. Constitutional Law ⇐84**

Although courts do not inquire into truth of the religious belief, it is incumbent on the court to insure that a free exercise claim is granted only when the threatened belief is religious in nature. U.S.C.A.Const. Amend. 1.

**10. Constitutional Law ⇐84**

Father's interpretation of social security numbers as tools of the Antichrist and his related refusal to obtain a number for daughter so that she could obtain aid to families with dependent children benefits was religious in nature and closely tied to a theistic belief, father was a member of Baptist Church, his ascription of diabolical status to social security numbers was derived from New Testament's Book of Revelation, and fact that his interpretation of scripture might differ from those of other church members could not invalidate his free exercise right; understanding of subject passage addressed spiritual and not merely worldly concerns. U.S.C.A.Const. Amend. 1; Social Security Act, § 402(a)(25), 42 U.S.C.A. § 602(a)(25).

**11. Constitutional Law ⇐84**

**Social Security and Public Welfare ⇐194.16**

Since father's views regarding social security numbers as the "mark of the beast" were theological in nature and plainly religious within meaning of free exercise clause and since father, who refused to obtain a number for his daughter so that she could obtain aid to families with dependent

children benefits, sincerely held his views, the government was required to show a compelling state interest in making social security numbers a prerequisite for benefits and trial court was to decide if that interest could be satisfied by some less restrictive means. U.S.C.A.Const. Amend. 1; Social Security Act, § 402(a)(25), 42 U.S.C.A. § 602(a)(25).

**12. Constitutional Law ⟹84**

Correct standard for free exercise purposes was not whether father's opposition to social security numbers as the "mark of the beast" had always been religious but, rather, whether they were religious in the context of the life as he now lived it. U.S.C.A.Const. Amend. 1; Social Security Act, § 402(a)(25), 42 U.S.C.A. § 602(a)(25).

**13. Constitutional Law ⟹84**

If judicial inquiry into the truth of one's religious beliefs violates free exercise clause, an inquiry into one's reasons for adopting those beliefs is similarly intrusive. U.S.C.A.Const. Amend. 1.

**14. Constitutional Law ⟹84**

So long as one's faith is religiously based at time it is asserted, it does not matter, for free exercise clause purposes, whether that faith derives from revelation, study, upbringing, gradual evolution or some source that appears entirely incomprehensible and constitutional protection cannot be denied simply because early experience has left one particularly open to current religious beliefs. U.S.C.A.Const. Amend. 1.

---

Alan Jaroslovsky, Santa Rosa, Cal., for plaintiff-appellant.

Leonard Schaitman, Dept. of Justice, Washington, D. C., for defendants-appellees.

Appeal from the United States District Court for the Northern District of California.

Before ADAMS,* GOODWIN and FARRIS, Circuit Judges.

ADAMS, Circuit Judge.

On this appeal we are asked to determine whether the state and federal governments, in requiring Robert D. Callahan to obtain a social security number for his daughter before she could obtain public assistance benefits, even though procuring such a number would contravene what appellant asserts is a sincere religious belief, violated his First Amendment right to the free exercise of religion. Because the district court, 479 F.Supp. 621, in awarding summary judgment for the government, incorrectly construed plaintiff's beliefs as non-religious, we reverse its judgment and remand for a determination of the governments' interest in the regulation.

I.

Callahan is married and has two children. Following his release from prison in 1974 he was unemployed, and his family became eligible to receive Aid to Families with Dependent Children (AFDC) benefits for both children. The State of California paid those benefits in full until May 10, 1977, when the County of Sonoma notified Callahan that his younger child, Serena, for whom Callahan refused to obtain a social security number, was no longer eligible. Callahan, his wife, and their older child all held social security numbers at the time. The State, in requiring a social security number for AFDC eligibility acted pursuant to the mandate of Section 402(a)(25) of the Social Security Act, 42 U.S.C. § 602(a)(25) (1976).[1]

* Hon. Arlin M. Adams, United States Court of Appeals for the Third Circuit, sitting by designation.

1. Although we do not reach the issue whether the Social Security Act requires numbers for children on whose behalf parents receive AFDC benefits, we note that courts confronting the issue have construed the statute to mandate issuance of the numbers. *See McElrath v. Califano*, 615 F.2d 434 (7th Cir. 1980); *Green v. Philbrook*, 576 F.2d 440 (2d Cir. 1978); *Doe v. Sharp*, 491 F.Supp. 346 (D.Mass.1980); *Mullaney v. Woods*, 97 Cal.App.3d 710, 718, 158 Cal.Rptr. 902 (1979).

