James-Francis: Murphy,
In Care of Postal Department 234277
Encinitas, California 92023-4277
Tel: 760-230-2868
In Propria Persona

**NUNC PRO TUNC**
AUG 2 5 2008

FILED
08 AUG 27 AM 9:30
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**UNITED STATES OF AMERICA**
PLAINTIFF,
v.
JAMES FRANCIS MURPHY
Defendant,

James-Francis: Murphy
Third Party Intervener,
Real Party in Interest,
Authorized Representative

CASE NO. - 08 CR 1196 W

**EXHIBIT 25**

**First Annual Report of the Social Security Board Fiscal Year Ended June 30, 1936**

Magistrate Judge Nita L. Stormes
August 26, 2008 at 9:30am

Judge Thomas J. Whelan
September 8, 2008 at 2:00pm and
September 30, 2008 at 9:00am

Total pages of **EXHIBIT 25** attached- two (2)

James Francis Murphy, AR, appears and presents this exhibit for the court for submission into evidence now and/or at trial.

Respectfully submitted August 25, 2008,

James-Francis: Murphy,
Authorized Representative

**CERTIFICATE OF SERVICE**

COPY of the forgoing hand delivered,
This 25 day of August, 2008, to:
U. S. Assistant Attorney Fred Sheppard
880 Front Street Room 6293
San Diego, CA
619-557-5610

---

Service performed by:

James-Francis: Murphy
In Care of Postal Department 234277
Encinitas, California a 92023-4277
Tel: 760-230-2868

C:\Documents and Settings\SDDoc\My Documen[illegible]ES MINE\Federal Case\exhibits\First_Annual_Report_of_the_S[illegible]l_Security_Board__1936_.doc Page 1 of 2

Certified to be a true copy

original

Certified to be a true copy

THE SOCIAL SECURITY BOARD
WASHINGTON, D. C.

# First Annual Report
of the
# Social Security Board

## Fiscal Year Ended June 30, 1936

With Supplementary Data for the Period
July 1, 1936–December 15, 1936

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1937

For sale by the Superintendent of Documents, Washington, D. C. - - - - Price 15 cents

domestic se[illegible] in a private home, casual labor "not in the course of the employer's trade or business", service on a vessel documented under the laws of the United States or any foreign country, governmental service and service to certain governmental instrumentalities, such as banks within the Federal Reserve System, and work for certain organizations not organized for profit. The Railroad Retirement Act of 1935 further excludes from title II of the Social Security Act employment by railway, express, and sleeping-car companies subject to the Interstate Commerce Act, as well as employment by certain subsidiaries engaged in a service connected with rail transportation.

Title VIII of the Social Security Act imposes an income tax on the employees covered by the old-age benefits sections and an excise tax upon the pay rolls of their employers. For the 3 calendar years beginning 1937, the rate of each tax is 1 percent of wages and pay rolls, excluding so much of an individual's wage from any one employer as exceeds $3,000 a year. On January 1, 1940, and at the start of each 3-year period thereafter, the rate of each tax is increased by one-half percent until the maximum of 3 percent is reached in 1949. The tax is to be collected by the Bureau of Internal Revenue and paid into the Treasury of the United States.

Any old-age benefits plan based on earnings accumulated after the inauguration of the system is confronted at the start with the problem of the older worker, who has little time to build up the sum to be used as the basis for calculating benefits. The method of computing benefits outlined in the Social Security Act gives favorable consideration to the older workers. The same provision has the effect of affording more adequate levels of benefits for lower-paid workers, for whom the problem of old-age security is most acute. This is in harmony with the aim of the Federal old-age benefits plan to remove the insecurity of penniless old age from a large part of the working population.

The cost of the old-age benefits plan is bound to increase year by year for some time as more and more of the persons covered by it will reach retirement age and as monthly benefits are based on larger aggregates of wages. The problem of increasing costs is intensified in the United States because the age distribution of the population is in a state of flux. Students of population estimate that the proportion of old people will double within the next 50 years. As a result of these factors, the cost of the old-age benefits system will rise very rapidly within the next half-century. The future obligations of the Government are envisaged in the act's provisions for building up the old-age reserve account to meet benefit claims maturing in subsequent decades.

During the consideration of the Social Security Act in Congress, there was much discussion of the position of employers who have established private retirement plans for their employees. [illegible]ch concerns have given considerable attention to the effect of the old-age benefits legislation on their arrangements. In a report to the Social Science Research Council, Mr. Rainard B. Robbins finds "there is no tendency on the part of employers to 'scrap' retirement plans because of the enactment of the Social Security Act" and that there is an increased interest in sound plans. A substantial number of employers are contemplating adjusting their retirement systems in such a way as to permit their benefits to supplement those payable under the act.

Since old-age benefits are based upon wages, a record of the wages of each employee covered by the plan must be maintained to determine the kind and amount of benefit to which an individual is entitled under the conditions of the act. It is estimated that approximately 26,000,000 workers are affected by the old-age benefits provisions as the plan goes into effect on January 1, 1937. Within the next 5 or 10 years, as workers not in covered occupations at the present time enter such occupations, wage records may be maintained for as many as 35 or 40 million individuals.

It was recognized from the start that in a program of such magnitude effective administration would require decentralization. As early as December 1935, the Board initiated studies of such factors as population densities, industrial concentrations, homogeneity of peoples, transportation facilities, location of cooperating agencies, and availability of space. After a thorough survey, a plan of field organization was outlined which provides for the eventual establishment of approximately 400 field offices throughout the United States. By December 15, 1936, the location of 108 field offices had been announced.

It is the function of the field offices to furnish information regarding the plan to employers, employees, and other interested persons and to maintain the Board's relationships with the millions of persons throughout the country for whom rights to benefits will begin to accrue on January 1, 1937. The offices will provide machinery for the administration of the program under which benefits will be paid to qualified workers. Finally, these field offices will bring the administration of Federal old-age benefits as close as possible to the people who are affected by this Federal plan and insure adequate, efficient, and economical operation.

A major problem in the inauguration of this program was that of opening an account for each of the persons who comes under the old-age benefits provisions as they go into effect. Once accounts have been opened for the existing labor force, the task of assigning account numbers to new entrants will be solved by routine procedure. A survey of methods of assigning account numbers to the millions of workers now employed in covered industries demonstrated that it

116620—37——2 5

**Social Security and Income Tax Linkage**: Note the second paragraph "Title VIII of the Social Security Act imposes an income tax on the employees covered by the old-age benefitss sections and an excise tax upon the pay rolls of their emplyers. ... The tax is to be collected by the Bureau of Internal Revenue and paid into the Treasury of the United States."