1  James-Francis: Murphy,
2  In Care of Postal Department 234277
3  Encinitas, California 92023-4277
4  Tel: 760-230-2868
5  In Propria Persona

**NUNC PRO TUNC**

AUG 2 5 2008

FILED

08 AUG 27 AM 9: 31

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

9           UNITED STATES DISTRICT COURT
10         SOUTHERN DISTRICT OF CALIFORNIA

11

12  **UNITED STATES OF AMERICA**     )     CASE NO. - 08 CR 1196 W
13                PLAINTIFF,          )
14              v.                    )     **EXHIBIT 29**
15  JAMES FRANCIS MURPHY             )
16              Defendant,           )     **TRUSTEES OF DARTMOUTH**
17                                    )     **COLL. V. WOODWARD**
18                                    )     **17 U.S. 518(1819)**
19  _____ )
20  James-Francis: Murphy            )     Magistrate Judge Nita L. Stormes
21      Third Party Intervener,      )     August 26, 2008 at 9:30am
22      Real Party in Interest,      )
23      Authorized Representative    )     Judge Thomas J. Whelan
24                                    )     September 8, 2008 at 2:00pm and
25                                    )     September 30, 2008 at 9:00am
26
27

28  Total pages of **EXHIBIT 29** attached- thirty three (33)
29

30  James Francis Murphy, AR, appears and presents this exhibit for the court for
31  submission into evidence now and/or at trial.

32

33

34

35  Respectfully submitted August 25, 2008,

36  _____
37  James-Francis: Murphy,
38  Authorized Representative
39

08/08/21 [Exhibit 29] — Page 1 of 2

## CERTIFICATE OF SERVICE

COPY of the forgoing hand delivered,
This 2⟨5⟩ day of August, 2008, to:
U. S. Assistant Attorney Fred Sheppard
880 Front Street Room 6293
San Diego, CA
619-557-5610

_____

Service performed by:
James-Francis: Murphy
In Care of Postal Department 234277
Encinitas, California a 92023-4277
Tel: 760-230-2868

US Supreme Court Center> US Supreme Court Cases & Opinions> Volume 17 > TRUSTEES OF DARTMOUTH COLL. V. WOODWARD, 17 U. S. 518 (1819)

## TRUSTEES OF DARTMOUTH COLL. V. WOODWARD, 17 U. S. 518 (1819)

Subscribe to Cases that cite 17 U. S. 518 [RSS]

Google™

[ Search Cases ]

**Free Cobranding of the US Supreme Court Center**
Link to Cases & Search with Linkback and Cobranding - **Lean More**

Link to the Case Preview: http://supreme.justia.com/us/17/518/

Link to the Full Text of Case: http://supreme.justia.com/us/17/518/case.html

# U.S. Supreme Court

## Trustees of Dartmouth Coll. v. Woodward, 17 U.S. 4 Wheat. 518 518 (1819)

**Trustees of Dartmouth College v. Woodward**

**17 U.S. (4 Wheat.) 518**

*ERROR TO THE SUPERIOR COURT*

*OF THE STATE OF NEW HAMPSHIRE*

*Syllabus*

The charter granted by the British Crown to the trustees of Dartmouth College, in New Hampshire, in the year 1769, is a contract within the meaning of that clause of the Constitution of the United States, art. 1, s. 10, which declares that no state shall make any law impairing the obligation of contracts. The charter was not dissolved by the Revolution.

An act of the State Legislature of New Hampshire altering the charter without the consent of the corporation in a material respect, is an act impairing the obligation of the charter, and is unconstitutional and void.

Under its charter, Dartmouth College was a private, and not a public, corporation. That a corporation is established for purposes of general charity, or for education generally does not, *per se,* make it a public corporation, liable to the control of the legislature.

The case was argued at February Term, 1811, and was decided at February Term, 1812. The defendant had died after February Term, 1811. The judgment was entered *nunc pro tunc.*

This was an action of trover, brought in the State court, in which the plaintiffs in error declared for

Page 17 U. S. 519

two books of records, purporting to contain the records of all the doings and proceedings of the trustees of Dartmouth College from the establishment of the corporation until the 7th day of October, 1816; the original charter or letters-patent, constituting the college; the common seal; and four volumes or books of account, purporting to contain the charges and accounts in favor of the college. The defendant pleaded the general issue, and at the trial, the following special verdict was found:

"The said jurors, upon their oath, say, that his Majesty George III., King of Great Britain, &c., issued his letters-patent, under the public seal of the

province, now State, of New Hampshire, bearing the 13th day of December, in the 10th year of his reign, and in the year of our Lord 1769, in the words following:"

" George the Third, by the grace of God, of Great Britain, France and Ireland, King, Defender of the Faith, and so forth, To all to whom these presents shall come, greeting:"

" Whereas, it hath been represented to our trusty and well-beloved John Wentworth, Esq., governor and commander-in-chief, in and over our province of New Hampshire, in New England, in America, that the Reverend Eleazar Wheelock, of Lebanon, in the colony of Connecticut, in New England, aforesaid, now doctor in divinity, did, on or about the year of our Lord 1754,

Page 17 U. S. 520

at his own expense, on his own estate and plantation, set on foot an Indian charity school, and for several years, through the assistance of well-disposed persons in America, clothed, maintained and educated a number of the children of the Indian natives, with a view to their carrying the Gospel, in their own language, and spreading the knowledge of the great Redeemer, among their savage tribes, and hath actually employed a number of them as missionaries and schoolmasters in the wilderness for that purpose; and by the blessing of God upon the endeavors of said Wheelock, the design became reputable among the Indians, insomuch that a large number desired the education of their children in said school, and were also disposed to receive missionaries and schoolmasters, in the wilderness, more than could be supported by the charitable contributions in these American colonies. Whereupon, the said Eleazar Wheelock thought it expedient, that endeavors should be used to raise contributions from well disposed persons in England for the carrying on and extending said undertaking; and for that purpose the said Eleazar Wheelock requested the Rev. Nathaniel Whitaker, now doctor in divinity, to go over to England for that purpose, and sent over with him the Rev. Samson Occom, an Indian minister, who had been educated by the said Wheelock. And to enable the said Whitaker to the more successful performance of said work, on which he was sent, said Wheelock gave him a full power of attorney, by which said Whitaker solicited those worthy and generous contributors to the charity, viz.,

Page 17 U. S. 521

The Right Honorable William, Earl of Dartmouth, the Honorable Sir Sidney Stafford Smythe, Knight, one of the barons of his Majesty's Court of Exchequer, John Thornton, of Clapham, in the County of Surrey, Esquire, Samuel Roffey, of Lincoln's Inn Fields, in the County of Middlesex, Esquire, Charles Hardy, of the parish of Saint Mary-le-bonne, in said county, Esquire, Daniel West, of Christ's Church, Spitalfields, in the county aforesaid, Esquire, Samuel Savage, of the same place, gentleman, Josiah Roberts, of the Parish of St. Edmund the King, Lombard Street, London, gentleman, and Robert Keen, of the Parish of Saint Botolph, Aldgate, London, gentleman, to receive the several sums of money which should be contributed, and to be trustees for the contributors to such charity, which they cheerfully agreed to. Whereupon, the said Whitaker did, by virtue of said power of attorney, constitute and appoint the said Earl of Dartmouth, Sir Sidney Stafford Smythe, John Thornton, Samuel Roffey, Charles Hardy and Daniel West, Esquires, and Samuel Savage, Josiah Roberts and Robert Keen, gentlemen, to be trustees of the money which had then been contributed, and which should, by his means, be contributed for said purpose, which trust they have accepted, as by their engrossed declaration of the same, under their hands and seals, well executed, fully appears, and the same has also been ratified, by a deed of trust, well executed by the said Wheelock."

" And the said Wheelock further represents, that he has, by power of attorney, for many weighty reasons,

Page 17 U. S. 522

given full power to the said trustees to fix upon and determine the place for said school, most subservient to the great end in view; and to enable them understandingly to give the preference, the said Wheelock has laid before the said trustees, the several offers which have been generously made in the several governments in America to encourage and invite the settlement of said school among them, for their own private emolument and the increase of learning in their respective places, as well as for the furtherance of the general design in view. And whereas a large number of the proprietors of lands in the western part of this our province of New Hampshire, animated and excited thereto by the generous example of his excellency, their Governor, and by the liberal contributions of many noblemen and gentlemen in England, and especially by the consideration that such a situation would be as convenient as any for carrying on the great design among the Indians; and also, considering, that without the least impediment to the said design, the same school may be enlarged and improved to promote learning among the English, and be a means to supply a great number of churches and congregations which are likely soon to be formed in that new country, with a learned and orthodox ministry; they, the said proprietors, have promised large tracts of land, for the uses aforesaid, provided the school shall be settled in the western part of our said province. And they, the said right honorable, honorable and worthy trustees before mentioned, having maturely considered the reasons and arguments in favor of the several places

Page 17 U. S. 523

proposed, have given the preference to the western part of our said province, lying on Connecticut river, as a situation most convenient for said school."

" And the said Wheelock has further represented a necessity of a legal incorporation in order to the safety and wellbeing of said seminary, and its being capable of the tenure and disposal of lands and bequests for the use of the same. And the said Wheelock has also represented that, for many weighty reasons, it will be expedient, at least in the infancy of said institution or till it can be accommodated in that new country and he and his friends be able to remove and settle by and round about it, that the gentlemen whom he has already nominated in his last will (which he has transmitted to the aforesaid gentlemen of the trust in England) to be trustees in America should be of the corporation now proposed. And also, as

there are already large collections for said school in the hands of the aforesaid gentlemen of the trust in England, and all reasons to believe, from their singular wisdom, piety and zeal to promote the Redeemer's cause (which has already procured for them the utmost confidence of the Kingdom), we may expect they will appoint successors in time to come who will be men of the same spirit, whereby great good may and will accrue many ways to the institution, and much be done, by their example and influence, to encourage and facilitate the whole design in view; for which reason, said Wheelock desires that the trustees aforesaid may be vested with all that power therein which can consist with their distance from the same. "

Page 17 U. S. 524

" KNOW YE, THEREFORE that We, considering the premises and being willing to encourage the laudable and charitable design of spreading Christian knowledge among the savages of our American wilderness, and also that the best means of education be established in our province of New Hampshire, for the benefit of said province, do, of our special grace, certain knowledge and mere motion, by and with the advice of our counsel for said province, by these presents, will, ordain, grant and constitute that there be a college erected in our said province of New Hampshire by the name of Dartmouth College, for the education and instruction of youth of the Indian tribes in this land in reading, writing, and all parts of learning which shall appear necessary and expedient for civilizing and christianizing children of pagans, as well as in all liberal arts and sciences, and also of English youth and any others. And the trustees of said college may and shall be one body corporate and politic, in deed, action and name, and shall be called, named and distinguished by the name of the Trustees of Dartmouth College."

" And further, we have willed, given, granted, constituted and ordained, and by this our present charter, of our special grace, certain knowledge and mere motion, with the advice aforesaid, do, for us, our heirs and successors forever, will, give, grant, constitute and ordain that there shall be in the said Dartmouth College, from henceforth and forever, a body politic consisting of trustees of said Dartmouth College. And for the more full and perfect erection of said corporation and body politic, consisting of trustees of Dartmouth College, we, of our special grace, certain

Page 17 U. S. 525

knowledge and mere motion, do, by these presents, for us, our heirs and successors, make, ordain, constitute and appoint our trusty and well beloved John Wentworth, Esq., Governor of our said province, and the Governor of our said province of New Hampshire for the time being, and our trusty and well beloved Theodore Atkinson, Esq., now president of our Council of said province, George Jaffrey and Daniel Peirce, Esq'rs, both our said Council, and Peter Gilman, Esq., now speaker of our house of representatives in said province, and William Pitkin, Esq., one of the assistants of our said colony of Connecticut, and our said trusty and well beloved Eleazar Wheelock, doctor in divinity, Benjamin Pomroy, of Hebroe, James Lockwood, of Weathersfield, Timothy Pitkin and John Smalley, of Farmington, and William Patten, of Hartford, all of our said colony of Connecticut, ministers of the gospel (the whole number of said trustees consisting, and hereafter for ever to consist, of twelve and no more) to be trustees of said Dartmouth College, in this our province of New Hampshire."

" And we do further, of our special grace, certain knowledge and mere motion, for us, our heirs and successors, will, give, grant and appoint that the said trustees and their successors shall forever hereafter be, in deed, act and name, a body corporate and politic, and that they, the said body corporate and politic, shall be known and distinguished, in all deeds, grants, bargains, sales, writings, evidences or otherwise howsoever, and in all courts forever hereafter, plea and be impleaded by the name of the Trustees of Dartmouth College; and that the said corporation,

Page 17 U. S. 526

by the name aforesaid, shall be able, and in law capable, for the use of said Dartmouth College, to have, get, acquire, purchase, receive, hold, possess and enjoy, tenements, hereditaments, jurisdictions and franchises, for themselves and their successors, in fee-simple, or otherwise howsoever, and to purchase, receive or build any house or houses, or any other buildings, as they shall think needful and convenient, for the use of said Dartmouth College, and in such town in the western part of our said province of New Hampshire, as shall, by said trustees, or the major part of them, he agreed on, their said agreement to be evidenced by an instrument in writing, under their hands, ascertaining the same; and also to receive and dispose of any lands, goods, chattels and other things, of what nature soever, for the use aforesaid; and also to have, accept and receive any rents, profits, annuities, gifts, legacies, donations or bequests of any kind whatsoever, for the use aforesaid; so, nevertheless that the yearly value of the premises do not exceed the sum of £6000 sterling; and therewith, or otherwise, to support and pay, as the said trustees, or the major part of such of them as are regularly convened for the purpose, shall agree, the president, tutors and other officers and ministers of said Dartmouth College; and also to pay all such missionaries and schoolmasters as shall be authorized, appointed and employed by them, for civilizing and christianizing, and instructing the Indian natives of this land, their several allowances; and also their respective annual salaries or allowances, and all such necessary and

Page 17 U. S. 527

contingent charges as from time to time shall arise and accrue relating to the said Dartmouth College; and also, to bargain, sell, let or assign, lands, tenements or hereditaments, goods or chattels, and all other things whatsoever, by the name aforesaid in as full and ample a manner, to all intents and purposes, as a natural person, or other body politic or corporate, is able to do, by the laws or our realm of Great Britain, or of said province of New Hampshire."

" And further, of our special grace, certain knowledge and mere motion, to the intent that our said corporation and body politic may answer the end of their erection and constitution, and may have perpetual succession and continuance forever, we do, for us, our heirs and successors, will, give and grant unto the Trustees of Dartmouth College, and to their successors forever that there shall be, once a year, and every year, a meeting of said trustees, held at said Dartmouth College, at such time as by said trustees, or the major part of them, at any legal meeting of said trustees, shall be agreed on; the first meeting to be called by the said Eleazar Wheelock, as soon as conveniently may be, within one year next

TRUSTEES OF DARTMOUTH COLL. v. WOODWARD, 17 U.S. 518 (1819) - JUS... Page 4 of 33

Case 3:08-cv-01195-M Document 32-2 Filed 08/21/2008 Page 8 of...

after the enrollment of these our letters-patent, at such time and place as he shall judge proper. And the said trustees, or the major part of any seven or more of them, shall then determine on the time for holding the annual meeting aforesaid, which may be altered as they shall hereafter find most convenient. And we further order and direct that the said Eleazar Wheelock shall notify the time for holding said first meeting, to be called as aforesaid, by sending a letter

Page 17 U. S. 528

to each of said trustees, and causing an advertisement thereof to be printed in the New Hampshire Gazette, and in some public newspaper printed in the colony of Connecticut. But in case of the death or incapacity of the said Wheelock, then such meeting to be notified in manner aforesaid, by the Governor or commander-in-chief of our said province for the time being. And we do also, for us, our heirs and successors, hereby will, give and grant unto the said Trustees of Dartmouth College, aforesaid, and to their successors forever that when any seven or more of the said trustees, or their successors, are convened and met together, for the service of said Dartmouth College, at any time or times, such seven or more shall be capable to act as fully and amply, to all intents and purposes, as if all the trustees of said college were personally present — and all affairs and actions whatsoever, under the care of said trustees, shall be determined by the majority or greater number of those seven or more trustees so convened and met together."

And we do further will, ordain and direct that the president, trustees, professors, tutors and all such officers as shall be appointed for the public instruction and government of said college shall, before they undertake the execution of their offices or trusts, or within one year after, take the oaths and subscribe the declaration provided by an act of parliament made in the first year of King George the First, entitled "an act for the further security of his majesty's person and government, and the succession of the Crown in the heirs of the late Princess Sophia, being

Page 17 U. S. 529

Protestants, and for the extinguishing the hopes of the pretended Prince of Wales, and his open and secret abettors;" that is to say, the president, before the Governor of our said province for the time being, or by one by him empowered to that service, or by the president of our said Council, and the trustees, professors, tutors and other officers, before the president of said college for the time being, who is hereby empowered to administer the same; an entry of all which shall be made in the records of said college.

And we do, for us, our heirs, and successors, hereby will, give and grant full power and authority to the president hereafter by us named, and to his successors, or, in case of his failure, to any three or more of the said trustees, to appoint other occasional meetings, from time to time, of the said seven trustees, or any greater number of them, to transact any matter or thing necessary to be done before the next annual meeting, and to order notice to the said seven, or any greater number of them, of the times and places of meeting for the service aforesaid, by a letter under his or their hands, of the same, one month before said meeting: provided always that no standing rule or order be made or altered, for the regulation of said college, nor any president or professor be chosen or displaced, nor any other matter or thing transacted or done, which shall continue in force after the then next annual meeting of the said trustees, as aforesaid.

" And further, we do, by these presents, for us, our heirs and successors, create, make, constitute, nominate and appoint our trusty and well beloved Eleazar Wheelock, doctor in divinity, the founder of said

Page 17 U. S. 530

college, to be President of said Dartmouth College, and to have the immediate care of the education and government of such students as shall be admitted into said Dartmouth College for instruction and education; and do will, give and grant to him, in said office, full power, authority and right, to nominate, appoint, constitute and ordain, by his last will, such suitable and meet person or persons as he shall choose to succeed him in the presidency of said Dartmouth College; and the person so appointed, by his last will, to continue in office, vested with all the powers, privileges, jurisdiction and authority of a president of said Dartmouth College; that is to say, so long and until such appointment by said last will shall be disapproved by the trustees of said Dartmouth College."