[1] Although born a Catholic and raised as a Baptist, Callahan did not develop a strong interest in religion until 1973, while at San Quentin. Since then he has read the Bible for half an hour to an hour each day, and is now a member of the West Santa Rosa Baptist Church. Callahan, who claims to have a literal belief in the Bible, asserts that his refusal to comply with the social security number requirement for Serena is solely religious. He cites in support of his objection to social security numbers a religious text, Chapter 13 of the New Testament *Book of Revelation*, which reads in part:

> 16. [H]e causeth all, both small and great, rich and poor, free and bond, to receive a mark in their right hand, or in their foreheads;
>
> 17. And that no man might buy or sell, save that he had the mark, or the name of the beast, or the number of his name;
>
> 18. Here is wisdom. Let him that hath understanding count the number of the beast: for it is the number of a man; and his number *is* Six hundred three-score *and* six.

According to Callahan, social security numbers are the "mark of the beast"—the sign of the Antichrist who threatens to control the world. To accept a number, he maintains, is to "serve the beast." Callahan acknowledges that his aversion to social security and other personal identification numbers predates his interest in religion. Nonetheless, he asserts that his objection is now religious in nature, that the *Revelation* text articulates a concept that he felt in a more inchoate form before studying the Bible. He and his wife freely accepted social security numbers, but according to appellant they did so before he arrived at his religious understanding. Although Callahan did not wish to obtain a number for his first child he did so, apparently fearing violation of his parole, which terminated in December 1975. Now he believes that, on behalf of Serena,[2] he must observe his religious objections to assigning numbers and preserve her freedom to avoid serving the beast, even though she may well decide later to obtain a number voluntarily.

Upon receiving notification that benefits for Serena would be terminated, Callahan, pursuant to California administrative procedure, sought a hearing before the Department of Benefit Payments. The hearing officer found that Callahan held sincere religious beliefs that militated against issuance of a social security number for his daughter; nonetheless he held that federal regulations required the issuance of such a number before any more benefits could be paid on behalf of Serena. Callahan petitioned the Sonoma Superior Court for a writ of mandamus to compel the payment of those benefits. The Secretary of Health, Education, and Welfare (now Health and Human Services) was joined in that action as the real party in interest, and the case was removed to federal court. In the district court, Callahan and the Secretary filed cross-motions for summary judgment. The judge held an evidentiary hearing, consisting of live testimony by the plaintiff. On the basis of that hearing as well as the pleadings and affidavits previously filed, the court found that Callahan's views on the undesirability of personal identification numbers were, though sincere, not religious in nature. Rather, he found that they were primarily manifestations of a personal, secular philosophy developed during Callahan's thirteen years of incarceration. The court concluded that although Callahan relied upon "concepts admittedly drawn from traditional religious text," he did so only "to justify and support a secular, philosophical objection to the use of social security numbers by the government." *Callahan v. Woods*, 479 F.Supp. 621, 625 (N.D.Cal.1979). Consequently the court granted the government's summary judgment motion, holding that the state, in requiring Callahan to acquire a number for Serena before she could receive AFDC benefits, did not burden a protected interest.

2. Parents may exercise constitutional rights on behalf of their children. *See Wisconsin v. Yoder*, 406 U.S. 205, 232–34, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925).

II.

[2] A religious claim, to merit protection under the free exercise clause of the First Amendment,[3] must satisfy two basic criteria. First, the claimant's proffered belief must be sincerely held; the First Amendment does not extend to "so-called religions which . . . are obviously shams and absurdities and whose members are patently devoid of religious sincerity." *Theriault v. Carlson*, 495 F.2d 390, 395 (5th Cir. 1974), *cert. denied*, 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279 (1974); *see Stevens v. Berger*, 428 F.Supp. 896, 899 (E.D.N.Y.1977). Second, as the Supreme Court held in *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972), the claim must be rooted in religious belief, not in "purely secular" philosophical concerns. *Cf. United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965) (test for religious belief within meaning of draft law exemptions is whether beliefs professed are sincerely held and, in claimant's scheme of things, religious).[4]