" And we do also, for us, our heirs and successors, will, give and grant to the said trustees of said Dartmouth College, and to their successors forever, or any seven or more of them, convened as aforesaid that in the case of the ceasing or failure of a president, by any means whatsoever that the said trustees do elect, nominate and appoint such qualified person as they, or the major part of any seven or more of them, convened for that purpose as above directed, shall think fit, to be president of said Dartmouth College, and to have the care of the education and government of the students as aforesaid; and in case of the ceasing of a president as aforesaid, the senior professor or tutor, being one of the trustees, shall exercise the office of a president until the trustees shall make choice of and appoint, a president as aforesaid;

Page 17 U. S. 531

and such professor or tutor, or any three or more of the trustees, shall immediately appoint a meeting of the body of the trustees for the purpose aforesaid. And also we do will, give and grant to the said trustees, convened as aforesaid that they elect, nominate and appoint so many tutors and professors to assist the president in the education and government of the students belonging thereto as they the said trustees shall, from time to time, think needful and serviceable to the interests of said Dartmouth College. And also that the said trustees or their successors, or the major part of any seven or more of them, convened for that purpose as above directed, shall, at any time, displace and discharge from the service of said Dartmouth College, any or all such officers, and elect others in their room and stead, as before directed. And also that the said trustees, or their successors, or the major part of any seven of them which shall convene for that purpose, as above directed, do, from time to time, as occasion shall require, elect, constitute and appoint a treasurer, a clerk, an usher and a steward for the said Dartmouth College, and appoint to them, and each of them, their respective businesses and trust; and displace and discharge from the service of said college, such

treasurer, clerk, usher or steward, and to elect others in their room and stead; which officers so elected, as before directed, we do for us, our heirs and successors, by these presents, constitute and establish in their respective offices, and do give to each and every of them full power and authority to exercise the same in said Dartmouth College, according to the

Page 17 U. S. 532

directions, and during the pleasure of said trustees, as fully and freely as "

brk:

any like officers in any of our universities, colleges or seminaries of learning in our realm of Great Britain, lawfully may or ought to do. And also that the said trustees and their successors, or the major part of any seven or more of them, which shall convene for that purpose, as is above directed, as often as one or more of said trustees shall die, or by removal or otherwise shall, according to their judgment, become unfit or incapable to serve the interests of said college, do, as soon as may be after the death, removal or such unfitness or incapacity of such trustee or trustees, elect and appoint such trustee or trustees as shall supply the place of him or them so dying, or becoming incapable to serve the interests of said college; and every trustee so elected and appointed shall, by virtue of these presents, and such election and appointment, be vested with all the powers and privileges which any of the other trustees of said college are hereby vested with. And we do further will, ordain and direct that from and after the expiration of two years from the enrollment of these presents, such vacancy or vacancies as may or shall happen, by death or otherwise, in the aforesaid number of trustees, shall be filled up by election as aforesaid, so that when such vacancies shall be filled up unto the complete number of twelve trustees, eight of the aforesaid whole number of the body of trustees shall be resident, and respectable freeholders of our said province of New Hampshire, and seven of said whole number shall be laymen.

Page 17 U. S. 533

" And we do further, of our special grace, certain knowledge and mere motion, will, give and grant unto the said trustees of Dartmouth College that they, and their successors, or the major part of any seven of them, which shall convene for that purpose, as is above directed, may make, and they are hereby fully empowered, from time to time, fully and lawfully to make and establish such ordinances, orders and laws, as may tend to the good and wholesome government of the said college, and all the students and the several officers and ministers thereof, and to the public benefit of the same, not repugnant to the laws and statutes of our realm of Great Britain, or of this our province of New Hampshire, and not excluding any person of any religious denomination whatsoever, from free and equal liberty and advantage of education, or from any of the liberties and privileges or immunities of the said college, on account of his or their speculative sentiments in religion, and of his or their being of a religious profession different from the said trustees of the said Dartmouth College. And such ordinances, orders and laws, which shall as aforesaid be made, we do, for us, our heirs and successors, by these presents, ratify, allow of, and confirm, as good and effectual to oblige and bind all the students, and the several officers and ministers of the said college. And we do hereby authorize and empower the said trustees of Dartmouth College, and the president, tutors and professors by them elected and appointed as aforesaid, to put such ordinances, orders and laws in execution, to all proper intents and purposes. "

Page 17 U. S. 534

" And we do further, of our special grace, certain knowledge and mere motion, will, give, and grant unto the said trustees of said Dartmouth College, for the encouragement of learning, and animating the students of said college to diligence and industry, and a laudable progress in literature that they, and their successors, or the major part of any seven or more of them, convened for that purpose, as above directed, do, by the president of said college, for the time being, or any other deputed by them, give and grant any such degree or degrees to any of the students of the said college, or any others by them thought worthy thereof, as are usually granted in either of the universities, or any other college in our realm of Great Britain; and that they sign and seal diplomas or certificates of such graduations, to be kept by the graduates as perpetual memorials and testimonials thereof."

" And we do further, of our special grace, certain knowledge and mere motion, by these presents, for us, our heirs and successors, give and grant unto the trustees of said Dartmouth College, and to their successors that they and their successors shall have a common seal, under which they may pass all diplomas or certificates of degrees, and all other affairs and business of, and concerning the said college; which shall be engraven in such a form and with such an inscription as shall be devised by the said trustees, for the time being, or by the major part of any seven or more of them, convened for the service of the said college, as is above directed. "

Page 17 U. S. 535

" And we do further, for us, our heirs and successors, give and grant unto the said trustees of the said Dartmouth College, and their successors, or to the major part of any seven or more of them, convened for the service of the said college, full power and authority, from time to time, to nominate and appoint all other officers and ministers, which they shall think convenient and necessary for the service of the said college, not herein particularly named or mentioned; which officers and ministers we do hereby empower to execute their offices and trusts, as fully and freely as any of the officers and ministers in our universities or colleges in our realm of Great Britain lawfully may or ought to do."

" And further that the generous contributors to the support of this design of spreading the knowledge of the only true God and Saviour among the American savages, may, from time to time, be satisfied that their liberalities are faithfully disposed of, in the best manner, for that purpose, and that others may, in future time, be encouraged in the exercise of the like liberality, for promoting the same pious design, it shall be the duty of the president of said Dartmouth College, and of his successors, annually, or as often as he shall be thereunto desired or required, to transmit to the right honorable, honorable, and worthy gentlemen of the trust, in England, before mentioned, a faithful account of the improvements and

disbursements of the several sums he shall receive from the donations and bequests made in England, through the hands of said trustees, and also advise them of the general plans laid, and prospects exhibited, as well as a faithful

Page 17 U. S. 536

account of all remarkable occurrences, in order, if they shall think expedient that they may be published. And this to continue so long as they shall perpetuate their board of trust, and there shall be any of the Indian natives remaining to be proper objects of that charity. And lastly, our express will and pleasure is, and we do, by these presents, for us, our heirs and successors, give and grant unto the said trustees of Dartmouth College, and to their successors forever that these our letters-patent, on the enrollment thereof in the secretary's office of our province of New Hampshire aforesaid, shall be good and effectual in the law, to all intents and purposes, against us, our heirs and successors, without any other license, grant or confirmation from us, our heirs and successors, hereafter by the said trustees to be had and obtained, notwithstanding the not writing or misrecital, not naming or misnaming the aforesaid offices, franchises, privileges, immunities or other the premises, or any of them, and notwithstanding a writ of *ad quod damnum* hath not issued forth to inquire of the premises, or any of them, before the ensealing hereof, any statute, act, ordinance, or provision, or any other matter or thing, to the contrary notwithstanding. To have and to hold, all and singular the privileges, advantages, liberties, immunities, and all other the premises herein and hereby granted, or which are meant, mentioned or intended to be herein and hereby given and granted, unto them, the said trustees of Dartmouth College, and to their successors forever. In testimony whereof, we have caused these our letters to be made patent, and the public seal of

Page 17 U. S. 537

our said province of New Hampshire to be hereunto affixed. Witness our trusty and well beloved John Wentworth, Esquire, Governor and commander-in-chief in and over our said province, &c., this thirteenth day of December, in the tenth year of our reign, and in the year of our Lord 1769."

" *N.B.* The words 'and such professor or tutor, or any three or more of the trustees, shall immediately appoint a meeting of the body of the trustees, for the purpose aforesaid,' between the first and second lines, also the words 'or more,' between the 27th and 28th lines, also the words 'or more,' between the 28th and 29th lines, and also the words 'to all intents and purposes,' between the 37th and 38th lines of this sheet, were respectively interlined, before signing and sealing."

"And the said jurors, upon their oath, further say that, afterwards, upon the 18th day of the same December, the said letters-patent were duly enrolled and recorded in the secretary's office of said province, now State, of New Hampshire, and afterwards, and within one year from the issuing of the same letters-patent, all the persons named as trustees in the same accepted the said letters-patent, and assented thereunto, and the corporation therein, and thereby created and erected was duly organized, and has, until the passing of the act of the Legislature of the State of New Hampshire, of the 27th of June, A.D. 1816, and ever since (unless prevented by said act and the

Page 17 U. S. 538

doings under the same) continued to be a corporation."

"And the said jurors, upon their oath, further say that, immediately after its erection and organization as aforesaid, the said corporation had, took, acquired and received, by gift, donation, devise and otherwise, lands, goods, chattels and moneys of great value; and from time to time since, have had, taken, received and acquired, in manner aforesaid, and otherwise, lands, goods, chattels and moneys of great value; and on the same 27th day of June, A.D. 1816, the said corporation, erected and organized as aforesaid, had, held and enjoyed, and ever since have had, held and enjoyed, divers lands, tenements, hereditaments, goods, chattels and moneys, acquired in manner aforesaid, the yearly income of the same, not exceeding the sum of $26,666, for the use of said Dartmouth College, as specified in said letters-patent. And the said jurors, upon their oath, further say that part of the said lands, so acquired and holden by the said trustees as aforesaid, were granted by (and are situate in) the State of Vermont, A.D. 1785, and are of great value; and other part of said lands, so acquired and holden as aforesaid, were granted by (and are situate in) the State of New Hampshire, in the years 1789 and 1807, and are of great value. And the said jurors, upon their oath, further say that the said trustees of Dartmouth College, so constituted as aforesaid, on the same 27th day of June, A.D. 1816, were possessed of the goods and chattels in the declaration of the said trustees specified,

Page 17 U. S. 539

and at the place therein mentioned, as of their own proper goods and chattels, and continued so possessed until, and at the time of the demand and refusal of the same, as hereinafter mentioned, unless divested thereof, and their title thereto defeated and rendered invalid, by the provisions of the act of the State of New Hampshire, made and passed on the same 27th day of June, A.D. 1816, and the doings under the same, as hereinafter mentioned and recited."

"And the said jurors, upon their oath, further say that, on the 27th day of June, A.D. 1816, the legislature of said State of New Hampshire made and passed a certain act, entitled, 'An Act to amend the charter, and enlarge and improve the corporation of Dartmouth College,' in the words following:"

" An Act to amend the charter, and enlarge and improve the corporation of Dartmouth College."

" Whereas, knowledge and learning generally diffused through a community, are essential to the preservation of a free government, and

extending the opportunities and advantages of education is highly conducive to promote this end, and by the constitution it is made the duty of the legislators and magistrates to cherish the interests of literature, and the sciences, and all seminaries established for their advancement; and as the college of the State may, in the opinion of the legislature, be rendered more extensively useful: therefore –"

" 1. Be it enacted, &c. that the

Page 17 U. S. 540

corporation, heretofore called and known by the name of the Trustees of Dartmouth College shall ever hereafter be called and known by the name of the Trustees of Dartmouth University; and the whole number of said trustees shall be twenty-one, a majority of whom shall form a quorum for the transaction of business; and they and their successors in that capacity, as hereby constituted, shall respectively forever have, hold, use, exercise and enjoy all the powers, authorities, rights, property, liberties, privileges and immunities which have hitherto been possessed, enjoyed and used by the Trustees of Dartmouth College, except so far as the same may be varied or limited by the provisions of this act. And they shall have power to determine the times and places of their meetings, and manner of notifying the same; to organize colleges in the university; to establish an institute, and elect fellows and members thereof: to appoint such officers as they may deem proper, and determine their duties and compensation, and also to displace them; to delegate the power of supplying vacancies in any of the offices of the university, for any term of time not extending beyond their next meeting: to pass ordinances for the government of the students, with reasonable penalties, not inconsistent with the constitution and laws of this State; to prescribe the course of education, and confer degrees; and to arrange, invest and employ the funds of the university."

" 2. And be it further enacted that there shall be a Board of Overseers, who shall have perpetual succession, and whose number shall be twenty-five,

Page 17 U. S. 541

fifteen of whom shall constitute a quorum for the transaction of business. The President of the Senate, and the Speaker of the House of Representatives of New Hampshire, the Governor and Lieutenant Governor of Vermont, for the time being, shall be members of said board, *ex officio*. The Board of Overseers shall have power to determine the times and places of their meetings, and manner of notifying the same; to inspect and confirm, or disapprove and negative, such votes and proceedings of the Board of Trustees as shall relate to the appointment and removal of President, professors and other permanent officers of the university, and determine their salaries; to the establishment of colleges and professorships, and the erection of new college buildings: provided always that the said negative shall be expressed within sixty days from the time of said Overseers' being furnished with copies of such acts: provided also that all votes and proceedings of the Board of Trustees shall be valid and effectual, to all intents and purposes, until such negative of the Board of Overseers be expressed, according to the provisions of this act."

" 3. Be it further enacted that there shall be a treasurer of said corporation, who shall be duly sworn, and who, before he enters upon the duties of his office, shall give bonds, with sureties, to the satisfaction of the corporation, for the faithful performance thereof; and also a secretary to each of the Boards of Trustees and Overseers, to be elected by the said Boards, respectively, who shall keep a just and true record of the proceedings of the Board for

Page 17 U. S. 542

which he was chosen. And it shall furthermore be the duty of the secretary of the Board of Trustees to furnish, as soon as may be, to the said Board of Overseers, copies of the records of such votes and proceedings, as by the provisions of this act are made subject to their revision and control."

" 4. Be it further enacted that the President of Dartmouth University, and his successors in office, shall have the superintendence of the government and instruction of the students, and may preside at all meetings of the trustees, and do and execute all the duties devolving by usage on the president of a university. He shall render annually to the Governor of this State an account of the number of students, and of the State of the funds of the University, and likewise copies of all important votes and proceedings of the corporation and Overseers, which shall be made out by the secretaries of the respective Boards."

" 5. Be it further enacted that the President and professors of the University shall be nominated by the Trustees, and approved by the Overseers, and shall be liable to be suspended or removed from office in manner as before provided. And each of the two Boards of Trustees and Overseers shall have power to suspend and remove any member of their respective Boards."

" 6. Be it further enacted that the Governor and counsel are hereby authorized to fill all vacancies in the Board of Overseers, whether the same be original vacancies or are occasioned by the death, resignation or removal of any member. And

Page 17 U. S. 543

the Governor and counsel in like manner shall, by appointments, as soon as may be, complete the present Board of Trustees to the number of twenty-one, as provided for by this act, and shall have power also to fill all vacancies that may occur previous to, or during the first meeting of the said Board of Trustees. But the President of said University for the time being, shall, nevertheless, be a member of said Board of Trustees *ex officio*. And the Governor and Council shall have power to inspect the doings and proceedings of the corporation, and of all the officers of the

University, whenever they deem it expedient; and they are hereby required to make such inspection, and report the same to the legislature of this State, as often as once in every five years. And the Governor is hereby authorized and requested to summon the first meeting of the said Trustees and Overseers, to be held at Hanover, on the 26th day of August next."

" 7. Be it further enacted that the President and professors of the University, before entering upon the duties of their offices, shall take the oath to support the Constitution of the United States and of this State; certificates of which shall be in the office of the secretary of this State, within sixty days from their entering on their offices respectively."

" 8. Be it further enacted that perfect freedom of religious opinion shall be enjoyed by all the officers and students of the University, and no officer or student shall be deprived of any honors, privileges or benefits of the institution on account of his religious creed or belief. The theological colleges which

Page 17 U. S. 544

may be established in the University shall be founded on the same principles of religious freedom; and any man, or body of men, shall have a right to endow colleges or professorships of any sect of the Protestant Christian religion; and the Trustees shall be held and obliged to appoint professors of learning and piety of such sects, according to the will of the donors."

" Approved, June 27th, 1816."

"And the said jurors, upon their oath, further say that, at the annual meeting of the Trustees of Dartmouth College, constituted agreeably to the letters-patent aforesaid, and in no other way or manner, holden at said college, on the 28th day of August, A.D. 1816, the said Trustees voted and resolved, and caused the said vote and resolve to be entered on their records that they do not accept the provisions of the said act of the legislature of New Hampshire of the 27th of June 1816, above recited, but do, by the said vote and resolve, expressly refuse to accept or act under the same. And the said jurors, upon their oath, further say that the said Trustees of Dartmouth College have never accepted, assented to, or acted under, the said Act of the 27th of June, A.D. 1816, or any act passed in addition thereto, or in amendment thereof, but have continued to act, and still claim the right of acting, under the said letters-patent."

"And the said jurors, upon their oath, further say that, on the 7th day of October, A.D. 1816, and before the commencement of this suit, the said Trustees of Dartmouth College demanded of the said

Page 17 U. S. 545

William H. Woodward the property, goods and chattels in the said declaration specified, and requested the said William H. Woodward, who then had the same in his hands and possession, to deliver the same to them, which the said William H. Woodward then and there refused to do, and has ever since neglected and refused to do, but converted the same to his own use, if the said Trustees of Dartmouth College could, after the passing of the said act of the 27th day of June, lawfully demand the same, and if the said William H. Woodward was not, by law, authorized to retain the same in his possession after such demand."

"And the said jurors, upon their oath, further say that, on the 18th day of December, A.D. 1816, the Legislature of the said State of New Hampshire made and passed a certain other act, entitled"

" An act in addition to, and in amendment of, an act, entitled, an act to amend the charter, and enlarge and improve the corporation of Dartmouth College,"

"in the words following:"

" An act in addition to, and in amendment of, an act, entitled, 'an act to amend the charter, and enlarge and improve the Corporation of Dartmouth College.'"

" Whereas, the meetings of the Trustees and Overseers of Dartmouth University, which were summoned agreeably to the provisions of said act, failed of being duly holden, in consequence of a quorum of neither said Trustees nor Overseers attending at the

Page 17 U. S. 546

time and place appointed, whereby the proceedings of said corporation have hitherto been, and still are delayed:"

" 1. Be it enacted, &c. that the Governor be, and he is hereby authorized and requested to summon a meeting of the Trustees of Dartmouth University, at such time and place as he may deem expedient. And the said Trustees, at such meeting, may do and transact any matter or thing, within the limits of their jurisdiction and power, as such Trustees, to every intent and purpose, and as fully and completely as if the same were transacted at any annual or other meeting. And the Governor, with advice of Council, is authorized to fill all vacancies that have happened, or may happen in the Board of said Trustees, previous to their next annual meeting. And the Governor is hereby authorized to summon a meeting of the Overseers of said University, at such time and place as he may consider proper. And provided a less number than a quorum of said Board of Overseers convene at the time and place appointed for such meeting of their Board, they shall have power to adjourn, from time to time, until a quorum shall have convened."