[3] Initially we are faced with some ambiguity in the district court's application of the two-part test. It found that the plaintiff was sincere in his objection to identification numbers, but that his objection was not "rooted in religious belief." 479 F.Supp. at 624. The court did not explicitly attach its finding of sincerity to a specific idea or claim of Callahan's. Arguably, the court might have meant merely that Callahan sincerely dislikes social security numbers, but sincerity of that sort would be obvious from the very existence of this lawsuit. A First Amendment inquiry into sincerity generally has a different focus, addressing the sincerity with which the claimant holds the allegedly religious belief itself. *See, e. g., Theriault v. Carlson, supra*, 495 F.2d at 394–95. Thus, construed properly the trial court's blanket finding of sincerity must mean that the plaintiff, when he says that he opposes personal identification numbers because they are the "mark of the beast" and tools of the Antichrist, sincerely believes in the diabolical nature of those numbers. The remaining question, then, is whether Callahan's objections are "rooted in" a belief that is religious in nature. *See Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1977).

In purportedly examining whether Callahan's views were "rooted in" his alleged scriptural interpretation, the court focused on issues that in this case were more relevant to the already settled question of sincerity. It is of course imaginable that in some circumstances a person might assert a First Amendment claim and attempt to justify it with a religious belief which, though sincerely held, was simply irrelevant to the claim. For example, *Yoder* involved claims by the Amish that public education for their children after the eighth grade violated their religious beliefs. If in that case the court had determined that the objection of the Amish to education was unrelated to their religious beliefs, then their constitutional claim would have had no merit even though their religious beliefs were sincere. *See Yoder*, 406 U.S. at 215–16, 92 S.Ct. at 1532–33. But just as the Supreme Court found in that case that the claim was related to the religious belief of the Amish, 406 U.S. at 215–16, 92 S.Ct. at 1532–33, here the relevance of Callahan's proffered beliefs to his claim is apparent. Indeed, it is hard to imagine how Callahan's belief that social security numbers are the "mark of the beast" could, if sincere, be considered irrelevant to his stand against the issuance of a number for Serena. Once his belief is established as sincere, it would seem undisputable that Callahan's objection must be "rooted in" that belief, at least in part.

3. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

4. Though it construed a statute rather than the Constitution itself, *Seeger* is often read as addressing constitutional limits inherent in the draft statute; the case is therefore applicable to First Amendment analysis generally. *See Malnak v. Yogi*, 592 F.2d 197, 203–05 (3d Cir. 1979) (Adams, J., concurring); Note, *Toward a Constitutional Definition of Religion*, 91 Harv.L. Rev. 1056, 1064 & n.56.

Nonetheless, the court concluded that Callahan's objection to identification numbers, although sincere, was actually "rooted in" secular and philosophical concerns. In reaching this result, the court emphasized that Callahan's aversion to identification numbers predated by many years his religious awakening, and found that Callahan's long prison experience was the major impetus to his belief. 479 F.Supp. at 624–25. Distinguishing *Stevens v. Berger, supra,* a case which similarly involved plaintiffs who objected to the issuance of social security numbers for their children on the ground that such numbers were the "mark of the beast," the trial court here noted that in this case:

> Plaintiff's beliefs arose in a purely secular context, uninformed by religious training or inspiration. Under such circumstances, the First Amendment does not shield plaintiff from the legitimate commands of the government.

479 F.Supp. at 625 n.6. This reasoning strongly suggests an underlying premise that a long-held secular belief invalidates First Amendment protection for a related but newly-alleged religious belief.

**[4, 5]** This premise may in some cases be applicable to the question of sincerity. A person seeking to advance a secular interest might, if frustrated in his pursuit, decide to mask the cause in religious garb in order to bring it under First Amendment protection. The existence of a longstanding philosophical belief which has only recently, and to the claimant's advantage, taken on theological overtones could certainly give rise to reasonable suspicion of dissimulation. If the district court had, after hearing Callahan's testimony, decided that his current objection to social security numbers had nothing to do with the reason proffered, and thus decided that his claims about the "mark of the beast" were fictitious trappings for his longstanding secular concerns,[5] then the court would be obliged to find him insincere and his claims entitled to no special privilege. But where, as here, the court has found that the allegedly religious belief is sincerely held, the presence of longstanding secular objections does not refute the finding of sincerity any more than it negates in this case the obvious connection between Callahan's allegedly religious belief and his objection to obtaining a number.