" 2. And be it further enacted that so much of the act to which this is an addition as makes necessary any particular number of Trustees or Overseers of said University to constitute a quorum for the transaction of business be, and the same hereby is repealed; and that hereafter, nine of said Trustees, convened agreeably to the provisions of this act, or

Page 17 U. S. 547

to those of that to which this is an addition, shall be a quorum for transacting business; and that in the Board of Trustees, six votes at least shall be necessary for the passage of any act or resolution. And provided also that any smaller number than nine of said Trustees, convened at the time and place appointed for any meeting of their Board, according to the provisions of this act, or that to which this is an addition, shall have power to adjourn from time to time, until a quorum shall have convened."

" 3. And be it further enacted that each member of said Board of Trustees, already appointed or chosen, or hereafter to be appointed or chosen, shall, before entering on the duties of his office, make and subscribe an oath for the faithful discharge of the duties aforesaid; which oath shall be returned to, and filed in the office of the secretary of State, previous to the next regular meeting of said Board, after said member enters on the duties of his office, as aforesaid."

" Approved, December 18th, 1816."

"And the said jurors, upon their oath, further say that, on the 26th day of December, A.D. 1816, the Legislature of said State of New Hampshire made and passed a certain other act, entitled, 'an act in addition to an act, entitled, an act in addition to, and in amendment of an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College,' in the words following: "

Page 17 U. S. 548

" An act in addition to an act, entitled, 'an act in addition to, and in amendment of, an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College.'"

" Be it enacted &c. that if any person or persons shall assume the office of President, Trustee, professor, secretary, treasurer, librarian or other officer of Dartmouth University; or by any name, or under any pretext, shall, directly or indirectly, take upon himself or themselves the discharge of any of the duties of either of those offices, except it be pursuant to, and in conformity with, the provisions of an act, entitled, 'an act to amend the charter and enlarge and improve the corporation of Dartmouth College,' or, of the 'act, in addition to and in amendment of an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College,' or shall in any way, directly or indirectly, wilfully impede or hinder any such officer or officers already existing, or hereafter to be appointed agreeably to the provisions of the acts aforesaid, in the free and entire discharge of the duties of their respective offices, conformably to the provisions of said acts, the person or persons so offending shall, for each offence, forfeit and pay the sum of five hundred dollars, to be recovered by any person who shall sue therefor, one-half thereof to the use of the prosecutor, and the other half to the use of said University."

" And be it further enacted that the person or persons who sustained the offices of secretary and treasurer

Page 17 U. S. 549

of the Trustees of Dartmouth College, next before the passage of the act, entitled, 'an act to amend the charter and enlarge and improve the corporation of Dartmouth College,' shall continue to hold and discharge the duties of those offices, as secretary and treasurer of the Trustees of Dartmouth University, until another person or persons be appointed, in his or their stead, by the Trustees of said University. And that the treasurer of said University, so existing, shall, in his office, have the care, management, direction and superintendence of the property of said corporation, whether real or personal, until a quorum of said Trustees shall have convened in a regular meeting."

" Approved, December 26th, 1816."

"And the said jurors, upon their oath, further say that the said William H. Woodward, before the said 27th day of June, had been duly appointed by the said Trustees of Dartmouth College, secretary and treasurer of the said corporation, and was duly qualified to exercise, and did exercise the said offices, and perform the duties of the same; and as such secretary and treasurer, rightfully had, while he so continued secretary and treasurer as aforesaid, the custody and keeping of the several goods, chattels and property, in said declaration specified."

"And the said jurors, upon their oath, further say that the said William H. Woodward was removed by said Trustees of Dartmouth College (if the said Trustees could, by law, do the said acts) from said office of secretary, on the 27th day of August, A.D. 1816, and from said office of treasurer, on the 27th day of

Page 17 U. S. 550

September, then next following, of which said removals he, the said William H. Woodward, had due notice on each of said days last mentioned."

"And the said jurors, upon their oath, further say that the corporation called the Trustees of Dartmouth University was duly organized on the 4th day of February, A.D. 1817, pursuant to, and under, the said recited acts of the 27th day of June, and of the 18th and 26th days of December, A.D. 1816; and the said William H. Woodward was, on the said 4th day of February, A.D. 1817, duly appointed by the said Trustees of Dartmouth

University, secretary and treasurer of the said Trustees of Dartmouth University, and then and there accepted both said offices."

"And the said jurors, upon their oath, further say that this suit was commenced on the 8th day of February, A.D. 1817. But whether upon the whole matter aforesaid, by the jurors aforesaid, in manner and form aforesaid found, the said acts of the 27th of June, 18th and 26th of December, A.D. 1816, are valid in law, and binding on the said Trustees of Dartmouth College, without acceptance thereof and assent thereunto by them, so as to render the plaintiffs incapable of maintaining this action, or whether the same acts are repugnant to the Constitution of the United States, and so void, the said jurors are wholly ignorant, and pray the advice of the court upon the premises. And if, upon the said matter, it shall seem to the Court here that the said acts last mentioned are valid in law, and binding on said Trustees of Dartmouth College,

Page 17 U. S. 551

without acceptance thereof and assent thereto by them, so as to render the plaintiffs incapable of maintaining this action, and are not repugnant to the Constitution of the United States, then the said jurors, upon their oath, say that the said William H. Woodward is not guilty of the premises above laid to his charge by the declaration aforesaid, as the said William H. Woodward hath above in pleading alleged. But if, upon the whole matter aforesaid, it shall seem to the Court here that the said acts last mentioned are not valid in law, and are not binding on the said Trustees of Dartmouth College without acceptance thereof and assent thereto by them, so as to render them incapable of maintaining this action, and that the said acts are repugnant to the Constitution of the United States and void, then the said jurors, upon their oath, say that the said William H. Woodward is guilty of the premises above laid to his charge, by the declaration aforesaid, and in that case, they assess the damages of them, the said Trustees of Dartmouth College, by occasion thereof, at $20,000."

Judgment having been afterwards rendered upon the said special verdict, by the superior court of the State of New Hampshire, being the highest court of law or equity of said State, for the plaintiff below, the cause was brought before this court by writ of error.

Page 17 U. S. 624

Mr. Chief Justice MARSHALL delivered the opinion of the Court.

This is an action of trover, brought by the Trustees of Dartmouth College against William H. Woodward, in the State court of New Hampshire, for the book of records, corporate seal, and other corporate property, to which the plaintiffs allege themselves to be entitled.

A special verdict, after setting out the rights of the parties, finds for the defendant, if certain acts of the Legislature of New Hampshire, passed on the 27th of June, and on the 18th of December 1816, be valid, and binding on the Trustees, without their assent, and not repugnant to the Constitution of the United States; otherwise, it finds for the plaintiffs.

Page 17 U. S. 625

The Superior Court of judicature of New Hampshire rendered a judgment upon this verdict for the defendant, which judgment has been brought before this court by writ of error. The single question now to be considered is do the acts to which the verdict refers violate the Constitution of the United States?

This court can be insensible neither to the magnitude nor delicacy of this question. The validity of a legislative act is to be examined; and the opinion of the highest law tribunal of a State is to be revised -- an opinion which carries with it intrinsic evidence of the diligence, of the ability, and the integrity, with which it was formed. On more than one occasion, this Court has expressed the cautious circumspection with which it approaches the consideration of such questions, and has declared that in no doubtful case would it pronounce a legislative act to be contrary to the Constitution. But the American people have said in the Constitution of the United States that "no State shall pass any bill of attainder, *ex post facto law*, or law impairing the obligation of contracts." In the same instrument, they have also said, "that the judicial power shall extend to all cases in law and equity arising under the Constitution." On the judges of this Court, then, is imposed the high and solemn duty of protecting, from even legislative violation, those contracts which the Constitution of our country has placed beyond legislative control; and however irksome the task may be, this is a duty from which we dare not shrink.

Page 17 U. S. 626

The title of the plaintiffs originates in a charter dated the 13th day of December, in the year 1769, incorporating twelve persons therein mentioned, by the name of "The Trustees of Dartmouth College," granting to them and their successors the usual corporate privileges and powers, and authorizing the Trustees, who are to govern the college, to fill up all vacancies which may be created in their own body.

The defendant claims under three acts of the Legislature of New Hampshire, the most material of which was passed on the 27th of June, 1816, and is entitled "An act to amend the charter, and enlarge and improve the corporation of Dartmouth College." Among other alterations in the charter, this act increases the number of Trustees to twenty-one, gives the appointment of the additional members to the executive of the State, and creates a Board of Overseers with power to inspect and control the most important acts of the Trustees. This Board consists of twenty-five persons. The President of the Senate, the speaker of the house of representatives, of New Hampshire, and the Governor and Lieutenant Governor of Vermont, for the time being, are to be members *ex officio*. The Board is to be completed by the Governor and Council of New Hampshire, who are also empowered to fill all vacancies which may occur. The acts of the 18th and 26th of December are supplemental to that of the 27th of June, and are principally intended to carry that act into effect. The majority of the Trustees of the college have refused to accept this amended charter, and have

Page 17 U. S. 627

brought this suit for the corporate property, which is in possession of a person holding by virtue of the acts which have been stated.

It can require no argument to prove that the circumstances of this case constitute a contract. An application is made to the Crown for a charter to incorporate a religious and literary institution. In the application, it is stated that large contributions have been made for the object, which will be conferred on the corporation as soon as it shall be created. The charter is granted, and on its faith the property is conveyed. Surely, in this transaction, every ingredient of a complete and legitimate contract is to be found. The points for consideration are, 1. Is this contract protected by the Constitution of the United States? 2. Is it impaired by the acts under which the defendant holds?

1. On the first point, it has been argued that the word "contract," in its broadest sense, would comprehend the political relations between the government and its citizens, would extend to offices held within a State, for State purposes, to many of those laws concerning civil institutions, which must change with circumstances and be modified by ordinary legislation, which deeply concern the public, and which, to preserve good government, the public judgment must control. That even marriage is a contract, and its obligations are affected by the laws respecting divorces. That the clause in the Constitution, if construed in its greatest latitude,

Page 17 U. S. 628

would prohibit these laws. Taken in its broad, unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a State, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions, which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with varying circumstances. That, as the framers of the Constitution could never have intended to insert in that instrument a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term "contract" must be understood in a more limited sense. That it must be understood as intended to guard against a power of at least doubtful utility, the abuse of which had been extensively felt, and to restrain the legislature in future from violating the right to property. That, anterior to the formation of the Constitution, a course of legislation had prevailed in many, if not in all, of the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements. To correct this mischief by restraining the power which produced it, the State legislatures were forbidden "to pass any law impairing the obligation of contracts," that is, of contracts respecting property, under which some individual could claim a right to something beneficial to himself, and that, since the clause in the Constitution must in construction receive some limitation, it may be confined, and ought to be confined, to cases of this

Page 17 U. S. 629

description, to cases within the mischief it was intended to remedy.

The general correctness of these observations cannot be controverted. That the framers of the Constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us is not to be so construed, may be admitted. The provision of the Constitution never has been understood to embrace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces. * Those acts enable some tribunals not to impair a marriage contract, but to liberate one of the parties, because it has been broken by the other. When any State legislature shall pass an act annulling all marriage contracts, or allowing either party to annul it, without the consent of the other, it will be time enough to inquire, whether such an act be constitutional.

The parties in this case differ less on general principles, less on the true construction of the Constitution in the abstract, than on the application of those principles to this case and on the true construction of the charter of 1769. This is the point on which the cause essentially depends. If the act of incorporation be a grant of political power, if it create a civil institution, to be employed in the administration of the government, or if the funds of the college be

Page 17 U. S. 630

public property, or if the State of New Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the State may act according to its own judgment, unrestrained by any limitation of its power imposed by the Constitution of the United States.

But if this be a private eleemosynary institution, endowed with a capacity to take property for objects unconnected with government, whose funds are bestowed by individuals on the faith of the charter; if the donors have stipulated for the future disposition and management of those funds in the manner prescribed by themselves, there may be more difficulty in the case, although neither the persons who have made these stipulations, nor those for whose benefit they were made should be parties to the cause. Those who are no longer interested in the property may yet retain such an interest in the preservation of their own arrangements as to have a right to insist that those arrangements shall be held sacred. Or, if they have themselves disappeared, it becomes a subject of serious and anxious inquiry whether those whom they have legally empowered to represent them forever may not assert all the rights which they possessed while in being; whether, if they be without personal representatives who may feel injured by a violation of the compact, the Trustees be not so completely their representatives in the eye of the law as to stand in their place not only as respects the government of the College, but also as respects the maintenance of the College charter. It becomes then the duty of the Court, most

Page 17 U. S. 631

seriously to examine this charter and to ascertain its true character.

From the instrument itself, it appears that, about the year 1754, the Rev. Eleazer Wheelock established, at his own expense and on his own estate, a charity school for the instruction of Indians in the Christian religion. The success of this institution inspired him with the design of soliciting contributions in England for carrying on and extending his undertaking. n this pious work, he employed the Rev. Nathaniel Whitaker, who, by virtue of a power of attorney from Dr. Wheelock, appointed the Earl of Dartmouth and others Trustees of the money which had been and should be contributed, which appointment Dr. Wheelock confirmed by a deed of trust authorizing the Trustees to fix on a site for the College. They determined to establish the school on Connecticut River in the western part of New Hampshire, that situation being supposed favorable for carrying on the original design among the Indians and also for promoting learning among the English, and the proprietors in the neighborhood having made large offers of land on condition that the College should there be placed. Dr. Wheelock then applied to the Crown for an act of incorporation, and represented the expediency of appointing those whom he had, by his last will, named as Trustees in America to be members of the proposed corporation. "In consideration of the premises," "for the education and instruction of the youth of the Indian tribes," &c., "and also of English youth, and any others," the charter was granted, and the Trustees of Dartmouth College were, by that name, created a body

Page 17 U. S. 632

corporate, with power, *for the use of the said College,* to acquire real and personal property, and to pay the President, tutors and other officers of the College, such salaries as they shall allow.

The charter proceeds to appoint Eleazer Wheelock, "the founder of said College," President thereof, with power, by his last will, to appoint a successor, who is to continue in office until disapproved by the Trustees. In case of vacancy, the Trustees may appoint a President, and in case of the ceasing of a President, the senior professor or tutor, being one of the Trustees, shall exercise the office until an appointment shall be made. The Trustees have power to appoint and displace professors, tutors and other officers, and to supply any vacancies which may be created in their own body by death, resignation, removal or disability, and also to make orders, ordinances and laws for the government of the College, the same not being repugnant to the laws of Great Britain or of New Hampshire, and not excluding any person on account of his speculative sentiments in religion, or his being of a religious profession different from that of the Trustees. This charter was accepted, and the property, both real and personal, which had been contributed for the benefit of the College was conveyed to, and vested in, the corporate body.

From this brief review of the most essential parts of the charter, it is apparent that the funds of the College consisted entirely of private donations. It is, perhaps, not very important who were the donors. The probability is that the Earl of Dartmouth, and the other Trustees in England, were, in fact, the largest

Page 17 U. S. 633

contributors. Yet the legal conclusion from the facts recited in the charter would probably be that Dr. Wheelock was the founder of the College. The origin of the institution was undoubtedly the Indian charity school established by Dr. Wheelock at his own expense. It was at his instance and to enlarge this school that contributions were solicited in England. The person soliciting these contributions was his agent, and the Trustees who received the money were appointed by, and act under, his authority. It is not too much to say that the funds were obtained by him in trust, to be applied by him to the purposes of his enlarged school. The charter of incorporation was granted at his instance. The persons named by him in his last will as the Trustees of his charity school compose a part of the corporation, and he is declared to be the founder of the College, and its President for life. Were the inquiry material, we should feel some hesitation in saying that Dr. Wheelock was not, in law, to be considered as the founder, 1 Bl.Com. 481, of this institution, and as possessing all the rights appertaining to that character. But be this as it may, Dartmouth College is really endowed by private individuals, who have bestowed their funds for the propagation of the Christian religion among the Indians and for the promotion of piety and learning generally. From these funds the salaries of the tutors are drawn, and these salaries lessen the expense of education to the students. It

Page 17 U. S. 634

is then an eleemosynary (1 Bl. Com. 471), and so far as respects its funds, a private corporation.

Do its objects stamp on it a different character? Are the Trustees and professors public officers, invested with any portion of political power, partaking in any degree in the administration of civil government, and performing duties which flow from the sovereign authority? That education is an object of national concern, and a proper subject of legislation, all admit. That there may be an institution, founded by government and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to government, none will deny. But is Dartmouth College such an institution? Is education altogether in the hands of government? Does every teacher of youth become a public officer, and do donations for the purpose of education necessarily become public property so far that the will of the legislature, not the will of the donor, becomes the law of the donation? These questions are of serious moment to society, and deserve to be well considered.

Doctor Wheelock, as the keeper of his charity school, instructing the Indians in the art of reading, and in our holy religion, sustaining them at his own expense and on the voluntary contributions of the charitable, could scarcely be considered as a public officer exercising any portion of those duties which belong to government, nor could the legislature have

Page 17 U. S. 635

supposed that his private funds, or those given by others, were subject to legislative management because they were applied to the purposes of education. When, afterwards, his school was enlarged and the liberal contributions made in England and in America enabled him to extend his

care to the education of the youth of his own country, no change was wrought in his own character or in the nature of his duties. Had he employed assistant tutors with the funds contributed by others, or had the Trustees in England established a school, with Dr. Wheelock at its head, and paid salaries to him and his assistants, they would still have been private tutors, and the fact that they were employed in the education of youth could not have converted them into public officers, concerned in the administration of public duties, or have given the legislature a right to interfere in the management of the fund. The Trustees, in whose care that fund was placed by the contributors, would have been permitted to execute their trust uncontrolled by legislative authority.

Whence, then, can be derived the idea that Dartmouth College has become a public institution, and its Trustees public officers, exercising powers conferred by the public for public objects? Not from the source whence its funds were drawn, for its foundation is purely private and eleemosynary; not from the application of those funds, for money may be given for education, and the persons receiving it do not, by being employed in the education of youth, become members of the civil government. Is it from

Page 17 U. S. 636

the act of incorporation? Let this subject be considered.