**[6, 7]** Because Callahan's distaste for numbers is longstanding, one might infer that even if he now objects to numbers on scriptural grounds, he opposes them for personal and philosophical reasons as well. But a coincidence of religious and secular claims in no way extinguishes the weight appropriately accorded the religious one. In *Yoder* the Supreme Court warned that a belief that is based on "purely secular considerations" merits no protection under the free exercise clause. 406 U.S. at 215, 92 S.Ct. at 1532. It did not limit the scope of the First Amendment to "purely religious" claims; the area of overlap is presumably protected. The devout Seventh-Day Adventist may enjoy his Saturday leisure; the Orthodox Jew or Mohammedan may dislike the taste of pork. Such personal considerations are irrelevant to an analysis of the claimants' free exercise rights, so long as their religious motivation requires them to keep the Sabbath and avoid pork products. Religious duties need not contradict personal values or preferences in order to be protected. It might be argued that Callahan's personal animus toward numbers would by itself have been enough to motivate his refusal to give Serena a number.[6] Even if

5. Others have opposed the issuance of social security numbers on wholly secular grounds. *See McElrath v. Califano,* 615 F.2d 434 (7th Cir. 1980) (requiring social security numbers for dependent children as a condition of AFDC benefits does not violate constitutional rights of privacy and equal protection); *Doe v. Sharp,* 491 F.Supp. 346 (D.Mass.1980) (Social security number requirement for AFDC eligibility held not to violate constitutional right to privacy or statutory language of AFDC statute.); *Green v. Philbrook,* 576 F.2d 440 (2d Cir. 1978).

6. It seems unlikely, however, that Callahan's long-standing secular reasons for objecting to social security numbers would by themselves have prompted the refusal to issue Serena a number; while he held such views he and his wife freely accepted numbers themselves.

this were the
burdening her
would provide
son for his act
as religious,
tion.[7]

[8] In appl
of the First
inquire into tl
bleness of a
*See United S*
87, 64 S.Ct. 8
*Stevens v. B*
(E.D.N.Y.1977
pear to every
race preposter
of the Bill of
has recognize
right were d
establish the t
First Amendm
dered illusory.
Am" moveme
tus as a speci
God, were co
solicitations.
the district
withholding f
tion of the tr
made and lim
tion whether
lieved in the
Court explain
The religio
dents migh
posterous, t
doctrines ar
charged wi
ty, then th
religious be
triers of fa
enter a for
822 U.S. at 8

[9, 10] It
the courts to
claim is gran
belief is relig

7. St. Augusti
Chesterton, a

this were the case, his sincere objection to burdening her with the "mark of the beast" would provide a separate and sufficient reason for his action, one that, if characterized as religious, merits constitutional protection.[7]

III.

[8] In applying the free exercise clause of the First Amendment, courts may not inquire into the truth, validity, or reasonableness of a claimant's religious beliefs. *See United States v. Ballard*, 322 U.S. 78, 87, 64 S.Ct. 882, 886, 88 L.Ed. 1148 (1944); *Stevens v. Berger*, 428 F.Supp. 896, 899 (E.D.N.Y.1977) ("A religious belief can appear to every other member of the human race preposterous, yet merit the protections of the Bill of Rights.") The Supreme Court has recognized that if the free exercise right were dependent on one's ability to establish the truth of one's beliefs, then the First Amendment guarantees might be rendered illusory. In *Ballard*, leaders of the "I Am" movement, one of whom claimed status as a specially designated messenger of God, were convicted of mail fraud in their solicitations. The Supreme Court held that the district court had acted properly in withholding from the jury any consideration of the truth of the religious statements made and limiting the jury to a determination whether the defendants sincerely believed in their religious assertions. The Court explained:

> The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain.

322 U.S. at 87, 64 S.Ct. at 886.

[9, 10] It is nonetheless incumbent on the courts to ensure that a free exercise claim is granted only when the threatened belief is religious in nature. *Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972). While defining religious belief is often quite difficult, *see Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981); *United States v. Seeger*, 380 U.S. 163, 174, 85 S.Ct. 850, 858, 13 L.Ed.2d 733 (1965), there can be little doubt that Callahan's interpretation of social security numbers as tools of the Antichrist is religious in nature.