A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it either expressly or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality -- properties by which a perpetual succession of many persons are considered as the same, and may act as a single individual. They enable a corporation to manage its own affairs and to hold property without the perplexing intricacies, the hazardous and endless necessity, of perpetual conveyances for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men, in succession, with these qualities and capacities that corporations were invented, and are in use. By these means, a perpetual succession of individuals are capable of acting for the promotion of the particular object like one immortal being. But this being does not share in the civil government of the country, unless that be the purpose for which it was created. Its immortality no more confers on it political power, or a political character, than immortality would confer such power or character on a natural person. It is no more a state instrument than a natural person exercising the same powers would be. If, then, a natural person, employed

Page 17 U. S. 637

by individuals in the education of youth or for the government of a seminary in which youth is educated would not become a public officer or be considered as a member of the civil government, how is it that this artificial being, created by law for the purpose of being employed by the same individuals, for the same purposes, should become a part of the civil government of the country? Is it because its existence, its capacities, its powers, are given by law? Because the government has given it the power to take and to hold property, in a particular form, and for particular purposes, has the government a consequent right substantially to change that form, or to vary the purposes to which the property is to be applied? This principle has never been asserted or recognised, and is supported by no authority. Can it derive aid from reason?

The objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country, and this benefit constitutes the consideration, and in most cases, the sole consideration of the grant. In most eleemosynary institutions, the object would be difficult, perhaps unattainable, without the aid of a charter of incorporation. Charitable or public-spirited individuals, desirous of making permanent appropriations for charitable or other useful purposes, find it impossible to effect their design securely and certainly without an incorporating act. They apply to the government, state their beneficent object, and offer to advance the money necessary for its accomplishment,

Page 17 U. S. 638

provided the government will confer on the instrument which is to execute their designs the capacity to execute them. The proposition is considered and approved. The benefit to the public is considered as an ample compensation for the faculty it confers, and the corporation is created. If the advantages to the public constitute a full compensation for the faculty it gives, there can be no reason for exacting a further compensation by claiming a right to exercise over this artificial being, a power which changes its nature and touches the fund for the security and application of which it was created. There can be no reason for implying in a charter, given for a valuable consideration, a power which is not only not expressed, but is in direct contradiction to its express stipulations.

From the fact, then, that a charter of incorporation has been granted, nothing can be inferred which changes the character of the institution or transfers to the government any new power over it. The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes. The same institutions, created for the same objects, though not incorporated, would be public institutions, and, of course, be controllable by the legislature. The incorporating act neither gives nor prevents this control. Neither, in reason, can the incorporating act

Page 17 U. S. 639

change the character of a private eleemosynary institution.

We are next led to the inquiry for whose benefit the property given to Dartmouth College was secured? The counsel for the defendant have insisted that the beneficial interest is in the people of New Hampshire. The charter, after reciting the preliminary measures which had been taken,

and the application for an act of incorporation, proceeds thus:

"Know ye, therefore that we, considering the premises, and being willing to encourage the laudable and charitable design of spreading Christian knowledge among the savages of our American wilderness, and also that the best means of education be established in our province of New Hampshire, for the benefit of said province, do, of our special grace,"

&c. Do these expressions bestow on New Hampshire any exclusive right to the property of the College, any exclusive interest in the labors of the professors? Or do they merely indicate a willingness that New Hampshire should enjoy those advantages which result to all from the establishment of a seminary of learning in the neighborhood? On this point, we think it impossible to entertain a serious doubt. The words themselves, unexplained by the context, indicate that the "benefit intended for the province" is that which is derived from "establishing the best means of education therein," that is, from establishing in the province, Dartmouth College, as constituted by the charter. But, if these words, considered alone, could admit of doubt, that

Page 17 U. S. 640

doubt is completely removed, by an inspection of the entire instrument.

The particular interests of New Hampshire never entered into the mind of the donors; never constituted a motive for their donation. The propagation of the Christian religion among the savages and the dissemination of useful knowledge among the youth of the country were the avowed and the sole objects of their contributions. In these, New Hampshire would participate, but nothing particular or exclusive was intended for her. Even the site of the College was selected not for the sake of New Hampshire, but because it was "most subservient to the great ends in view" and because liberal donations of land were offered by the proprietors on condition that the institution should be there established. The real advantages from the location of the College are perhaps not less considerable to those on the west than to those on the east side of Connecticut River. The clause which constitutes the incorporation and expresses the objects for which it was made declares those objects to be the instruction of the Indians "and also of English youth, and any others." So that the objects of the contributors and the incorporating act were the same -- the promotion of Christianity and of education generally, not the interests of New Hampshire particularly.

From this review of the charter, it appears that Dartmouth College is an eleemosynary institution incorporated for the purpose of perpetuating the application of the bounty of the donors to the specified objects of that bounty; that its Trustees or Governors

Page 17 U. S. 641

were originally named by the founder and invested with the power of perpetuating themselves; that they are not public officers, nor is it a civil institution, participating in the administration of government, but a charity school or a seminary of education incorporated for the preservation of its property and the perpetual application of that property to the objects of its creation.

Yet a question remains to be considered of more real difficulty, on which more doubt has been entertained than on all that have been discussed. The founders of the College, at least, those whose contributions were in money, have parted with the property bestowed upon it, and their representatives have no interest in that property. The donors of land are equally without interest so long as the corporation shall exist. Could they be found, they are unaffected by any alteration in its Constitution, and probably regardless of its form, or even of its existence. The students are fluctuating, and no individual among our youth has a vested interest in the institution which can be asserted in a Court of justice. Neither the founders of the College nor the youth for whose benefit it was founded complain of the alteration made in its charter, or think themselves injured by it. The Trustees alone complain, and the Trustees have no beneficial interest to be protected. Can this be such a contract as the Constitution intended to withdraw from the power of State legislation? Contracts the parties to which have a vested beneficial interest, and those only, it has been said, are the objects about

Page 17 U. S. 642

which the Constitution is solicitous, and to which its protection is extended.

The Court has bestowed on this argument the most deliberate consideration, and the result will be stated. Dr. Wheelock, acting for himself and for those who, at his solicitation, had made contributions to his school, applied for this charter, as the instrument which should enable him, and them, to perpetuate their beneficent intention. It was granted. An artificial, immortal being was created by the Crown, capable of receiving and distributing forever, according to the will of the donors, the donations which should be made to it. On this being the contributions which had been collected were immediately bestowed. These gifts were made not indeed to make a profit for the donors or their posterity, but for something, in their opinion, of inestimable value -- for something which they deemed a full equivalent for the money with which it was purchased. The consideration for which they stipulated is the perpetual application of the fund to its object in the mode prescribed by themselves. Their descendants may take no interest in the preservation of this consideration. But, in this respect, their descendants are not their representatives; they are represented by the corporation. The corporation is the assignee of their rights, stands in their place, and distributes their bounty as they would themselves have distributed it had they been immortal. So, with respect to the students who are to derive learning from this source, the corporation is a Trustee for them also. Their potential rights, which, taken distributively,

Page 17 U. S. 643

are imperceptible, amount collectively to a most important interest. These are, in the aggregate, to be exercised, asserted and protected by the

corporation. They were as completely out of the donors, at the instant of their being vested in the corporation, and as incapable of being asserted by the students as at present.

According to the theory of the British Constitution, their Parliament is omnipotent. To annul corporate rights might give a shock to public opinion, which that government has chosen to avoid, but its power is not questioned. Had parliament, immediately after the emanation of this charter and the execution of those conveyances which followed it, annulled the instrument, so that the living donors would have witnessed the disappointment of their hopes, the perfidy of the transaction would have been universally acknowledged. Yet then, as now, the donors would have no interest in the property; then, as now, those who might be students would have had no rights to be violated; then, as now, it might be said that the Trustees, in whom the rights of all were combined, possessed no private, individual, beneficial interests in the property confided to their protection. Yet the contract would, at that time, have been deemed sacred by all. What has since occurred to strip it of its inviolability? Circumstances have not changed it. In reason, in justice, and in law, it is now what is was in 1769.

This is plainly a contract to which the donors, the Trustees, and the Crown (to whose rights and obligations New Hampshire succeeds) were the original

Page 17 U. S. 644

parties. It is a contract made on a valuable consideration. It is a contract for the security and disposition of property. It is a contract on the faith of which real and personal estate has been conveyed to the corporation. It is, then, a contract within the letter of the Constitution, and within its spirit also, unless the fact that the property is invested by the donors in Trustees for the promotion of religion and education, for the benefit of persons who are perpetually changing, though the objects remain the same, shall create a particular exception taking this case out of the prohibition contained in the Constitution.

It is more than possible that the preservation of rights of this description was not particularly in the view of the framers of the Constitution when the clause under consideration was introduced into that instrument. It is probable that interferences of more frequent occurrence, to which the temptation was stronger, and of which the mischief was more extensive, constituted the great motive for imposing this restriction on the State legislatures. But although a particular and a rare case may not, in itself, be of sufficient magnitude to induce a rule, yet it must be governed by the rule, when established, unless some plain and strong reason for excluding it can be given. It is not enough to say that this particular case was not in the mind of the convention when the article was framed, nor of the American people when it was adopted. It is necessary to go further and to say that, had this particular case been suggested, the language would have been so varied as to exclude it, or it would have been made a special exception. The

Page 17 U. S. 645

case, being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd or mischievous or repugnant to the general spirit of the instrument as to justify those who expound the Constitution in making it an exception.

On what safe and intelligible ground can this exception stand? There is no expression in the Constitution, no sentiment delivered by its contemporaneous expounders, which would justify us in making it. In the absence of all authority of this kind, is there in the nature and reason of the case itself that which would sustain a construction of the Constitution not warranted by its words? Are contracts of this description of a character to excite so little interest that we must exclude them from the provisions of the Constitution as being unworthy of the attention of those who framed the instrument? Or does public policy so imperiously demand their remaining exposed to legislative alteration as to compel us, or rather permit us, to say that these words, which were introduced to give stability to contracts and which in their plain import comprehend this contract, must yet be so construed as to exclude it?

Almost all eleemosynary corporations, those which are created for the promotion of religion, of charity, or of education, are of the same character. The law of this case is the law of all. In every literary or charitable institution, unless the objects of the bounty be themselves incorporated, the whole legal interest is in Trustees, and can be asserted only by them. The donors, or claimants of the bounty, if

Page 17 U. S. 646

they can appear in Court at all, can appear only to complain of the Trustees. In all other situations, they are identified with, and personated by, the Trustees, and their rights are to be defended and maintained by them. Religion, charity and education are, in the law of England, legatees or donees, capable of receiving bequests or donations in this form. They appear in court, and claim or defend by the corporation. Are they of so little estimation in the United States that contracts for their benefit must be excluded from the protection of words which in their natural import include them? Or do such contracts so necessarily require new modeling by the authority of the legislature that the ordinary rules of construction must be disregarded in order to leave them exposed to legislative alteration?

All feel that these objects are not deemed unimportant in the United States. The interest which this case has excited proves that they are not. The framers of the Constitution did not deem them unworthy of its care and protection. They have, though in a different mode, manifested their respect for science by reserving to the government of the Union the power

"to promote the progress of science and useful arts by securing for limited times, to authors and inventors, the exclusive right to their respective writings and discoveries."

They have so far withdrawn science and the useful arts from the action of the State governments. Why then should they be supposed so regardless of contracts made for the advancement of literature as to intend to exclude them from provisions, made for the security

Page 17 U. S. 647

of ordinary contracts between man and man? No reason for making this supposition is perceived.

If the insignificance of the object does not require that we should exclude contracts respecting it from the protection of the Constitution, neither, as we conceive, is the policy of leaving them subject to legislative alteration so apparent as to require a forced construction of that instrument in order to effect it. These eleemosynary institutions do not fill the place which would otherwise be occupied by government, but that which would otherwise remain vacant. They are complete acquisitions to literature. They are donations to education, donations, which any government must be disposed rather to encourage than to discountenance. It requires no very critical examination of the human mind to enable us to determine that one great inducement to these gifts is the conviction felt by the giver that the disposition he makes of them is immutable. It is probable that no man ever was, and that no man ever will be, the founder of a college, believing at the time that an act of incorporation constitutes no security for the institution, believing that it is immediately to be deemed a public institution, whose funds are to be governed and applied not by the will of the donor, but by the will of the legislature. All such gifts are made in the pleasing, perhaps, delusive, hope that the charity will flow forever in the channel which the givers have marked out for it. If every man finds in his own bosom strong evidence of the universality of this sentiment, there can be but little reason to imagine that the framers of our Constitution were

Page 17 U. S. 648

strangers to it, and that, feeling the necessity and policy of giving permanence and security to contracts, of withdrawing them from the influence of legislative bodies, whose fluctuating policy, and repeated interferences, produced the most perplexing and injurious embarrassments, they still deemed it necessary to leave these contracts subject to those interferences. The motives for such an exception must be very powerful to justify the construction which makes it.

The motives suggested at the bar grow out of the original appointment of the Trustees, which is supposed to have been in a spirit hostile to the genius of our government, and the presumption that, if allowed to continue themselves, they now are, and must remain forever, what they originally were. Hence is inferred the necessity of applying to this corporation, and to other similar corporations, the correcting and improving hand of the legislature.

It has been urged repeatedly, and certainly with a degree of earnestness which attracted attention that the Trustees, deriving their power from a regal source, must, necessarily, partake of the spirit of their origin, and that their first principles, unimproved by that resplendent light which has been shed around them, must continue to govern the College and to guide the students. Before we inquire into the influence which this argument ought to have on the constitutional question, it may not be amiss to examine the fact on which it rests. The first Trustees were undoubtedly named in the charter by the Crown, but at whose suggestion were they named? By whom were they

Page 17 U. S. 649

selected? The charter informs us. Dr. Wheelock had represented

"that, for many weighty reasons, it would be expedient that the gentlemen whom he had already nominated in his last will to be Trustees in America should be of the corporation now proposed."

When afterwards the Trustees are named in the charter, can it be doubted that the persons mentioned by Dr. Wheelock in his will were appointed? Some were probably added by the Crown, with the approbation of Dr. Wheelock. Among these is the doctor himself. If any others were appointed at the instance of the Crown, they are the Governor, three members of the Council, and the Speaker of the House of Representatives of the Colony of New Hampshire. The stations filled by these persons ought to rescue them from any other imputation than too great a dependence on the Crown. If, in the revolution that followed, they acted under the influence of this sentiment, they must have ceased to be Trustees; if they took part with their countrymen, the imputation which suspicion might excite would no longer attach to them. The original Trustees, then, or most of them, were named by Dr. Wheelock, and those who were added to his nomination, most probably with his approbation, were among the most eminent and respectable individuals in New Hampshire.

The only evidence which we possess of the character of Dr. Wheelock is furnished by this charter. The judicious means employed for the accomplishment of his object, and the success which attended his endeavors, would lead to the opinion that he united a sound understanding to that humanity and

Page 17 U. S. 650

benevolence which suggested his undertaking. It surely cannot be assumed that his Trustees were selected without judgment. With as little probability can it be assumed that, while the light of science and of liberal principles pervades the whole community, these originally benighted Trustees remain in utter darkness, incapable of participating in the general improvement; that while the human race is rapidly advancing, they are stationary. Reasoning a priori, we should believe that learned and intelligent men, selected by its patrons for the government of a literary institution, would select learned and intelligent men for their successors, men as well fitted for the government of a College as those who might be chosen by other means. Should this reasoning ever prove erroneous in a particular case, public opinion, as has been stated at the bar, would

correct the institution. The mere possibility of the contrary would not justify a construction of the Constitution which should exclude these contracts from the protection of a provision whose terms comprehend them.

The opinion of the Court, after mature deliberation, is that this is a contract the obligation of which cannot be impaired without violating the Constitution of the United States. This opinion appears to us to be equally supported by reason and by the former decisions of this Court.

2. We next proceed to the inquiry whether its obligation has been impaired by those acts of the Legislature of New Hampshire to which the special verdict refers.

Page 17 U. S. 651

From the review of this charter which has been taken, it appears that the whole power of governing the College, of appointing and removing tutors, of fixing their salaries, of directing the course of study to be pursued by the students, and of filling up vacancies created in their own body, was vested in the Trustees. On the part of the Crown, it was expressly stipulated that this corporation thus constituted should continue forever, and that the number of Trustees should forever consist of twelve, and no more. By this contract, the Crown was bound, and could have made no violent alteration in its essential terms without impairing its obligation.

By the revolution, the duties as well as the powers, of government devolved on the people of New Hampshire. It is admitted that among the latter was comprehended the transcendent power of Parliament, as well as that of the executive department. It is too clear to require the support of argument that all contracts and rights respecting property, remained unchanged by the revolution. The obligations, then, which were created by the charter to Dartmouth College were the same in the new that they had been in the old government. The power of the government was also the same. A repeal of this charter at any time prior to the adoption of the present Constitution of the United States would have been an extraordinary and unprecedented act of power, but one which could have been contested only by the restrictions upon the legislature, to be found in the constitution of the State. But the Constitution of the United States has imposed this additional limitation --

Page 17 U. S. 652

that the legislature of a State shall pass no act "impairing the obligation of contracts."

It has been already stated that the act "to amend the charter, and enlarge and improve the corporation of Dartmouth College" increases the number of Trustees to twenty-one, gives the appointment of the additional members to the executive of the State, and creates a Board of Overseers, to consist of twenty-five persons, of whom twenty-one are also appointed by the Executive of New Hampshire, who have power to inspect and control the most important acts of the Trustees.

On the effect of this law, two opinions cannot be entertained. Between acting directly and acting through the agency of Trustees and Overseers, no essential difference is perceived. The whole power of governing the College is transferred from Trustees, appointed according to the will of the founder, expressed in the charter, to the Executive of New Hampshire. The management and application of the funds of this eleemosynary institution, which are placed by the donors in the hands of Trustees named in the charter, and empowered to perpetuate themselves, are placed by this act under the control of the government of the State. The will of the State is substituted for the will of the donors in every essential operation of the College. This is not an immaterial change. The founders of the College contracted not merely for the perpetual application of the funds which they gave, to the objects for which those funds were given; they contracted also to secure that application by the constitution of the corporation.

Page 17 U. S. 653

They contracted for a system which should, so far as human foresight can provide, retain forever the government of the literary institution they had formed in the hands of persons approved by themselves. This system is totally changed. The charter of 1769 exists no longer. It is reorganized, and reorganized in such a manner as to convert a literary institution, moulded according to the will of its founders, and placed under the control of private literary men, into a machine entirely subservient to the will of government. This may be for the advantage of this College in particular, and may be for the advantage of literature in general, but it is not according to the will of the donors, and is subversive of that contract on the faith of which their property was given.

In the view which has been taken of this interesting case, the Court has confined itself to the rights possessed by the Trustees as the assignees and representatives of the donors and founders, for the benefit of religion and literature. Yet it is not clear that the Trustees ought to be considered as destitute of such beneficial interest in themselves as the law may respect. In addition to their being the legal owners of the property, and to their having a freehold right in the powers confided to them, the charter itself countenances the idea that Trustees may also be tutors, with salaries. The first President was one of the original Trustees, and the charter provides that, in case of vacancy in that office,

"the senior professor or tutor, *being one of the Trustees,* shall exercise the office of President, until the Trustees shall make choice

Page 17 U. S. 654

of, and appoint a President."