While many cases have grappled with the difficult problem of identifying nontraditional beliefs that merit protection, *see, e. g., Seeger, supra*, this case presents a matter that in many respects is less difficult to resolve. Although traditional religious beliefs are entitled to no greater protection than many nontraditional dogmas, their status as religious beliefs is often more readily ascertained. Indeed, such doctrines are the standard by which other beliefs are measured for inclusion in the First Amendment guarantee. *See Malnak v. Yogi*, 592 F.2d 197, 207 (3d Cir. 1979) (Adams, J., concurring). And in this case, Callahan's views on social security numbers are closely tied to a theistic belief. Callahan is a member of the Baptist church; his ascription of diabolical status to social security numbers is derived from the New Testament's *Book of Revelation*, a text which his church, and indeed most churches, consider holy.

Callahan's interpretation of the scriptures may differ from the meaning members of his church generally find in that text, but such disagreement cannot itself invalidate his free exercise right. Though the district court did not have available the guidance of the Supreme Court's analysis in *Thomas*, since it was decided after the court's decision, that case establishes that "the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." 450 U.S. at 715, 101 S.Ct. at 1431. In *Thomas*, the Court held that a Jehovah's Witness's objection to producing armaments was religiously motivat-

7. St. Augustine and the British writer, G. K. Chesterton, are examples of persons who first had strong philosophical convictions or views that in later life became religious in nature.

ed even though others of his denomination found that work " 'scripturally' acceptable." The Court explained that "it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation." *Id.* 450 U.S. 715–16, 101 S.Ct. at 1431. While this abstention from evaluating the merits of a scriptural interpretation may not be maintained when the claim is so bizarre or so unrelated to the religious nature of the text that it is "clearly nonreligious in motivation," *id.*, in this case a court cannot disregard Callahan's reading as nonreligious. His understanding of the *Revelation* passage is theological and eschatological; it clearly addresses spiritual, not merely worldly, concerns.

Given the close similarity of the ideas involved in this case and those in *Stevens v. Berger, supra*, Judge Weinstein's thorough and compelling analysis of the Stevenses' dogma is fully apposite here.[8] In *Stevens* the plaintiffs, while seeking AFDC benefits for their children, objected to the issuance of social security numbers as a prerequisite to eligibility. They explained that social security numbers were becoming the universal identification number predicted in the *Book of Revelation* as the tool used by the Antichrist to control individuals. The Stevenses feared that obtaining numbers for their children would jeopardize their children's spiritual well-being and threaten their opportunity to enter heaven. 428 F.Supp. at 901–02. Noting that neither widespread adherence nor scriptural support is a prerequisite to constitutionally protected status for a purportedly religious claim, the court nevertheless traced the history of the Jewish and Christian concepts of the Antichrist and found that "The meaning of the mark to theologians—whatever they believe the mark to have been—is strikingly similar to the meaning for the Stevenses, who see a potential for abuse of the spiritual side of humanity in a number which could act as a universal identifier." 428 F.Supp. at 905. It concluded that:

> Since having a social security number in this society has become a prerequisite for so many of the society's benefits (both from the public and private sectors), no great leap of imagination is necessary to travel from the exegesis of *Revelation* to the plaintiffs' belief that such numbers could function, if the state were to become too powerful, like the mark of the Antichrist spoken of in the biblical text. With the history and literature marshalled by plaintiffs to support their contention, their belief must be characterized as religious for purposes of this case.

*Id.* at 905. Though Callahan's interpretation of *Revelation* may not have been as well articulated as the Stevenses' interpretation, it reaches the same conclusions for substantially the same stated reasons. And as the Supreme Court recently held in *Thomas*, a person's free exercise should not be curtailed simply because "his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." 450 U.S. at 715, 101 S.Ct. at 1430.