According to the tenor of the charter, then, the Trustees might, without impropriety, appoint a President and other professors from their own body.

This is a power not entirely unconnected with an interest. Even if the proposition of the counsel for the defendant were sustained, if it were admitted that those contracts only are protected by the Constitution, a beneficial interest in which is vested in the party, who appears in Court to assert that interest, yet it is by no means clear that the Trustees of Dartmouth College have no beneficial interest in themselves. But the Court has deemed it unnecessary to investigate this particular point, being of opinion on general principles that, in these private eleemosynary institutions, the body corporate, as possessing the whole legal and equitable interest and completely representing the donors for the purpose of executing the trust, has rights which are protected by the Constitution.

It results from this opinion that the acts of the Legislature of New Hampshire which are stated in the special verdict found in this cause are repugnant to the Constitution of the United States, and that the judgment on this special verdict ought to have been for the plaintiffs. The judgment of the State Court must, therefore, be reversed.

* Starr v. Hamilton, 1 Deady 268.

WASHINGTON, Justice.

This cause turns upon the validity of certain laws of the State of New Hampshire, which have been stated in the case, and which, it is contended by the counsel for the plaintiffs

Page 17 U. S. 655

in error, are void, being repugnant to the constitution of that State and also to the Constitution of the United States. Whether the first objection to these laws be well founded or not is a question with which this Court, in this case, has nothing to do, because it has no jurisdiction as an appellate court over the decisions of a State court except in cases where is drawn in question the validity of a treaty, or statute of, or an authority exercised under, the United States, and the decision is against their validity, or where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of their validity, or where is drawn in question the construction of any clause of the Constitution, or of a treaty, or statute of, or commission held under, the United States, and the decision is against the title, right, privilege or exemption specially set up or claimed by either party, under such clause of the said Constitution, treaty, statute or commission.

The clause in the Constitution of the United States which was drawn in question in the Court from whence this transcript has been sent is that part of the tenth section of the first article which declares that "no State shall pass any bill of attainder, ex post facto law, or any law impairing the obligation of contracts." The decision of the State court is against the title specially claimed by the plaintiffs in error under the above clause, because they contend that the laws of New Hampshire, above referred to,

Page 17 U. S. 656

impair the obligation of a contract and are consequently repugnant to the above clause of the Constitution of the United States, and void. There are, then, two questions for this Court to decide: 1st.: Is the charter granted to Dartmouth College on the 13th of December 1769, to be considered as a contract? If it be, then, 2d.: Do the laws in question impair its obligation?

1. What is a contract? It may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other and each reciprocally acquires a right to whatever is promised by the other. Powell on Cont. 6. Under this definition, says Mr. Powell, it is obvious that every feoffment, gift, grant, agreement, promise, &c., may be included, because in all there is a mutual consent of the minds of the parties concerned in them, upon an agreement between them respecting some property or right that is the object of the stipulation. He adds that the ingredients requisite to form a contract are, parties, consent, and an obligation to be created or dissolved; these must all concur, because the regular effect of all contracts is, on one side, to acquire, and on the other, to part with, some property or rights, or to abridge or to restrain natural liberty, by binding the parties to do, or restraining them from doing, something which before they might have done or omitted. If a doubt could exist that a grant is a contract, the point was decided in the case of *Fletcher v. Peck*, 6 Cranch 87,

Page 17 U. S. 657

in which it was laid down that a contract is either executory or executed; by the former, a party binds himself to do or not to do a particular thing; the latter is one in which the object of the contract is performed, and this differs in nothing from a grant; but whether executed or executory, they both contain obligations binding on the parties, and both are equally within the provisions of the Constitution of the United States, which forbids the State governments to pass laws impairing the obligation of contracts.

If, then, a grant be a contract within the meaning of the Constitution of the United States, the next inquiry is whether the creation of a corporation by charter be such a grant and as includes an obligation of the nature of a contract which no State legislature can pass laws to impair? A corporation is defined by Mr. Justice Blackstone (2 Bl.Com. 37) to be a franchise. It is, says he,

"a franchise for a number of persons to be incorporated and exist as a body politic, with a power to maintain perpetual succession, and to do corporate acts, and each individual of such corporation is also said to have a franchise, or freedom."

This franchise, like other franchises, is an incorporeal hereditament, issuing out of something real or personal, or concerning or annexed to, and exercisable within a thing corporate. To this grant or this franchise the parties are the King and the persons for whose benefit it is created, or

Trustees for them. The assent of both is necessary.

Page 17 U. S. 658

The subjects of the grant are not only privileges and immunities, but property, or, which is the same thing, a capacity to acquire and to hold property in perpetuity. Certain obligations are created, binding both on the grantor and the grantees. On the part of the former, it amounts to an extinguishment of the King's prerogative to bestow the same identical franchise on another corporate body, because it would prejudice his prior grant. 2 Bl.Com. 37. It implies, therefore, a contract not to reassert the right to grant the franchise to another, or to impair it. There is also an implied contract that the founder of a private charity, or his heirs, or other persons appointed by him for that purpose, shall have the right to visit and to govern the corporation of which he is the acknowledged founder and patron, and also that, in case of its dissolution, the reversionary right of the founder to the property with which he had endowed it should be preserved inviolate.

The rights acquired by the other contracting party are those of having perpetual succession, of suing and being sued, of purchasing lands for the benefit of themselves and their successors, and of having a common seal and of making by-laws. The obligation imposed upon them, and which forms the consideration of the grant, is that of acting up to the end or design for which they were created by their founder. Mr. Justice Buller, in the case of the *King v. Pasmore*, 3 T.R. 246, says that the grant of incorporation is a compact between the Crown and a number of persons, the latter of whom undertake, in consideration

Page 17 U. S. 659

of the privileges bestowed, to exert themselves for the good government of the place. If they fail to perform their part of it, there is an end of the compact. The charter of a corporation, says Mr. Justice Blackstone, 2 Bl.Com. 484, may be forfeited through negligence or abuse of its franchises, in which case the law judges that the body politic has broken the condition upon which it was incorporated, and thereupon the corporation is void. It appears to me, upon the whole, that these principles and authorities prove incontrovertibly that a charter of incorporation is a contract.

2. The next question is do the acts of the Legislature of New Hampshire of the 27th of June, and 18th and 26th of December, 1816, impair this contract within the true intent and meaning of the Constitution of the United States? Previous to the examination of this question, it will be proper clearly to mark the distinction between the different kinds of lay aggregate corporations in order to prevent any implied decision by this Court of any other case than the one immediately before it.

We are informed by the case of *Philips v. Bury*, 1 Lord Raym. 5, S.C. 2 T. R. 346, which contains all the doctrine of corporations connected with this point, that there are two kinds of corporations aggregate, *viz.*, such as are for public government and such as are for private charity. The first are those for the government of a town, city or the like, and, being for public advantage, are

Page 17 U. S. 660

to be governed according to the law of the land. The validity and justice of their private laws and Constitutions are examinable in the King's courts. Of these, there are no particular founders, and consequently, no particular visitor; there are no patrons of these corporations. But private and particular corporations for charity, founded and endowed by private persons, are subject to the private government of those who erect them, and are to be visited by them or their heirs or such other persons as they may appoint. The only rules for the government of these private corporations are the laws and Constitutions assigned by the founder. This right of government and visitation arises from the property which the founder had in the lands assigned to support the charity; and, as he is the author of the charity, the law invests him with the necessary power of inspecting and regulating it. The authorities are full to prove that a College is a private charity, as well as an hospital, and that there is, in reality, no difference between them except in degree, but they are within the same reason, and both eleemosynary.

These corporations, civil and eleemosynary, which differ from each other so especially in their nature and constitution, may very well differ in matters which concern their rights and privileges, and their existence and subjection to public control. The one is the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the King, or government may bestow upon it, and having no other founder or visitor than the King or government, the *fundator incipiens*.

Page 17 U. S. 661

The validity and justice of its laws and Constitution are examinable by the courts having jurisdiction over them, and they are subject to the general law of the land. It would seem reasonable that such a corporation may be controlled, and its Constitution altered and amended, by the government in such manner as the public interest may require. Such legislative interferences cannot be said to impair the contract by which the corporation was formed, because there is, in reality, but one party to it, the Trustees or Governors of the corporation being merely the Trustees for the public, the *cestui que trust* of the foundation. These Trustees or Governors have no interest, no privileges or immunities, which are violated by such interference, and can have no more right to complain of them than an ordinary trustee, who is called upon in a court of equity to execute the trust. They accepted the charter for the public benefit alone, and there would seem to be no reason why the government, under proper limitations, should not alter or modify such a grant at pleasure. But the case of a private corporation is entirely different. That is the creature of private benefaction for a charity or private purpose. It is endowed and founded by private persons, and subject to their control, laws and visitation, and not to the general control of the government, and all these powers, rights and privileges flow from the property of the founder in the funds assigned for the support of the charity. Although the King, by the grant of the charter, is in some sense the founder of all eleemosynary corporations because, without his grant, they cannot exist, yet the patron or endower is the perficient founder to whom belongs, as of

Page 17 U. S. 662

right, all the powers and privileges, which have been described. With such a corporation it is not competent for the legislature to interfere. It is a franchise or incorporeal hereditament founded upon private property, devoted by its patron to a private charity, of a peculiar kind, the offspring of his own will and pleasure, to be managed and visited by persons of his own appointment according to such laws and regulations as he or the persons so selected may ordain.

It has been shown that the charter is a contract on the part of the government that the property with which the charity is endowed shall be forever vested in a certain number of persons and their successors, to subserve the particular purposes designated by the founder and to be managed in a particular way. If a law increases or diminishes the number of the Trustees, they are not the persons which the grantor agreed should be the managers of the fund. If it appropriate the fund intended for the support of a particular charity to that of some other charity, or to an entirely different charity, the grant is in effect set aside, and a new contract substituted in its place, thus disappointing completely the intentions of the founder by changing the objects of his bounty. And can it be seriously contended that a law which changes so materially the terms of a contract does not impair it? In short, does not every alteration of a contract, however unimportant, even though it be manifestly for the interest of the party objecting to it, impair its obligation? If the assent of all the parties to be bound by a contract be of its essence, how

Page 17 U. S. 663

is it possible that a new contract, substituted for or engrafted on another without such assent, should not violate the old charter?

This course of reasoning, which appears to be perfectly manifest, is not without authority to support it. Mr. Justice Blackstone lays it down, 2 Bl.Com. 37, that the same identical franchise that has been before granted to one cannot be bestowed on another, and the reason assigned is that it would prejudice the former grant. In the *King v. Pasmore*, 3 T.R. 246, Lord Kenyon says that an existing corporation cannot have another charter obtruded upon it by the Crown. It may reject it, or accept the whole or any part of the new charter. The reason is obvious -- a charter is a contract, to the validity of which the consent of both parties is essential, and therefore it cannot be altered or added to without such consent.

But the case of *Terrett v. Taylor*, 9 Cranch 43, fully supports the distinction above stated between civil and private corporations, and is entirely in point. It was decided in that case that a private corporation, created by the legislature, may lose its franchises by misuser or nonuser, and may be resumed by the government under a judicial judgment of forfeiture. In respect to public corporations, which exist only for public purposes, such as towns, cities, &c., the legislature may, under proper limitations, change, modify, enlarge or restrain them, securing, however, the property for the use of those for whom and at whose expense it was purchased. But it is denied that it has power to repeal

Page 17 U. S. 664

statutes creating private corporations or confirming to them property already acquired under the faith of previous laws, and that it can, by such repeal, vest the property of such corporations in the State, or dispose of the same to such purposes as it may please, without the consent or default of the corporators. Such a law, it is declared, would be repugnant both to the spirit and the letter of the Constitution of the United States.

If these principles, before laid down, be correct, it cannot be denied that the obligations of, the charter to Dartmouth College are impaired by the laws under consideration. The name of the corporation, its constitution and government, and the objects of the founder and of the grantor of the charter are totally changed. By the charter, the property of this founder was vested in twelve trustees, and no more, to be disposed of by them, or a majority, for the support of a College, for the education and instruction of the Indians, and also of English youth, and others. Under the late acts, the trustees and visitors are different, and the property and franchises of the College are transferred to different and new uses not contemplated by the founder. In short, it is most obvious that the effect of these laws is to abolish the old corporation and to create a new one in its stead. The laws of Virginia, referred to in the case of *Terrett v. Taylor*, authorized the Overseers of the poor to sell the glebes belonging to the Protestant Episcopal Church and to appropriate the proceeds to other uses. The laws in question divest the Trustees of Dartmouth College of the property vested in them

Page 17 U. S. 665

by the founder and vest it in other trustees, for the support of a different institution, called Dartmouth University. In what respects do they differ? Would the difference have been greater in principle if the law had appropriated the funds of the College to the making of turnpike roads, or to any other purpose of a like nature? In all respects in which the contract has been altered without the assent of the corporation, its obligations have been impaired, and the degree can make no difference in the construction of the above provision of the Constitution.

It has been insisted in the argument at the bar that Dartmouth College was a mere civil corporation, created for a public purpose, the public being deeply interested in the education of its youth, and that, consequently, the charter was as much under the control of the Government of New Hampshire as if the legislature had concerned the government of a town or city. But it has been shown that the authorities are all the other way. There is not a case to be found which contradicts the doctrine laid down in the case of *Philips v. Bury*, viz., that a College founded by an individual or individuals is a private charity, subject to the government and visitation of the founder, and not to the unlimited control of the government.

It is objected, in this case that Dr. Wheelock is not the founder of Dartmouth College. Admit he is not. How would this alter the case? Neither the King nor the Province of New Hampshire was the founder, and if the contributions made by the Governor of New Hampshire, by those persons who

Page 17 U. S. 666

granted lands for the College, in order to induce its location in a particular part of the State, by the other liberal contributors in England and America, bestow upon them claims equal with Dr. Wheelock, still it would not alter the nature of the corporation, and convert it into one for public government. It would still be a private eleemosynary corporation, a private charity, endowed by a number of persons instead of a single individual. But the fact is that whoever may mediately have contributed to swell the funds of this charity, they were bestowed at the solicitation of Dr. Wheelock, and vested in persons appointed by him, for the use of a charity of which he was the immediate founder and is so styled in the charter.

Upon the whole, I am of opinion that the above acts of New Hampshire, not having received the assent of the corporate body of Dartmouth College, are not binding on them, and, consequently that the judgment of the State Court ought to be reserved.

Mr. Justice JOHNSON concurred for the reasons stated by the Chief Justice.

Mr. Justice LIVINGSTON concurred for the reasons stated by the Chief Justice, and Justices WASHINGTON and STORY.

Mr. Justice STORY.

This is a cause of great importance, and as the very learned discussions as well here as in the State Court show, of no inconsiderable difficulty. There are two questions to which the appellate jurisdiction of this Court properly applies:

Page 17 U. S. 667

1. Whether the original charter of Dartmouth College is a contract within the prohibitory clause of the Constitution of the United States, which declares that no State shall pass any "law impairing the obligation of contracts?" 2. If so, whether the legislative acts of New Hampshire of the 27th of June, and of the 18th and 23rd of December, 1816, or any of them, impair the obligations of that charter?

It will be necessary, however, before we proceed to discuss these questions, to institute an inquiry into the nature, rights and duties of aggregate corporations at common law, that we may apply the principles drawn from this source to the exposition of this charter, which was granted emphatically with reference to that law.

An aggregate corporation, at common law, is a collection of individuals, united into one collective body under a special name and possessing certain immunities, privileges and capacities in its collective character which do not belong to the natural persons composing it. Among other things, it possesses the capacity of perpetual succession, and of acting by the collected vote or will of its component members, and of suing and being sued in all things touching its corporate rights and duties. It is, in short, an artificial person, existing in contemplation of law and endowed with certain powers and franchises which, though they must be exercised through the medium of its natural members, are yet considered as subsisting in the corporation itself as distinctly as if it were a real personage. Hence, such a corporation may sue and be sued by its own members, and

Page 17 U. S. 668

may contract with them in the same manner as with any strangers. 1 Bl.Com. 469, 475, 1 Kyd on Corp. 13, 69, 189, 1 Wooddes. 471, &c. A great variety of these corporations exist in every country governed by the common law, in some of which, the corporate existence is perpetuated by new elections, made from time to time, and in others by a continual accession of new members, without any corporate act. Some of these corporations are, from the particular purposes to which they are devoted, denominated spiritual, and some lay, and the latter are again divided into civil and eleemosynary corporations. It is unnecessary, in this place, to enter into any examination of civil corporations. Eleemosynary corporations are such as are constituted for the perpetual distribution of the free alms and bounty of the founder in such manner as he has directed, and in this class are ranked hospitals for the relief of poor and impotent persons, and Colleges for the promotion of learning and piety and the support of persons engaged in literary pursuits. 1 Bl.Com. 469, 470, 471, 482; 1 Kyd on Corp. 25; 1 Wooddes. 474; *Attorney General v. Whorwood,* 1 Ves. 534; *St. John's College v. Todington,* 1 Bl.Rep. 84, S.C. 1 Burr. 200; *Philips v. Bury,* 1 Ld. Raym. 5, S.C. 2 T.R. 346; *Porter's Case,* 1 Co. 22, b. 23.

Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes and counties, and in many respects they are so, although they involve some private interests; but, strictly speaking, public corporations

Page 17 U. S. 669

are such only as are founded by the government for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution. For instance, a bank created by the government for its own uses, whose stock is exclusively owned by the government, is, in the strictest sense, public corporation. So an hospital created and endowed by the government for general charity. But a bank whose stock is owned by private persons is a private corporation, although it is erected by the government and its objects and operations partake of a public nature. The same doctrine may be affirmed of insurance, canal, bridge and turnpike companies. In all these cases, the uses may, in a certain sense, be called public, but the corporations are private -- as much

so, indeed, as if the franchises were vested in a single person.

This reasoning applies in its full force to eleemosynary corporations. An hospital founded by a private benefactor is, in point of law, a private corporation although dedicated by its charter to general charity. So a College, founded and endowed in the same manner, although, being for the promotion of learning and piety, it may extend its charity to scholars from every class in the community, and thus acquire the character of a public institution. This is the unequivocal doctrine of the authorities, and cannot be

Page 17 U. S. 670

shaken but by undermining the most solid foundations of the common law. *Philips v. Bury*, 1 Lord Raym. 5, 9, S. C. 2 T.R. 346.