## IV.

[11] It would appear quite clear then that Callahan's views regarding social security numbers as the "mark of the beast" are theological in nature and plainly religious within the meaning of the First Amendment. As the district court found, Callahan sincerely holds those views. It would seem that both requirements of the threshold test for a free exercise claim are satisfied. The appropriate course, therefore, is to determine the extent to which Callahan's protected beliefs were burdened by the government's regulations, consider whether the government has a compelling interest in making social security numbers a prerequisite for AFDC benefits, and decide

8. The district court here noted the cogency of Judge Weinstein's analysis, and distinguished Callahan's case not because his belief was at variance with the belief of the Stevenses, but because *Callahan* came to that belief differently. *Callahan v. Woods*, 479 F.Supp. 621, 625 n.6 (N.D.Cal.1979).

if that interest
less restrictive r
450 U.S. at 715,

[12] Before
ever, the distric
additional thre
claimant's belie
in order to fall
Amendment.
though plaintif
to be 'religious
involvement or
ganized or oth
But the corre
Callahan's bel
gious; they n
context of his
*Seeger, supra,*
863 (test for
draft statute
play a role in l
traditional the
*ally* Note, *To*
*tion of Religic*

[13, 14] If
of one's relig
free exercise
*Ballard, supr*
886, an inquir
ing those bel
long as one's
time it is asse
constitutional
derived from
gradual evol
pears entirel
the courts ea
springing fr
gin.[10] A sec

9. Courts cor
lar to those
ent results.
F.Supp. 896
devise alter
for those fe
numbers as
*laney v. W*
Rptr. 902 (1
prehensive
fits is comp

if that interest may be satisfied by some less restrictive means.[9] *See Thomas, supra,* 450 U.S. at 715, 101 S.Ct. at 1431.

[12] Before it reached this step, however, the district court seemingly applied an additional threshold requirement: that a claimant's belief must be of religious *origin* in order to fall within the ambit of the First Amendment. The court found that "although plaintiff may now claim [his] beliefs to be 'religious' in origin, they predate any involvement on his part with religion—organized or otherwise," 479 F.Supp. at 625. But the correct standard is not whether Callahan's beliefs have *always* been religious; they need only be religious in the context of his life as he now lives it. *Cf. Seeger, supra,* 380 U.S. at 184, 85 S.Ct. at 863 (test for religious exemption under draft statute is whether objector's beliefs play a role in his life similar to that of more traditional theological beliefs). *See generally* Note, *Toward a Constitutional Definition of Religion,* 91 *Harv.L.Rev.* 1056 (1978).

[13, 14] If judicial inquiry into the truth of one's religious beliefs would violate the free exercise clause, *see United States v. Ballard, supra,* 322 U.S. at 87, 64 S.Ct. at 886, an inquiry into one's reasons for adopting those beliefs is similarly intrusive. So long as one's faith is religiously based at the time it is asserted, it should not matter, for constitutional purposes, whether that faith derived from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible. Nor can the courts easily distinguish between beliefs springing from religious and secular origin.[10] A secular experience can stimulate a spiritual response; lives are not so compartmentalized that one can readily keep the two separate. It may well be that Callahan first developed an aversion to numbers when he felt their dehumanizing effect in prison. If later study or inspiration has provided him with an additional, theological objection to numbering people, then his present belief developed out of secular and religious elements that cannot be disentangled. In any event, constitutional protection cannot be denied simply because earlier experience has left him particularly open to his current religious belief.

V.

Inasmuch as Callahan's objections to acquiring a social security number for his daughter are sincerely held and religious in nature, we reverse the holding of the district court and remand for a determination, in light of *Thomas,* of the extent to which Callahan's protected belief is burdened by the government's requirement, and whether the government here is following the "least restrictive means of achieving some compelling . . . interest," *Thomas, supra,* 450 U.S. at 718, 101 S.Ct. at 1432.




9. Courts conducting this balance on facts similar to those involved here have reached different results. *Compare Stevens v. Berger,* 428 F.Supp. 896 (E.D.N.Y.1977) (government must devise alternative to social security numbers for those few who, like plaintiffs, object to such numbers as the "mark of the beast"), *and Mullaney v. Woods,* 97 Cal.App.3d 710, 158 Cal. Rptr. 902 (1979) (government's interest in comprehensive numbering system for AFDC benefits is compelling and unachievable by less restrictive means, and thus overcomes "incidental infringement" of plaintiff's religious belief that social security numbers are the "mark of the beast").

10. Courts are ill-equipped to discriminate according to the psychological basis for a religious faith. *See* Clark, *Guidelines for the Free Exercise Clause,* 83 Harv.L.Rev. 327, 342–43 (1969).