It was, indeed, supposed at the argument that if the uses of an eleemosynary corporation be for general charity, this alone would constitute it a public corporation. But the law is certainly not so. To be sure, in a certain sense, every charity which is extensive in its reach may be called a public charity, in contradistinction to a charity embracing but a few definite objects. In this sense, the language was unquestionably used by Lord Hardwicke in the case cited at the argument, *Attorney General v. Pearce*, 2 Atk. 87, 1 Bac.Abr. tit. Charitable Uses, E, 589; and in this sense, a private corporation may well enough be denominated a public charity. So it would be if the endowment, instead of being vested in a corporation, were assigned to a private trustee; yet, in such a case, no one would imagine that the trust ceased to be private, or the funds became public property. That the mere act of incorporation will not change the charity from a private to a public one is most distinctly asserted in the authorities. Lord Hardwicke, in the case already alluded to, says

"the charter of the Crown cannot make a charity more or less public, but only more permanent than it would otherwise be; but it is the extensiveness which will constitute it a public one. A devise to the poor of the parish is a public charity. Where testators leave it to the discretion of a trustee to choose out the objects, though each particular

Page 17 U. S. 671

object may be said to be private, yet, in the extensiveness of the benefit accruing from them, they may properly be called public charities. A sum to be disposed of by A.B. and his executors, at their discretion, among poor housekeepers, is of this kind."

The charity, then, may, in this sense, be public although it may be administered by private trustees; and for the same reason, it may thus be public though administered by a private corporation. The fact, then that the charity is public affords no proof that the corporation is also public; and consequently, the argument, so far as it is built on this foundation, falls to the ground. If, indeed, the argument were correct, it would follow that almost every hospital and college would be a public corporation, a doctrine utterly irreconcilable with the whole current of decisions since the time of Lord Coke. *Case of Sutton's Hospital*, 10 Co. 23.

When, then, the argument assumes that, because the charity is public, the corporation is public, it manifestly confounds the popular with the strictly legal sense of the terms. And if it stopped here, it would not be very material to correct the error. But it is on this foundation that a superstructure is erected which is to compel a surrender of the cause. When the corporation is said, at the bar, to be public, it is not merely meant that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control and direct the corporation and its funds and its franchises at its own good will and pleasure. Now such

Page 17 U. S. 672

an authority does not exist in the government except where the corporation is, in the strictest sense, public – that is, where its whole interests and franchises are the exclusive property and domain of the government itself. If it had been otherwise, courts of law would have been spared many laborious adjudications in respect to eleemosynary corporations, and the visitatorial powers over them, from the time of Lord Holt down to the present day. *Rex v. Bury*, 1 Lord Raym. 5; S. C. Comb. 265; Holt 715; 1 Show. 360; 4 Mod. 106; Skin. 447; and Lord Holt's opinion from his own MS., in 2 T.R. 346. Nay, more, private Trustees for charitable purposes would have been liable to have the property confided to their care taken away from them, without any assent or default on their part, and the administration submitted not to the control of law and equity, but to the arbitrary discretion of the government. Yet who ever thought before that the munificent gifts of private donors for general charity became instantaneously the property of the government, and that the Trustees appointed by the donors, whether corporate or unincorporated, might be compelled to yield up their rights to whomsoever the government might appoint to administer them? If we were to establish such a principle, it would extinguish all future eleemosynary endowments, and we should find as little of public policy as we now find of law to sustain it.

An eleemosynary corporation, then, upon a private foundation, being a private corporation, it is next to be considered what is deemed a foundation,

Page 17 U. S. 673

and who is the founder. This cannot be stated with more brevity and exactness than in the language of the elegant commentator upon the laws of England:

"The founder of all corporations [says Sir William Blackstone], in the strictest and original sense, is the King alone, for he only can incorporate a society, and in civil corporations, such as mayor, commonalty, &c., where there are no possessions or endowments given to the body, there is no other founder but the King; but in eleemosynary foundations, such as Colleges and hospitals, where there is an endowment of lands, the law

distinguishes and makes two species of foundation, the one *fundatio incipiens,* or the incorporation, in which sense the King is the general founder of all Colleges and hospitals, the other *fundatio perficiens,* or the dotation of it, in which sense the first gift of the revenues is the foundation, and he who gives them is, in the law, the founder; and it is in this last sense we generally call a man the founder of a college or hospital."

1 Bl.Com. 480, 10 Co. 33.

To all eleemosynary corporations, a visitatorial power attaches as a necessary incident, for these corporations being composed of individuals, subject to human infirmities, are liable as well as private persons to deviate from the end of their institution. The law, therefore, has provided that there shall somewhere exist a power to visit, inquire into, and correct all irregularities and abuses in such corporations, and to compel the original purposes of the charity to be faithfully fulfilled. 1 Bl.Com. 480. The nature and extent of this visitatorial power has been expounded

Page 17 U. S. 674

with admirable fulness and accuracy by Lord Holt in one of his most celebrated judgments. *Phillips v. Bury,* 1 Lord Raym. 5, S. C. 2 T.R. 346. And of common right, by the dotation, the founder and his heirs are the legal visitors, unless the founder has appointed and assigned another person to be visitor. For the founder may, if he please, at the time of the endowment, part with his visitatorial power, and the person to whom it is assigned will, in that case, possess it in exclusion of the founder's heirs. 1 Bl.Com. 482. This visitatorial power is therefore an hereditament founded in property, and valuable, in intendment of law, and stands upon the maxim that he who gives his property has a right to regulate it in future. It includes also the legal right of patronage, for as Lord Holt justly observes, "patronage and visitation are necessary consequents one upon another." No technical terms are necessary to assign or vest the visitatorial power; it is sufficient if, from the nature of the duties to be performed by particular persons under the charter it can be inferred that the founder meant to part with it in their favor; and he may divide it among various persons, or subject it to any modifications or control, by the fundamental statutes of the corporation. But where the appointment is given in general terms, the whole power vests in the appointee. *Eden v. Foster,* 2 P.Wms. 325; *Attorney General v. Middleton,* 2 Ves. 327; *St. Johns College v. Todington,* 1 Bl.Rep. 84., S. C. 2 Burr. 200; *Attorney General v. Clare College,* 3 Atk. 662; S. C. 1 Ves. 78. In the construction

Page 17 U. S. 675

of charters, too, it is a general rule that if the objects of the charity are incorporated, as for instance the master and fellows of a college or the master and poor of a hospital, the visitatorial power, in the absence of any special appointment, silently vests in the founder and his heirs. But where Trustees or Governors are incorporated to manage the charity, the visitatorial power is deemed to belong to them in their corporate character. *Philips v. Bury,* 1 Lord Raym. 5; S. C. 2 T.R. 346; *Green v. Rutherforth,* 1 Ves. 472; *Attorney General v. Middleton,* 2 Ves. 327; *Case of Sutton Hospital,* 10 Co. 23, 31.

When a private eleemosynary corporation is thus created by the charter of the Crown, it is subject to no other control on the part of the Crown than what is expressly or implicitly reserved by the charter itself. Unless a power be reserved for this purpose, the Crown cannot, in virtue of its prerogative, without the consent of the corporation, alter or amend the charter or divest the corporation of any of its franchises, or add to them, or add to, or diminish the number of the trustees, or remove any of the members, or change or control the administration of the charity, or compel the corporation to receive a new charter. This is the uniform language of the authorities, and forms one of the most stubborn and well settled doctrines of the common law. See *Rex v. Pasmore,* 3 T.R. 199, and the cases there cited.

But an eleemosynary, like every other corporation, is subject to the general law of the land. It may forfeit its corporate franchises by misuser or nonuser

Page 17 U. S. 676

of them. I t is subject to the controlling authority of its legal visitor, who, unless restrained by the terms of the charter, may amend and repeal its statutes, remove its officers, correct abuses, and generally superintend the management of the trusts. Where, indeed, the visitatorial power is vested in the Trustees of the charity in virtue of their incorporation, there can be no amotion of them from their corporate capacity. But they are not, therefore, placed beyond the reach of the law. As managers of the revenues of the corporation, they are subject to the general superintending power of the court of chancery, not as itself possessing a visitatorial power, or a right to control the charity, but as possessing a general jurisdiction, in all cases of an abuse of trust, to redress grievances and suppress frauds. [Footnote 1] And where a corporation is a mere trustee of a charity, a court of equity will go yet further, and though it cannot appoint or remove a corporator, it will, yet, in a case of

Page 17 U. S. 677

gross fraud or abuse of trust, take away the trust from the corporation and vest it in other hands. *Mayor, &c. of Coventry v. Attorney General,* 7 Bro.Parl.Cases 235; *Attorney General v. Earl of Clarendon,* 17 Ves. 491, 499.

Thus much it has been thought proper to premise respecting the nature, rights, and duties of eleemosynary corporations growing out of the common law. We may now proceed to an examination of the original charter of Dartmouth College.

It begins by a recital, among other things that the Rev. Eleazer Wheelock, of Lebanon, in Connecticut, about the year 1754, at his own expense, on his own estate, set on foot an Indian charity school and, by the assistance of other persons, educated a number of the children of the Indians, and employed them as missionaries and schoolmasters among the savage tribes; that the design became reputable among the Indians, so that

more desired the education of their children at the school than the contributions in the American colonies would support; that the said Wheelock thought it expedient to endeavor to procure contributions in England, and requested the Rev. Nathaniel Whitaker to go to England as his attorney to solicit contribution, and also solicited the Earl of Dartmouth and others to receive the contributions and become trustees thereof, which they cheerfully agreed to; and he constituted them trustees accordingly, by a power of attorney, and they testified their acceptance by a sealed instrument, *that the said Wheelock also authorized the Trustees to fix and determine*

Page 17 U. S. 678

*upon the place for the said school,* and, to enable them understandingly to give the preference, laid before them the several offers of the governments in America inviting the settlement of the school among them; that a large number of the proprietors of lands in the western parts of New Hampshire, to aid the design, and *considering that the same school might be enlarged and improved to promote learning among the English,* and to supply the churches there with an orthodox ministry, promised large tracts of land for the uses aforesaid, *provided the school should be settled in the western part of said province;* that the trustees thereupon gave a preference to the western part of said province,

brk:

lying on Connecticut River, as a situation most convenient for said school; *that the said Wheelock further represented the necessity for a legal incorporation,* in order to the safety and wellbeing of said seminary, and its being capable of the tenure and disposal of lands and bequests for the use of the same; that in the infancy of said institution, *certain gentlemen whom he had already nominated in his last will* (which he had transmitted to the Trustees in England) *to be Trustees in America should be the corporation now proposed, and lastly that there were already large contributions for said school in the hands of the Trustees in England,* and further success might be expected, for which reason the said Wheelock desired they might be invested with all that power therein which could consist with their distance from the same. The charter, after these recitals, declares that the King, *considering the premises,* and being willing to

Page 17 U. S. 679

encourage the charitable design, and that the best means of education might be established in New Hampshire for the benefit thereof, does, of his *special grace, certain knowledge* and *mere motion,* ordain and grant that there be a College erected in New Hampshire by the name of Dartmouth College, for the education and instruction of youth of the Indian tribes *and also of English youth and others;* that the *Trustees of said College shall be a corporation forever, by the name of the Trustees of Dartmouth College;* that the then Governor of New Hampshire, the said Wheelock, and ten other persons, specially named in the charter, shall be Trustees of the said College, and that *the whole number of Trustees shall forever thereafter consist of twelve, and no more,* that the said corporation shall have power to sue and to be sued by their corporate name, and to acquire and hold for *the use of the said Dartmouth College,* lands, tenements, hereditaments and franchises; to receive, purchase and build any houses for *the use of said College,* in such town in the western part of New Hampshire, as the Trustees, or a major part of them, shall, by a written instrument, agree on, and to receive, accept and dispose of any lands, goods, chattels, rents, gifts, legacies, &c., not exceeding the yearly value of six thousand pounds. It further declares that the Trustees, or a major part of them, regularly convened (*for which purpose seven shall form a quorum*), shall have authority to appoint and remove the professors, tutors and other officers of the College, and to pay them, and also such *missionaries* and *schoolmasters as shall be employed by the Trustees for instructing the Indians,* salaries and

Page 17 U. S. 680

allowances, as well as other corporate expenses, out of the corporate funds. It further declares that, the *said Trustees,* as often as one or more of the Trustees shall die, or by removal or otherwise, shall, according to their judgment, become unfit or incapable to serve the interests of the College, shall have power to *elect and appoint other Trustees* in their stead, so that when the whole number shall be complete of *twelve Trustees, eight* shall be resident freeholders of New Hampshire, and seven of the whole number laymen. It further declares that the Trustees shall have power, from time to time, to make and establish rules, ordinances and laws for the government of the College not repugnant to the laws of the land, and to confer collegiate degrees. It further appoints the said Wheelock, whom it denominates "the founder of the College," to be President of the College, with authority to appoint his successor, who shall be President, until disapproved of by the Trustees. It then concludes with a direction that it shall be the duty of the President to transmit to the Trustees in England, so long as they should perpetuate their Board, and as there should be Indian natives remaining to be proper objects of the bounty, an annual account of all the disbursements from the donations in England, and of the general plans and prosperity of the institution.

Such are the most material clauses of the charter. It is observable, in the first place, that no endowment whatever is given by the Crown, and no power is reserved to the Crown or government in any manner to alter, amend or control the charter. It is also apparent

Page 17 U. S. 681

from the very terms of the charter that Dr. Wheelock is recognised as the founder of the College, and that the charter is granted upon his application, and that the Trustees were in fact nominated by him. In the next place, it is apparent that the objects of the institution are purely charitable, for the distribution of the private contributions of private benefactors. The charity was, in the sense already explained, a public charity - - that is, for the general promotion of learning and piety -- but in this respect it was just as much public before as after the incorporation. The only effect of the charter was to give permanency to the design by enlarging the sphere of its action and granting a perpetuity of corporate powers and franchises, the better to secure the administration of the benevolent donations. As founder, too, Dr. Wheelock and his heirs would have been completely clothed with the visitatorial power; but the whole government and control, as well of the officers as of the revenues of the College, being with his consent assigned to the Trustees in corporate character, the visitatorial power, which is included in this authority, rightfully devolved on the Trustees. As managers of the property and revenues of the corporation, they were amenable to the jurisdiction of the judicial

Case 3:08-cr-01196-W Document 97-2 Filed 08/27/2008 Page 27 of 35

tribunals of the State; but as visitors, their discretion was limited only by the charter, and liable to no supervision or control, at least unless it was fraudulently misapplied.

From this summary examination it follows that Dartmouth College was, under its original charter, a private eleemosynary corporation, endowed with

Page 17 U. S. 682

the usual privileges and franchises of such corporations, and among others, with a legal perpetuity, and was exclusively under the government and control of twelve Trustees, who were to be elected and appointed, from time to time by the existing Board as vacancies or removals should occur.

We are now led to the consideration of the first question in the cause -- whether this charter is a contract within the clause of the Constitution prohibiting the States from passing any law impairing the obligation of contracts. In the case of @ 10 U. S. 136, this Court laid down its exposition of the word "contract" in this clause in the following manner:

"A contract is a compact between two or more persons, and is either executory or executed. An executory contract is one in which a party binds himself to do or not to do a particular thing. A contract executed is one in which the object of the contract is performed, and this, says Blackstone, differs in nothing from a grant. A contract executed, as well as one that is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is always estopped by his own grant."

This language is perfectly unambiguous, and was used in reference to a grant of land by the Governor of a State under a legislative act. It determines in the most unequivocal manner that the grant of a State is a contract, within the clause of

Page 17 U. S. 683

the Constitution now in question, and that it implies a contract not to reassume the rights granted; *a fortiori* the doctrine applies to a charter or grant from the King.

But it is objected that the charter of Dartmouth College is not a contract contemplated by the Constitution, because no valuable consideration passed to the King as an equivalent for the grant, it purporting to be granted *ex mero motu*, and further that no contracts merely voluntary are within the prohibitory clause. It must be admitted that mere executory contracts cannot be enforced at law unless there be a valuable consideration to sustain them, and the Constitution certainly did not mean to create any new obligations or give any new efficacy to nude pacts. But it must, on the other hand, be also admitted that the Constitution did intend to preserve all the obligatory force of contracts which they have by the general principles of law. Now when a contract has once passed, *bona fide*, into grant, neither the King nor any private person who may be the grantor can recall the grant of the property, although the conveyance may have been purely voluntary. A gift, completely executed, is irrevocable. The property conveyed by it becomes, as against the donor, the absolute property of the donee, and no subsequent change of intention of the donor can change the rights of the donee. 2 Bl.Com. 441, Jenk.Cent. 104. And a gift by the Crown of incorporeal hereditaments, such as corporate franchises, when executed, comes completely

Page 17 U. S. 684

within the principle, and is, in the strictest sense of the terms, a grant. 2 Bl.Com. 317, 346; Shep.Touch. ch. 12, p. 227. Was it ever imagined that land voluntarily granted to any person by a State was liable to be resumed at its own good pleasure? Such a pretension would, under any circumstances, be truly alarming, but in a country like ours, where thousands of land titles had their origin in gratuitous grants of the States, it would go far to shake the foundations of the best settled estates. And a grant of franchises is not, in point of principle, distinguishable from a grant of any other property. If, therefore, this charter were a pure donation, when the grant was complete and accepted by the grantees, it involved a contract that the grantees should hold, and the grantor should not reassume the grant, as much as if it had been founded on the most valuable consideration.

But it is not admitted that this charter was not granted for what the law deems a valuable consideration. For this purpose, it matters not how trifling the consideration may be -- a pepper-corn is as good as a thousand dollars. Nor is it necessary that the consideration should be a benefit to the grantor. It is sufficient if it import damage or loss, or forbearance of benefit, or any act done or to be done, on the part of the grantee. It is unnecessary to State cases; they are familiar to the mind of every lawyer. *Pillans v. Van Mierop*, per Yates, J., 3 Burr. 1663; *Forth v. Stanton*, 1 Saund. 211; Williams' note 2, and the cases there cited.

With these principles in view, let us now examine

Page 17 U. S. 685

the terms of this charter. It purports, indeed, on its face, to be granted "of the special grace, certain knowledge and *mere motion*" of the King, but these words were introduced for a very different purpose from that now contended for. It is a general rule of the common law (the reverse of that applied in ordinary cases) that a grant of the King, at the suit of the grantee, is to be construed most beneficially for the King and most strictly against the grantee. Wherefore it is usual to insert in the King's grants a clause that they are made not at the *suit of the grantee*, but of the

special grace, certain knowledge and mere motion of the King, and then they receive a more liberal construction. This is the true object of the clause in question, as we are informed by the most accurate authorities. 2 Bl.Com. 347; Finch's Law 100; 10 Rep. 112; 1 Shep.Abridg. 136; Bull.N.P. 136. But the charter also, on its face, purports to be granted in consideration of *the premises* in the introductory recitals.

Now among these recitals it appears that Dr. Wheelock had founded a charity school at his own expense, on his own estate; that divers contributions had been made in the colonies by others for its support; that new contributions had been made, and were making, in England, for this purpose, and were in the hands of Trustees appointed by Dr. Wheelock to act in his behalf; that Dr. Wheelock had consented to have the school established at such other place as the Trustees should select; that offers had been made by several of the governments in America, inviting the

Page 17 U. S. 686

establishment of the school among them; that offers of land had also been made by divers proprietors of lands in the western parts of New Hampshire if the school should be established there; that the Trustees had finally consented to establish it in New Hampshire; and that Dr. Wheelock represented that, to effectuate the purposes of all parties, an incorporation was necessary. Can it be truly said that these recitals contain no legal consideration of benefit to the Crown, or of forbearance of benefit on the other side? Is there not an implied contract by Dr. Wheelock, if a charter is granted, that the school shall be removed from his estate to New Hampshire?; and that he will relinquish all his control over the funds collected and to be collected in England under his auspices and subject to his authority?; that he will yield up the management of his charity school to the Trustees of the College?; that he will relinquish all the offers made by other American governments and devote his patronage to this institution? It will scarcely be denied that he gave up the right any longer to maintain the charity school already established on his own estate, and that the funds collected for its use and subject to his management were yielded up by him as an endowment of the College. The very language of the charter supposes him to be the legal owner of the funds of the charity school, and, in virtue of this endowment, declares him the founder of the College. It matters not whether the funds were great or small; Dr. Wheelock had procured them by his own influence, and they were under his control, to be applied to the

Page 17 U. S. 687

support of his charity school, and when he relinquished this control, he relinquished a right founded in property acquired by his labors. Besides, Dr. Wheelock impliedly agreed to devote his future services to the College, when erected, by becoming President thereof at a period when sacrifices must necessarily be made to accomplish the great design in view. If, indeed, a pepper-corn be, in the eye of the law, of sufficient value to found a contract, as upon a valuable consideration, are these implied agreements, and these relinquishments of right and benefit, to be deemed wholly worthless? It has never been doubted that an agreement not to exercise a trade in a particular place was a sufficient consideration to sustain a contract for the payment of money; *a fortiori,* the relinquishment of property which a person holds, or controls the use of, as a trust, is a sufficient consideration, for it is parting with a legal right. Even a right of patronage (*jus patronatus*) is of great value in intendment of law. Nobody doubts that an advowson is a valuable hereditament, and yet, in fact, it is but a mere trust, or right of nomination to a benefice, which cannot be legally sold to the intended incumbent. 2 Bl.Com. 22; Christian's note.

In respect to Dr. Wheelock, then, if a consideration be necessary to support the charter as a contract, it is to be found in the implied stipulations on his part in the charter itself. He relinquished valuable rights and undertook a laborious office in consideration of the grant of the incorporation.

Page 17 U. S. 688

This is not all. A charter may be granted upon an executory, as well as an executed or present, consideration. When it is granted to persons who have not made application for it, until their acceptance thereof, the grant is yet *in fieri.* Upon the acceptance, there is an implied contract on the part of the grantees, in consideration of the charter, that they will perform the duties, and exercise the authorities conferred by it. This was the doctrine asserted by the late learned Mr. Justice Buller in a modern case. *Rex v. Pasmore,* 3 T.R. 199, 239, 246. He there said,

"I do not know how to reason on this point better than in the manner urged by one of the relator's counsel, who considered the grant of incorporation to be a compact between the Crown and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place,"

(*i.e.,* the place incorporated). It will not be pretended that if a charter be granted for a bank, and the stockholders pay in their own funds, the charter is to be deemed a grant without consideration, and, therefore, revocable at the pleasure of the grantor. Yet here, the funds are to be managed and the services performed exclusively for the use and benefit of the stockholders themselves. And where the grantees are mere trustees to perform services without reward, exclusively for the benefit of others, for public charity, can it be reasonably argued that these services are less valuable to the government than if performed for the private emolument of

Page 17 U. S. 689

the Trustees themselves? In respect then to the Trustees also, there was a valuable consideration for the charter, the consideration of services agreed to be rendered by them in execution of a charity, from which they could receive no private remuneration.

There is yet another view of this part of the case which deserves the most weighty consideration. The corporation was expressly created for the purpose of distributing in perpetuity the charitable donations of private benefactors. By the terms of the charter, the Trustees, and their successors, in their corporate capacity, were to receive, hold and exclusively manage all the funds so contributed. The Crown, then, upon the face of the charter, pledged its faith that the donations of private benefactors should be perpetually devoted to their original purposes, without any

interference on its own part, and should be forever administered by the Trustees of the corporation, unless its corporate franchises should be taken away by due process of law. From the very nature of the case, therefore, there was an implied contract on the part of the Crown with every benefactor that, if he would give his money, it should be deemed a charity protected by the charter, and be administered by the corporation according to the general law of the land. As soon, then, as a donation was made to the corporation, there was an implied contract, springing up and founded on a valuable consideration that the Crown would not revoke or alter the charter or change its administration without the consent of the corporation. There was also an implied contract between the corporation itself and every benefactor,

Page 17 U. S. 690

upon a like consideration, that it would administer his bounty according to the terms and for the objects stipulated in the charter.

In every view of the case, if a consideration were necessary (which I utterly deny) to make the charter a valid contract, a valuable consideration did exist as to the founder, the Trustees, and the benefactors. And upon the soundest legal principles, the charter may be properly deemed, according to the various aspects in which it is viewed, as a several contract with each of these parties in virtue of the foundation or the endowment of the College, or the acceptance of the charter, or the donations to the charity.

And here we might pause; but there is yet remaining another view of the subject which cannot consistently be passed over without notice. It seems to be assumed by the argument of the defendant's counsel that there is no contract whatsoever, in virtue of the charter, between the Crown and the corporation itself. But it deserves consideration whether this assumption can be sustained upon a solid foundation.

If this had been a new charter, granted to an existing corporation, or a grant of lands to an existing corporation, there could not have been a doubt that the grant would have been an executed contract with the corporation -- as much so as if it had been to any private person. But it is supposed that as this corporation was not then in existence, but was created, and its franchises bestowed, *uno flatu;* the charter cannot be construed a contract, because there was no person *in rerum natura* with whom it might be made. Is this, however, a just and legal view of the

Page 17 U. S. 691

subject? If the corporation had no existence so as to become a contracting party, neither had it for the purpose of receiving a grant of the franchises. The truth is that there may be a priority of operation of things in the same grant, and the law distinguishes and gives such priority, wherever it is necessary to effectuate the objects of the grant. *Case of Sutton's Hospital,* 10 Co. 23; *Buckland v. Fowcher,* cited 10 Co. 27, 28, and recognised in *Attorney General v. Bowyer,* 3 Ves.Jun. 714, 726, 727, S. P. Highmore on Mortm. 200, &c. From the nature of things, the artificial person called a corporation must be created before it can be capable of taking anything. When, therefore, a charter is granted and it brings the corporation into existence without any act of the natural persons who compose it, and gives such corporation any privileges, franchises or property, the law deems the corporation to be first brought into existence, and then clothes it with the granted liberties and property. When, on the other hand, the corporation is to be brought into existence by some future acts of the corporators, the franchises remain in abeyance until such acts are done, and, when the corporation is brought into life, the franchises instantaneously attach to it. There may be, in intendment of law, a priority of time, even in an instant, for this purpose. And if the corporation have an existence before the grant of its other franchises attaches, what more difficulty is there in deeming the grant of these franchises a contract with it than if granted by another instrument at a subsequent period?

It behooves those also who hold that a grant to a corporation not then in existence is incapable

Page 17 U. S. 692

of being deemed a contract on that account to consider whether they do not, at the same time, establish that the grant itself is a nullity for precisely the same reason. Yet such a doctrine would strike us all, as pregnant with absurdity, since it would prove that an act of incorporation could never confer any authorities or rights or property on the corporation it created. It may be admitted that two parties are necessary to form a perfect contract, but it is denied that it is necessary that the assent of both parties must be at the same time. If the legislature were voluntarily to grant land in fee to the first child of A. to be hereafter born, as soon as such child should be born, the estate would vest in it. Would it be contended that such grant, when it took effect, was revocable, and not an executed contract, upon the acceptance of the estate? The same question might be asked in a case of a gratuitous grant by the King or the legislature to A. for life, and afterwards, to the heirs of B., who is then living. Take the case of a bank, incorporated for a limited period upon the express condition that it shall pay out of its corporate funds a certain sum as the consideration for the charter, and, after the corporation is organized, a payment duly made of the sum out of the corporate funds; will it be contended that there is not a subsisting contract between the government and the corporation, by the matters thus arising *ex post facto,* that the charter shall not be revoked, during the stipulated period? Suppose, an act declaring that all persons, who should thereafter pay into the public treasury a stipulated sum should be tenants in common of certain

Page 17 U. S. 693

lands belonging to the State, in certain proportions; if a person, afterwards born, pays the stipulated sum into the treasury, is it less a contract with him than it would be with a person *in esse* at the time the act passed? We must admit that there may be future springing contracts in respect to persons not now *in esse* or we shall involve ourselves in inextricable difficulties. And if there may be, in respect to natural persons, why not also in respect to artificial persons, created by the law for the very purpose of being clothed with corporate powers? I am unable to distinguish between the case of a grant of land or of franchises to an existing corporation and a like grant to a corporation brought into life for the very purpose of receiving the grant. As soon as it is *in esse* and the franchises and property become vested and executed in it, the grant is just as much an executed contract as if its prior existence had been established for a century.

Supposing, however that in either of the views which have been suggested the charter of Dartmouth College is to be deemed a contract; we are yet met with several objections of another nature. It is, in the first place, contended that it is not a contract, within the prohibitory clause of the Constitution, because that clause was never intended to apply to mere contracts of civil institution, such as the contract of marriage, or to grants of power to State officers, or to contracts relative to their offices, or to grants of trust to be exercised for purposes merely public, where the grantees take no beneficial interest.

It is admitted that the State legislatures have

Page 17 U. S. 694

power to enlarge, repeal and limit the authorities of public officers, in their official capacities, in all cases where the constitutions of the States respectively do not prohibit them; and this, among others, for the very reason that there is no express or implied contract that they shall always, during their continuance in office, exercise such authorities. They are to exercise them only during the good pleasure of the legislature. But when the legislature makes a contract with a public officer, as in the case of a stipulated salary for his services during a limited period, this, during the limited period, is just as much a contract within the purview of the constitutional prohibition as a like contract would be between two private citizens. Will it be contended that the legislature of a State can diminish the salary of a judge holding his office during good behavior? Such an authority has never yet been asserted, to our knowledge. It may also be admitted that corporations for mere public government, such as towns, cities and counties, may in many respects be subject to legislative control. But it will hardly be contended that, even in respect to such corporations, the legislative power is so transcendent that it may, at its will, take away the private property of the corporation or change the uses of its private funds, acquired under the public faith. Can the legislature confiscate to its own use the private funds which a municipal corporation holds under its charter without any default or consent of the corporators? If a municipal corporation be capable of holding devises and legacies to charitable uses (as may municipal corporations

Page 17 U. S. 695

are), does the legislature, under our forms of limited government, possess the authority to seize upon those funds and appropriate them to other uses at its own arbitrary pleasure, against the will of the donors and donees? From the very nature of our governments, the public faith is pledged the other way, and that pledge constitutes a valid compact, and that compact is subject only to judicial inquiry, construction and abrogation. This Court have already had occasion, in other causes, to express their opinion upon this subject, and there is not the slightest inclination to retract it. *Terrett v. Taylor,* 9 Cranch 43; *Town of Pawlet v. Clark,* 9 Cranch 292.

As to the case of the contract of marriage, which the argument supposes not to be within the reach of the prohibitory clause, because it is matter of civil institution, I profess not to feel the weight of the reason assigned for the exception. In a legal sense, all contracts recognised as valid in any country may be properly said to be matters of civil institution, since they obtain their obligation and construction *jure loci contractus.* Titles to land constituting part of the public domain, acquired by grants under the provisions of existing laws by private persons, are certainly contracts of civil institution. Yet no one ever supposed that, when acquired *bona fide,* they were not beyond the reach of legislative revocation. And so, certainly, is the established doctrine of this Court. *Terret v. Taylor,* 9 Cranch 43; *Town of Pawlet v. Clark,* 9 Cranch 292. A *general* law regulating divorces from the contract of marriage, like a law regulating

Page 17 U. S. 696

remedies in other cases of breaches of contracts, is not necessarily a law impairing *the obligation of such a contract. Holmes v. Lansing,* 3 Johns.Cas. 73. It may be the only effectual mode of enforcing the obligations of the contract on both sides. A law punishing a breach of a contract, by imposing a forfeiture of the rights acquired under it, or dissolving it because the mutual obligations were no longer observed, is in no correct sense a law impairing the obligations of the contract. Could a law, compelling a specific performance, by giving a new remedy, be justly deemed an excess of legislative power? Thus far the contract of marriage has been considered with reference to general laws regulating divorces upon breaches of that contract. But if the argument means to assert that the legislative power to dissolve such a contract, without *any breach on either side, against the wishes of the parties,* and without any judicial inquiry to ascertain a breach, I certainly am not prepared to admit such a power, or that its exercise would not entrench upon the prohibition of the Constitution. If, under the faith of existing laws, a contract of marriage be duly solemnized, or a marriage settlement be made (and marriage is always in law a valuable consideration for a contract), it is not easy to perceive why a dissolution of its obligations, without any default or assent of the parties, may not as well fall within the prohibition as any other contract for a valuable consideration. A man has just as good a right to his wife as to *the property* acquired under a marriage

Page 17 U. S. 697

contract. He has a legal right to her society and her fortune, and to divest such right, without his default and against his will, would be as flagrant a violation of the principles of justice as the confiscation of his own estate. I leave this case, however, to be settled when it shall arise. I have gone into it because it was urged with great earnestness upon us, and required a reply. It is sufficient now to say that, as at present advised, the argument derived from this source does not press my mind with any new and insurmountable difficulty.

In respect also to grants and contracts, it would be far too narrow a construction of the Constitution to limit the prohibitory clause to such only where the parties take for their own private benefit. A grant to a private Trustee, for the benefit of a particular *cestui que trust* or for any special, private or public charity cannot be the less a contract because the Trustee takes nothing for his own benefit. A grant of the next presentation to a church is still a contract, although it limit the grantee to a mere right of nomination or patronage. 2 Bl.Com. 21. The fallacy of the argument consists in assuming the very ground in controversy. It is not admitted that a contract with a Trustee is, in its own nature, revocable, whether it be for special or general purposes, for public charity or particular beneficence. A private donation vested in a trustee for objects of a general nature

does not thereby become a public trust which the government may, at its pleasure, take from the Trustee, and administer

Page 17 U. S. 698

in its own way. The truth is that the government has no power to revoke a grant, *even of its own funds,* when given to a private person, or a corporation, for special uses It cannot recall its own endowments, granted to any hospital or College, or city or town, for the use of such corporations. The only authority remaining to the government is judicial, to ascertain the validity of the grant, to enforce its proper uses, to suppress frauds, and, if the uses are charitable, to secure their regular administration, through the means of equitable tribunals, in cases where there would otherwise be a failure of justice.

Another objection growing out of and connected with that which we have been considering is that no grants are within the constitutional prohibition except such as respect *property* in the strict sense of the term, that is to say, beneficial interests in lands, tenements and hereditaments, &c., which may be sold by the grantees for their own benefit, and that grants of franchises, immunities and authorities not valuable to the parties, *as property,* are excluded from its purview. No authority has been cited to sustain this distinction, and no reason is perceived to justify its adoption. There are many rights, franchises and authorities which are valuable in contemplation of law where no beneficial interest can accrue to the possessor. A grant of the next presentation to a church, limited to the grantee alone, has been already mentioned. A power of appointment, reserved in a marriage settlement, either to a party or a stranger, to appoint uses in favor of third persons, without compensation, is another instance.

Page 17 U. S. 699

A grant of lands to a Trustee, to raise portions or pay debts is, in law, a valuable grant, and conveys a legal estate. Even a power given by will to executors to sell an estate for payment of debts is, by the better opinions and authority, coupled with a trust, and capable of survivorship. [Footnote 2] Many dignities and offices existing at common law are merely honorary, and without profit, and sometimes are onerous. Yet a grant of them has never been supposed the less a contract on that account. In respect to franchises, whether corporate or not, which include a pernancy of profits, such as a right of fishery, or to hold a ferry, a market or a fair, or to erect a turnpike, bank or bridge, there is no pretence to say that grants of them are not within the Constitution. Yet they may, in point of fact, be of no exchangeable value to the owners. They may be worthless in the market. The truth, however, is that all incorporeal hereditaments, whether they be immunities, dignities, offices or franchises, or other rights, are deemed valuable in law. The owners have a legal estate and property in them, and legal remedies to support and recover them, in case of any injury, obstruction or disseisin of them. Whenever they are the subjects of a contract or grant, they are just as much within the reach of the Constitution as any other grant.

Page 17 U. S. 700

Nor is there any solid reason why a contract for the exercise of a mere authority should not be just as much guarded as a contract for the use and dominion of property. Mere naked powers which are to be exercised for the exclusive benefit of the grantor are revocable by him *for that very reason.* But it is otherwise where a power is to be exercised in aid of a right vested in the *grantee.* We all know that a power of attorney, forming a part of a security upon the assignment of a chose in action, is not revocable by the grantor. For it then sounds in contract, and is coupled with an interest. *Walsh v. Whitcomb,* 2 Esp. 565; *Bergen v. Bennett,* 1 Caines' Cases in Error 1, 15; *Raymond v. Squire,* 11 Johns. 47. So, if an estate be conveyed in trust for the grantor, the estate is irrevocable in the grantee, although he can take no beneficial interest for himself. Many of the best settled estates stand upon conveyances of this nature, and there can be no doubt that such grants are contracts within the prohibition in question.

In respect to *corporate franchises,* they are, properly speaking, legal estates, vested in the corporation itself, as soon as it is *in esse.* They are not mere naked powers granted to the corporation, but powers coupled with an interest. The property of the corporation rests upon the possession of its franchises, and whatever may be thought as to the corporators, it cannot be denied that the corporation itself has a legal interest in them. It may sue and be sued for them. Nay, more, this very right is one of its ordinary

Page 17 U. S. 701

franchises. "It is likewise a franchise," says Mr. Justice Blackstone,

"for a number of persons to be incorporated and subsist as a body politic, with power to maintain perpetual succession, and do other corporate acts, and each individual member of such corporation is also said to have a franchise or freedom."

2 Bl.Com. 37; 1 Kyd on Corp. 14, 16. In order to get rid of the legal difficulty of these franchises being considered as valuable hereditaments or property, the counsel for the defendant are driven to contend that the corporators or Trustees are mere agents of the corporation, in whom no beneficial interest subsists, and so nothing but a naked power is touched by removing them from the trust, and then to hold the corporation itself a mere ideal being, capable indeed of holding property or franchises, but having no interest in them which can be the subject of contract. Neither of these positions is admissible. The former has been already sufficiently considered, and the latter may be disposed of in a few words. The corporators are not mere agents, but have vested rights in their character as corporators. The right to be a freeman of a corporation is a valuable temporal right. It is a right of voting and acting in the corporate concerns, which the law recognises and enforces, and for a violation of which it provides a remedy. It is founded on the same basis as the right of voting in public elections; it is as sacred a right, and whatever might have been the prevalence of former doubts, since the time of Lord Holt, such a right has always been deemed a valuable franchise or privilege. *Ashby v. White,* 2 Lord Raym. 938; 1 Kyd on Corp. 16.

Page 94 U. S. 702

This reasoning, which has been thus far urged applies with full force to the case of Dartmouth College. The franchises granted by the charter were vested in the Trustees, in their corporate character. The lands and other property, subsequently acquired, were held by them in the same manner. They were the private demesnes of the corporation, held by it not, as the argument supposes, for the use and benefit of the people of New Hampshire, but, as the charter itself declares, "for the use of Dartmouth College." There were not, and in the nature of things, could not be, any other *cestui que use* entitled to claim those funds. They were, indeed, to be devoted to the promotion of piety and learning, not at large, but in that *College* and the establishments connected with it; and the mode in which the charity was to be applied, and the objects of it, were left solely to the Trustees, who were the legal Governors and administrators of it. No particular person in New Hampshire possessed a vested right in the bounty, nor could he force himself upon the Trustees as a proper object. The legislature itself could not deprive the Trustees of the corporate funds, nor annul their discretion in the application of them, nor distribute them among its its own favorites. Could the Legislature of New Hampshire have seized the land given by the State of Vermont to the corporation and appropriated it to uses distinct from those intended by the charity, against the will of the Trustees? This question cannot be answered in the affirmative until it is established that the legislature may lawfully take the property of A. and give it to B., and if it

Page 17 U. S. 703

could not take away or restrain the corporate *funds,* upon what pretence can it take away or restrain the corporate *franchises?* Without the franchises, the funds could not be used for corporate purposes, but without the funds, the possession of the franchises might still be of inestimable value to the College, and to the cause of religion and learning.

Thus far, the rights of the corporation itself in respect to its property and franchises have been more immediately considered. But there are other rights and privileges, belonging to the Trustees collectively and severally, which are deserving of notice. They are intrusted with the exclusive power to manage the funds, to choose the officers, and to regulate the corporate concerns according to their own discretion. The *jus patronatus* is vested in them. The visitatorial power, in its most enlarged extent, also belongs to them. When this power devolves upon the founder of a charity, it is an hereditament, descendible in perpetuity to his heirs, and in default of heirs, it escheats to the government. *Rex v. St. Catherine's Hall,* 4 T.R. 233. It is a valuable right, founded in property, as much so as the right of patronage in any other case. It is a right which partakes of a judicial nature. May not the founder as justly contract for the possession of this right, in return for his endowment, as for any other equivalent? and if, instead of holding it as an hereditament, he assigns it in perpetuity to the Trustees of the corporation, is it less a valuable hereditament in their hands? The right is not merely a collective right in all the Trustees,

Page 17 U. S. 704

each of them also has a franchise in it. Lord Holt says,

"it is agreeable to reason and the rules of law that a franchise should be vested in the corporation aggregate, and yet the benefit redound to the particular members and be enjoyed by them in their private capacities. Where the privilege of election is used by particular persons, it is a particular right vested in each particular man."

*Ashby v. White,* 2 Lord Raym. 938, 952; *Attorney General v. Dixie,* 13 Ves. 519. Each of the Trustees had a right to vote in all elections. If obstructed in the exercise of it, the law furnished him with an adequate recompense in damages. If ousted unlawfully from his office, the law would, by a mandamus, compel a restoration.

It is attempted, however, to establish that the Trustees have no interest in the corporate franchises, because it is said that they may be witnesses in a suit brought against the corporation. The case cited at the bar certainly goes the length of asserting that, in a suit brought against a charitable corporation for a recompence for services performed for the corporation, the Governors, constituting the corporation (but whether intrusted with its funds or not by the act of incorporation does not appear), are competent witnesses against the plaintiff. *Weller v. Governor of the Foundling Hospital,* 1 Peake's N.P.Rep. 153. But assuming this case to have been rightly decided (as to which, upon the authorities, there may be room to doubt), the corporators

Page 17 U. S. 705

being technically parties to the record, *Attorney General v. City of London,* 3 Bro.Ch.C. 171; S. C. 1 Ves.Jun. 243; *Burton v. Hinde,* 5 T.R. 174, *Nason v. Thatcher,* 7 Mass.Rep. 398; Phillips on Evid. 42, 52, 57 and notes; 1 Kyd on Corp. 304, &c.; Highmore on Mortm. 514, it does not establish that, in a suit for the corporate property vested in the Trustees in their corporate capacity, the Trustees are competent witnesses. At all events, it does not establish that, in a suit for the corporate franchises to be exercised by the Trustees, or to enforce their visitatorial power, the Trustees would be competent witnesses. On a mandamus to restore a Trustee to his corporate or visitatorial power, it will not be contended that the Trustee is himself a competent witness to establish his own rights or the corporate rights. Yet why not, if the law deems that a Trustee has no interest in the franchise? The test of interest assumed in the argument proves nothing in this case. It is not enough to establish that the Trustees are sometimes competent witnesses; it is necessary to show that they are always so in respect to the corporate franchises and their own. It will not be pretended that, in a suit for damages for obstruction in the exercise of his official powers, a Trustee is a disinterested witness. Such an obstruction is not a *damnum absque injuria.* Each Trustee has a vested right, and legal interest, in his office, and it cannot be divested but by due course of law. The illustration, therefore, lends no new force to the argument, for it does not establish that, when their own rights

Page 17 U. S. 706

are in controversy, the Trustees have no legal interest in their offices.

The principal objections having been thus answered, satisfactorily, at least, to my own mind, it remains only to declare that my opinion, after the most mature deliberation, is that the charter of Dartmouth College, granted in 1969, is a contract within the purview of the constitutional prohibition.

I might now proceed to the discussion of the second question, but it is necessary previously to dispose of a doctrine which has been very seriously urged at the bar, *viz.,* that the charter of Dartmouth College was dissolved at the Revolution, and is therefore a mere nullity. A case before Lord Thurlow has been cited in support of this doctrine. *Attorney General v. City of London,* 3 Bro.Ch.C. 171; S. C. 1 Ves.Jun. 243. The principal question in that case was whether the corporation of William & Mary College, in Virginia (which had received its charter from King William and Queen Mary) should still be permitted to administer the charity under Mr. Boyle's will, no interest having passed to the College under the will, but it acting as an agent or trustee under a decree in chancery, or whether a new scheme for the administration of the charity should be laid before the Court. Lord Thurlow directed a new scheme because the College, belonging to an independent government, was no longer within the reach of the Court. And he very unnecessarily added that he could not now consider the College as a corporation, or, as another report, 1 Ves.Jun. 243, states,

Page 17 U. S. 707

that he could not take notice of it, as a corporation, it not having proved its existence, as a corporation, at all. If, by this, Lord Thurlow meant to declare that all charters acquired in America from the Crown, were destroyed by the Revolution, his doctrine is not law, and if it had been true, it would equally apply to all other grants from the Crown, which would be monstrous. It is a principle of the common law which has been recognised as well in this as in other Courts that the division of an empire works no forfeiture of previously vested rights of property. And this maxim is equally consonant with the common sense of mankind and the maxims of eternal justice. *13 U. S. 50;* Kelly v. Harrison, *5 Johns.Cas. 29;* Jackson v. Lunn, *3 Johns.Cas.. 109;* Calvin's Case,@ 7 Co. 27. This objection therefore may be safely dismissed without further comment.

The remaining inquiry is whether the acts of the Legislature of New Hampshire now in question, or any of them, impair the obligations of the charter of Dartmouth College. The attempt certainly is to force upon the corporation a new charter, against the will of the corporators. Nothing seems better settled at the common law than the doctrine that the Crown cannot force upon a private corporation a new charter, or compel the old members to give up their own franchises, or to admit new members into the corporation. *Rex v. Vice-Chancellor of Cambridge,* 3 Burr. 1656; *Rex v. Pasmore,* 3 T.R. 240; 1 Kyd on Corp. 65; *Rex v. Larwood,* Comb. 316. Neither can the Crown compel a man

Page 17 U. S. 708

to become a member of such corporation against his will. *Rex v. Dr. Askew,* 4 Burr. 2200. As little has it been supposed that, under our limited governments, the legislature possessed such transcendent authority. On one occasion, a very able court held that the State legislature had no authority to compel a person to become a member of a mere private corporation, created for the promotion of a private enterprise, because every man had a right to refuse a grant. *Ellis v. Marshall,* 2 Mass.Rep. 269. On another occasion, the same learned Court declared that they were all satisfied that the rights legally vested in a corporation cannot be controlled or destroyed by any subsequent statute unless *a power for that purpose be reserved to the legislature in the act of incorporation. Wales v. Stetson,* 2 Mass.Rep. 143, 146. These principles are so consonant with justice, sound policy, and legal reasoning that it is difficult to resist the impression of their perfect correctness. The application of them, however, does not, from our limited authority, properly belong to the appellate jurisdiction of this Court in this case.

A very summary examination of the acts of New Hampshire will abundantly show that, in many material respects, they change the charter of Dartmouth College. The Act of the 27th of June, 1816, declares that the corporation known by the name of the Trustees of Dartmouth College shall be called the Trustees of Dartmouth University. That the whole number of Trustees shall be *twenty-one,* a majority

Page 17 U. S. 709

of whom shall form a quorum, that they and their successors shall hold, use, and enjoy forever all the powers, authorities, rights, property, liberties, privileges and immunities, heretofore held, &c., by the Trustees of Dartmouth College, except where the act otherwise provides; that they shall also have power to determine the times and places of their meetings, and manner of notifying the same; to organize Colleges in the University; to establish an institute and elect fellows and members thereof; to appoint and displace officers and determine their duties and compensation; to delegate the power of supplying vacancies in any of the offices of the University for a limited term; to pass ordinances for the government of the students; to prescribe the course of education; and to arrange, invest and employ the funds of the University. The act then provides for the appointment of a Board of twenty-five overseers, fifteen of whom shall form a quorum, of whom five are to be such ex officio, and the residue of the Overseers, as well as the new Trustees, are to be appointed by the Governor and Council. The Board of Overseers are, among other things, to have power, "to *inspect and confirm,* or *disapprove and negative,* such votes and proceedings of the Board of Trustees as shall relate to the appointment and removal of President, professors, and other permanent officers of the University, and determine their salaries; to the establishment of Colleges and professorships, and the erection of new College buildings." The act then provides that the President and professors shall be *nominated* by the *Trustees,* and *appointed* by the *Overseers,*

Page 17 U. S. 710

and shall be liable to be suspended and removed in the same manner, and that *each of the two Boards of Trustees and Overseers shall have power to suspend and remove any member of their respective Boards.* The Supplementary Act of the 18th of December, 1816, declares that *nine* Trustees shall form a quorum, and that *six* votes at least shall be necessary for the passage of any act or resolution. The Act of the 26th of

December, 1816, contains other provisions not very material to the question before us.

From this short analysis, it is apparent that, in substance, a new corporation is created, including the old corporators, with new powers, and subject to a new control, or that the old corporation is newly organized and enlarged, and placed under an authority hitherto unknown to it. The Board of Trustees are increased from twelve to twenty-one. The College becomes a University. The property vested in the old Trustees is transferred to the new Board of Trustees, in their corporate capacities. The quorum is no longer *seven*, but *nine*. The old Trustees have no longer the sole right to perpetuate their succession by electing other Trustees, but the *nine* new Trustees are, in the first instance, to be appointed by the Governor and Council, and the new Board are then to elect other Trustees from time to time, as vacancies occur. The new Board, too, have the power to suspend or remove any member, so that a *minority* of the old Board, cooperating with the new Trustees, possess the unlimited power to remove the *majority* of the *old* Board. The powers, too, of the corporation are varied. It has authority to organize new Colleges in

Page 17 U. S. 711

"the University, and to establish an institute, and elect fellows and members thereof." A Board of Overseers is created (a board utterly unknown to the old charter), and is invested with a general supervision and negative upon all the most important acts and proceedings of the Trustees. And to give complete effect to this new authority, instead of the right to appoint, the trustees are, in future, only to nominate, and the Overseers are to approve, the President and professors of the University.

If these are not essential changes, impairing the rights and authorities of the Trustees and vitally affecting the interests and organization of Dartmouth College under its old charter, it is difficult to conceive what acts, short of an unconditional repeal of the charter, could have that effect. If a grant of land or franchises be made to A., in trust for special purposes, can the grant be revoked, and a new grant thereof be made to A., B. and C., in trust for the same purposes, without violating the obligation of the first grant? If property be vested by grant in A. and B., for the use of a College, or an hospital, of private foundation, is not the obligation of that grant impaired when the estate is taken from their exclusive management and vested in them in common with ten other persons? If a power of appointment be given to A. and B., is it no violation of their right to annul the appointment unless it be assented to by five other persons, and then confirmed by a distinct body? If a bank or insurance company, by the terms of its charter, be under the management of directors, elected by the stockholders, would not the

Page 17 U. S. 712

rights acquired by the charter be impaired if the legislature should take the right of election from the stockholders and appoint directors unconnected with the corporation? These questions carry their own answers along with them. The common sense of mankind will teach us that all these cases would be direct infringements of the legal obligations of the grants to which they refer, and yet they are, with no essential distinction, the same as the case now at the bar.

In my judgment, it is perfectly clear that any act of a legislature which takes away any powers or franchises vested by its charter in a private corporation, or its corporate officers, or which restrains or controls the legitimate exercise of them, or transfers them to other persons without its assent is a violation of the obligations of that charter. If the legislature mean to claim such an authority, it must be reserved in the grant. The charter of Dartmouth College contains no such reservation, and I am therefore bound to declare that the acts of the Legislature of New Hampshire now in question do impair the obligations of that charter, and are consequently unconstitutional and void.

In pronouncing this judgment, it has not for one moment escaped me how delicate, difficult, and ungracious is the task devolved upon us. The predicament in which this Court stands in relation to the nation at large is full of perplexities and embarrassments. It is called to decide on causes between citizens of different States, between a State and its citizens, and between different States. It stands, therefore, in the midst of

Page 17 U. S. 713

jealousies and rivalries of conflicting parties with the most momentous interests confided to its care. Under such circumstances, it never can have a motive to do more than its duty, and I trust it will always be found to possess firmness enough to do that.

Under these impressions, I have pondered on the case before us with the most anxious deliberation. I entertain great respect for the Legislature whose acts are in question. I entertain no less respect for the enlightened tribunal whose decision we are called upon to review. In the examination, I have endeavored to keep my steps *super antiquas vias* of the law, under the guidance of authority and principle. It is not for judges to listen to the voice of persuasive eloquence or popular appeal. We have nothing to do, but to pronounce the law as we find it, and, having done this, our justification must be left to the impartial judgment of our country.

Page 17 U. S. 714

[Footnote 1]

2 Fonb.Eq., b. 2, pt. 2, ch. 1, s. 1, note (a). Coop.Eq.Pl. 292; 2 Kyd on Corp. 195; *Green v. Rutherforth*, 1 Ves. 462; *Attorney General v. Foundling Hospital*, 4 Bro. Ch. 165; S. C. 2 Ves.Jun. 42; *Eden v. Foster*, 2 P.W. 325; 1 Wooddes. 476; *Attorney General v. Price*, 3 Atk. 108; *Attorney General v. Lock*, 3 Atk. 164; *Attorney General v. Dixie*, 13 Ves. 519; *Ex parte Kirby Ravensworth Hospital*, 15 Ves. 304, 314; *Attorney General v. Earl of Clarendon*, 17 Ves. 491, 499; *Berkhamstead Free School*, 2 Ves. & Beames 134; *Attorney General v. Corporation of Carmarthen*, Coop.Rep. 30; *Mayor, &c. of Colchester v. Lowten*, 1 Ves. & Beames 226; *Rex v. Watson*, 2 T.R. 199; *Attorney General v. Utica Ins. Co.*, 2 Johns.Ch. 371; *Attorney General v. Middleton*, 2 Ves. 327.

[Footnote 2]

Co.Litt. 113a; Harg. & Butler's note 2; Sugden on Powers 140; *Jackson v. Jansen*, 6 Johns. 73; *Franklin v. Osgood*, 2 Johns.Cas. 1; S. C. 14 Johns.Rep. 527; *Zebach v. Smith*, 3 Binn. 69; *Lessee of Moody v. Vandyke*, 4 Binn. 7, 31; *Attorney General v. Gley*, 1 Atk. 356; 1 Bac.Abr. 586 (Gwill. edit.).

DUVALL, Justice, dissented.

Upon the suggestion of the plaintiff's counsel that the defendant had died since the last term, the Court ordered the judgment to be entered *nunc pro tunc* as of that term, as follows:

JUDGMENT. -- This cause came on to be heard on the transcript of the record, and was argued by counsel. And thereupon, all and singular the premises being seen, and by the Court now here fully understood, and mature deliberation being thereupon had,

Page 17 U. S. 715

it appears to this Court that the said acts of the Legislature of New Hampshire of the 27th of June and of the 18th and 26th of December, Anno Domini 1816, in the record mentioned, are repugnant to the Constitution of the United States, and so not valid, and therefore that the said Superior Court of Judicature of the State of New Hampshire erred in rendering judgment on the said special verdict in favor of the said plaintiffs, and that the said Court ought to have rendered judgment thereon that the said Trustees recover against the said Woodward the amount of damages found and assessed in and by the verdict aforesaid, *viz.*, the sum of $20,000. Whereupon, it is considered, ordered and adjudged by this Court now here that the aforesaid judgment of the said Superior Court of judicature of the State of New Hampshire be, and the same hereby is, reversed and annulled. And this Court proceeding to render such judgment in the premises as the said Superior Court of judicature ought to have rendered, it is further considered by this Court now here that the said Trustees of Dartmouth College do recover against the said William Woodward the aforesaid sum of $20,000, with costs of suit, and it is by this Court now here further ordered that a special mandate do go from this Court to the said Superior Court of Judicature to carry this judgment into execution.

Google    [ Search Cases ]

US Supreme Court Cases | by Volume | by Year    Oyez Supreme Court Multimedia | Dog Law | US Laws | US Federal Court Appeals Opinions
Blawgs.FM Constitutional Law PodCasts | BlawgSearch.com Constitutional Law Blogs | Lawyer and Legal Aid & Services Directory

Copyright © Justia & Oyez & Forms WorkFlow :: Terms of Service :: Privacy Policy :: Have a Happy Day!